IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 21-1784 (WCB) (SRF) |
| TOLMAR, INC., | ) ) ) | |
| Defendant. | ) | |

**JANSSEN'S OPENING STATEMENT**

I. **INTRODUCTION**

This is a Hatch-Waxman case involving Janssen's U.S. Patent No. 9,439,906 (the "'906 patent") (JTX-1). The '906 patent is directed to novel dosing regimens that utilize long-acting injectable ("LAI") paliperidone palmitate formulations to treat psychotic disorders, the most common of which is schizophrenia. Although LAI paliperidone palmitate formulations were known to have the potential to provide *sustained* efficacy, the claimed dosing regimen achieved a novel clinical result by using a specific combination of dose amounts, dosing schedule and injection sites, to also provide *rapid* efficacy with an LAI formulation. For this patient population, where there are tremendous barriers to patient adherence to any prescribed medication regimen, that is very significant. The Janssen inventors, seeing an unmet need for a rapid-onset LAI, challenged conventional wisdom by developing a unique high-dose loading dose regimen for paliperidone palmitate. It took over twelve years of research, clinical study, and modeling and simulation work to perfect the formulation and develop a dosing regimen that offered this important clinical benefit.

With hindsight, Tolmar will contend this was all routine. The evidence will show that is

far from the truth. After nearly ten years of research and development, Janssen developed a large proprietary body of knowledge about paliperidone palmitate that it used to design a dosing regimen that succeeded in a Phase II clinical trial. But to the shock and dismay of Janssen's scientists, a series of Phase III clinical trials, testing this dosing regimen in a larger patient population, failed. Under immense pressure, the inventors undertook a concerted effort to understand and overcome these surprising failures. This effort led the inventors to rethink their approach and ultimately arrive at the claimed dosing regimen. The claimed dosing regimen was established as successful in a second series of Phase III clinical trials, paving the way for the approval of Invega Sustenna®, a groundbreaking therapy that solved a significant adherence challenge facing this fragile patient population. Invega Sustenna was first marketed in the U.S. in 2009 and sales in the U.S. alone exceed $1.5 billion dollars per year.

Stipulations on infringement have been entered. Trial will only address Tolmar's challenges to the validity of the '906 patent. Tolmar's primary validity challenge, obviousness, fails to grapple with the reality of the art, as reflected in the patent, the history of the invention, and Janssen's expert testimony. Tolmar essentially argues that a person of ordinary skill in the art ("POSA") would have stumbled upon the claimed invention by mixing and matching certain disclosures concerning paliperidone palmitate that Janssen published before the filing date of the '906 patent. But nothing in the prior art revealed the critical modifications to the prior-art dosing regimens that brought Janssen from failure to success. Nor would anything in the prior art have pointed a POSA in the direction of the claimed dosing regimen.

To the contrary, the references Tolmar's experts have identified as the closest prior art— the disputed October 2007 Kramer document ("Kramer") (JTX-36) and the NCT00210548 ClinicalTrials.gov protocol summary ("NCT 548") (JTX-23)—disclose the dosing regimens that

failed in Phase III trials and prompted Janssen's inventors to go back to the drawing board. The evidence at trial will demonstrate that the claimed invention is an unexpected and counterintuitive solution to an unrecognized and unsolved problem in a highly unpredictable art. Tolmar's effort to belittle Janssen's innovation is not credible.

## II.     THE INVENTIONS OF THE '906 PATENT

The dosing regimens claimed in the '906 patent recite a specific combination of dose amounts, dosing schedule and injection sites, which provide *rapid* as well as *sustained* efficacy with a LAI paliperidone palmitate formulation.

### A.     The Need for the Invention

As Janssen's psychiatrist expert, Dr. Christian Kohler, will explain, the invention of the '906 patent fulfilled a long-felt and unmet need. Patients with psychotic disorders are challenging to treat, due in large part to difficulties in ensuring patient adherence to treatment regimens. The symptoms associated with psychotic disorders often interfere with the patient's perception of reality, inhibiting the patient's ability to seek treatment and adhere to treatment regimens. Side-effects of the antipsychotics further decrease adherence; psychotic patients who have experienced medication side-effects are much less willing to continue treatment. Non-adherence leads to relapse, which carries risks of decreased treatment response, long-term cognitive impairment, and functional decline. And these risks are cumulative; with each successive relapse, the brain pays a permanent price. Adherence is especially challenging when patients are prescribed oral antipsychotics, which need to be self-administered on a daily basis in accordance with physician instructions. If a patient forgets (or refuses) to take their oral medication, the symptoms associated with psychotic disorders can escalate very quickly.

Prior to the inventions of the '906 patent, there were few LAI antipsychotics available, and

those available had significant drawbacks that limited their ability to meaningfully address adherence challenges. The first-generation options, namely haloperidol decanoate and fluphenazine decanoate, had a higher risk of debilitating side effects, and required stabilizing patients on oral counterparts (oral run-in) before they could be transitioned to the LAI. The only second-generation LAI on the market, Risperdal Consta, requires administration every two weeks, and requires three weeks of oral supplementation at the beginning of treatment because there is a lag time before plasma concentrations of the drug reach levels of therapeutic efficacy, meaning that the patient has to take oral medication for an extended period of time after starting therapy with the LAI. Oral run-in and oral supplementation mean that patient adherence is mandatory for the therapies to be effective, and this patient population is far from reliable for reasons beyond their own control.

   B. <u>The Development of the Formulation and the Prior-Art Dosing Regimens</u>

Janssen will present three witnesses to testify on the work leading to the inventions claimed in the '906 patent: two inventors (Dr. An Vermeulen and Dr. Mahesh Samtani) and a Janssen clinical psychiatrist and former clinical leader for the Invega Sustenna development team (Dr. David Hough). These witnesses will testify that the path to the invention of the claimed dosing regimen was long, arduous, and far from straightforward. As the testimony and documentary record will show, Janssen's principal goal in developing Invega Sustenna was to solve the problems with these pre-existing treatments and fulfill the unmet need for a LAI antipsychotic that could achieve both rapid and sustained efficacy, without the need for oral supplementation or oral-run-in.

In 1998, prior to developing the claimed dosing regimen, Janssen filed for a patent claiming paliperidone palmitate formulations having specific attributes associated with long term efficacy;

4

that issued as U.S. Patent No. 6,555,544, the "'544 patent" (one of the references Tolmar's experts rely on in their obviousness analysis) (JTX-20). The formulations in the '544 patent are described as effective for three weeks to a month, and the '544 patent taught that certain particle sizes of paliperidone palmitate should be pursued for this long-acting effect. There is nothing in the '544 patent that indicates either that the long-acting formulations could be dosed more frequently than every three weeks, or that it could achieve rapid efficacy. Nor does the '544 patent provide any clinical data about the pharmacokinetics or efficacy of paliperidone palmitate in any human dosing regimen.

After filing the application that led to the '544 patent, and in connection with developing the claimed dosing regimen, Janssen discovered the optimal particle size for a formulation that would still provide long-term efficacy, but could also provide rapid efficacy if given in two quick doses, about a week apart. As Janssen's pharmaceutical expert Dr. Patrick Sinko will explain, the specific particle size requirements of claims 17-21 of the '906 patent are not obvious. The '544 patent disclosed an upper limit to a particle size distribution but contained experimental examples that a POSA would have understood to teach away from the median particle size range that is optimal and claimed in claims 17-21 of the '906 patent (an average particle size (d50) of about 1600 to 900 nm). And there is nothing in the prior art relied on by Tolmar's experts that would have guided a POSA to the claimed particle size range.

But the '906 patent is not primarily about paliperidone palmitate formulations. Janssen's inventors were part of a multi-disciplinary research and development team consisting of experts in pharmacokinetics and pharmacodynamics, clinical pharmacology, and psychiatry, assembled for the purpose of developing dosing regimens for paliperidone palmitate formulations. After multiple dosing scenarios were evaluated through Phase I studies, Janssen arrived at what it hoped would

5

be appropriate dosing regimens. These regimens consisted of administering a *fixed* dose (meaning every injection was the same dose) of paliperidone palmitate into the *gluteal* muscle on days 1, 8, and 36 of treatment. A Phase II study, reported in Kramer (whose prior art status is disputed[1]), suggested that such a fixed-dose regimen for doses of 50 or 100 mg-eq. of paliperidone palmitate would achieve the development goals of rapid and sustained efficacy while avoiding the need for oral supplementation. Buoyed by these results, Janssen initiated three Phase III trials of fixed-dose, gluteal regimens.

### C. The Inventors Overcome an Unforeseen Crisis to Develop the Claimed Dosing Regimen

To Janssen's dismay, these Phase III studies were failures. They revealed a treatment-by-country interaction, with U.S. subjects showing no statistically significant improvement over placebo at any dose. This meant that a paliperidone palmitate drug product was unlikely to be approved in the United States based on these results. Furthermore, the studies failed to establish rapid efficacy, indicating that the dosing regimens could not fulfill this critical clinical need. Importantly, none of the results from these Phase III trials are in the prior art. The only prior-art disclosure of the trials is NCT 548, which is a two-page summary of a clinical trial *protocol* for one of the Phase III trials. NCT 548 discloses only that Janssen was testing three separate fixed-dose, gluteal injected dosing regimens for paliperidone palmitate.

In the real world, the need to modify the regimens disclosed in NCT 548 was completely unexpected. The non-prior-art Phase III results provoked a "crisis" at Janssen. Janssen convened

---

[1] As the Court has already found as a matter of law, Kramer is not § 102(a) prior art because the invention was reduced to practice before Kramer's alleged presentation in October 2007. It remains to be tried whether Kramer qualifies as § 102(b) prior art. To establish this, Tolmar will have to show both that (1) the '906 patent is not entitled to the benefit of the December 19, 2007 provisional application, and (2) what specific contents of the Kramer document were actually "published" in circumstances that meet the requirements of § 102(b). Tolmar cannot make these showings.

a task force that worked intensively for months to understand what had gone wrong and to identify a solution.  After extensive analysis and sophisticated population-pharmacokinetic modeling of thousands of patient-level clinical data (none of which is prior art), the inventors determined that, to ensure rapid and sustained therapeutic effect, it was necessary to do two things: (1) abandon the fixed-dose concept and require a specific loading dose strategy comprising a first loading dose of 150 mg-eq. of paliperidone palmitate on the first day of treatment, followed by a second loading dose of 100 mg-eq. a week (±2 days) later; and (2) require the two loading dose injections to be administered in the deltoid muscle.  Notably, the specific doses of the loading dose regimen uniformly apply regardless of the dose that turns out to be appropriate for maintenance.  And the requirement for deltoid injections was based on the inventors discovering, counterintuitively, that it was not only safe, but also necessary to administer these specific loading dose injections into the deltoid muscle to achieve rapid efficacy.

Before the invention of the claimed dosing regimens, LAI antipsychotics were generally administered into the gluteal muscle, a large muscle that could accommodate the amount of drug required for once-monthly treatment.  Indeed, prior art taught that deltoid injections should be avoided because administering large injections in that muscle is very painful.  But the inventors discovered, through clinical research and population pharmacokinetic modeling not in the prior art, that deltoid administration of paliperidone palmitate led to faster absorption, which in turn, led to a faster therapeutic effect.  As the trial evidence will show, this latter insight was unpredictable and unexpected to a skilled artisan; the injection site effect for paliperidone palmitate would not have been obvious.

In fact, it was not even immediately apparent to the inventors that this unexpected absorption-effect with deltoid injections was a desirable attribute for a powerful antipsychotic drug

7

with the potential for serious side effects. To the contrary, the insight initially led Janssen to avoid dosing into the deltoid injection site. It was not until after the unforeseen failure of the Phase III trials that the inventors recognized that deltoid injections could be a solution to the deficiencies of the prior-art dosing regimens.

Based on the sophisticated pharmacokinetic modeling of Dr. Vermeulen and Dr. Samtani, the inventors designed new Phase III clinical trials to test the dosing regimens later embodied in the claims of the '906 patent. These trials were highly successful, achieving rapid and sustained efficacy, and they did so without the need for oral supplementation or oral run-in. The revised trials led to the approval of Invega Sustenna, whose instructions for use practice the claimed dosing regimen, and do not call for oral supplementation or run-in.

This history is reflected in the specification of the '906 patent, which reports that "after the data was analyzed from the clinical trials" it "was discovered that the absorption of paliperidone" was "far more complex than was originally anticipated." '906 patent (JTX-1), col. 1:64-67. The '906 patent notes that it was "also discovered that deltoid injections result in a faster rise in initial plasma concentration, facilitating a rapid attainment of potential therapeutic concentrations." *Id.* at 5:2-8. These insights led directly to the dosing regimen claimed in the patent.

## III. TOLMAR'S OBVIOUSNESS CHALLENGE FAILS

Tolmar's invalidity challenges may be superficially appealing, but in fact reflect nothing more than Monday-morning quarterbacking. Tolmar has disclosed three experts for its case-in-chief on obviousness: a clinical pharmacologist, Dr. Coles; a psychiatrist, Dr. Dizon; and a formulation expert, Dr. Havel. None of these experts have offered a cogent account of how the prior art would have pointed a POSA to the dosing regimen Janssen discovered after the prior-art regimens failed. Indeed, none of them has even attempted to do so. Instead, Tolmar contends, in

8

effect, that a POSA could have arrived at the claimed dosing regimen through trial and error, mixing and matching combinations of multiple variables with the intent to optimize the dosing regimen. But the evidence will not support the premise that a POSA would have, or could have, taken this approach in developing an antipsychotic dosing regimen. The evidence at trial will show that nothing in the prior art would have provided a reason to reject the fixed-dose, gluteal-injected prior-art dosing regimens, let alone to modify them in the specific ways necessary to achieve the claimed dosing regimen. The evidence will also show that the effects of different dosing parameters for paliperidone palmitate—an experimental drug with little or no prior-art clinical data—were entirely unpredictable, and that the claimed dosing regimen could not have been arrived at by guessing.

### A. The Primary Dosing Regimen Claims

Tolmar's obviousness challenge to the primary dosing regimen claims (claims 1-7 and 15) is based on a mishmash of theories. Tolmar begins with a traditional motivation-to-combine analysis based on two primary references, the disputed Kramer document and NCT 548. As the Court will recall from summary judgment briefing, Kramer reports the results of the only Phase II clinical study Janssen conducted to compare the efficacy and tolerability paliperidone palmitate to placebo. It tests two different doses—50 mg-eq. and 100 mg-eq. of paliperidone palmitate—in a *fixed*-dose regimen, with equal doses injected into the *gluteal* muscle on days 1, 8 and 36. The second primary reference relied upon by Tolmar's experts, NCT 548, describes Janssen's *plans* to test the efficacy of *fixed*-dose regimens of 150, 100, and 50 mg-eq. in the *gluteal* muscle on days 1, 8, 36 and 64 against placebo in a Phase III clinical trial. The results of this trial are not reported in the prior art; NCT 548 is just a two-page summary of the clinical protocol, as disclosed on

9

ClinicalTrials.gov. There is no combination of these references that would have guided a POSA to the claimed dosing regimen. Quite the contrary.

### 1. Tolmar Cannot Establish a Motivation to Arrive at the Claimed Dosing Regimen with a Reasonable Expectation of Success

NCT 548—a two-page clinical trial protocol summary—contained no results, conclusions, or data about the fixed-dose, gluteal injected regimens to be studied. According to Tolmar's experts, there is no suggestion in the prior art that any of NCT 548's dosing regimens would fail. What then would have motivated a POSA to modify the NCT 548's dosing regimens? As the history of the invention shows, the impetus to modify the prior-art dosing regimens and arrive at the claimed invention came from proprietary—and unexpected—Janssen data and the extraordinarily skillful analysis of that data by Janssen's inventors. That was not disclosed in the prior art, and leaves Tolmar's experts suggesting a hindsight-driven motivation to combine this with other prior art or to modify the dosing regimens based on the general knowledge and ambition of a POSA.

Kramer similarly fails to provide motivation to modify any dosing regimen in the prior art. Kramer reports that both the 50 and the 100 mg-eq. doses administered on days 1, 8, and 36 in the gluteal muscle led to statistically significant efficacy improvements over placebo, from day 8 onward. With overlapping error bars, the results showed that there was no significant difference between the efficacy of the 50 mg-eq. dose and the 100 mg-eq. dose. This would have suggested to a POSA, as it did to Janssen, that no modifications to the fixed-dose gluteal dosing regimens were needed. As Drs. Kohler and Sinko will explain, a POSA reviewing Kramer would therefore not have seen any reason to deviate from the gluteal injection site, much less reason to increase any of the doses or abandon the fixed dose concept. To the extent Kramer provides any directional guidance for "optimizing" its dosing regimens, it points away from the claimed invention. As Dr.

Kohler and Dr. Sinko will explain, Kramer reports that the 100 mg-eq. dose was associated with some clinically significant side effects not seen with the 50 mg-eq. dose. That would have dissuaded a POSA from increasing the first dose.

Indeed, as the trial evidence will show, the conventional wisdom for antipsychotic treatment at the time was to "start low and go slow," *i.e.*, start with a low dose and titrate upwards very slowly. JTX-230, at 3. The reason why this conventional wisdom pervaded the field was because of the potentially severe and clinically significant dose-dependent side effects that antipsychotics tend to provoke: extrapyramidal symptoms (EPS). These side-effects—including facial tics, Parkinsonism, muscle spasms, and motor restlessness—are uncomfortable, prominent, and stigmatizing. As a result, as Dr. Kohler will explain, the onset of EPS is clinically significant for the long-term prognosis of a patient with schizophrenia. Indeed, as prior art guidance instructs, "[e]xtrapyramidal side-effects from antipsychotic treatment should be avoided in order to encourage future adherence to medication." *Id.*

Nothing in Kramer, or anywhere else in the prior art, would have suggested to a POSA that the fixed-dose, gluteal injection approach needed to be rejected, let alone suggested that it should be modified in the specific ways to achieve the claimed dosing regimen. There was no reason for a POSA to abandon the fixed-dose concept of Kramer and NCT 548 in favor of the claimed dosing regimens with a specific sequence of 150 mg-eq. and 100 mg-eq. loading doses in the deltoid that are independent of the maintenance doses. With proprietary data, the inventors were able to make use of this particular dose combination together with the unexpected fast-absorption-effect of deltoid, without regard to maintenance dosing, because they discovered that high doses of paliperidone palmitate unexpectedly resulted in a lower-than-expected exposure. But the prior art did not teach this. Moreover, for various reasons, including the pain associated with this type of

11

injection, the prior art taught to avoid deltoid muscle for large injections. There was no suggestion whatsoever that this should, much less must, be changed to require that certain injections are administered into the deltoid muscle.

Tolmar's experts, Drs. Coles and Dizon, have disclosed opinions to the effect that the data in Kramer would have motivated a POSA to increase the first dose of the fixed 100 mg-eq. regimen to a higher dose, *i.e.*, 150 mg-eq. But, as Dr. Kohler and Dr. Sinko will explain, and as cross-examination will reveal, Tolmar's experts rely on isolated pieces of unreliable data from Kramer and ignore Kramer's overall teachings and what a POSA developing a dosing regimen for patients with psychotic disorders would take from them. Based on the data in Kramer, raising the first dose from a 100 mg-eq. dose to a 150 mg-eq. dose would not have been considered necessary for efficacy, would have been contrary to conventional wisdom of using the lowest effective dose for LAI antipsychotics, and would have raised clinically significant safety concerns. As the relationship between blood levels and efficacy was uncertain—and the efficacy for the 100 mg-eq. and 50 mg-eq. doses was strong—the prior art gave no reason to increase the dose to improve efficacy. In contrast, there were robust reasons to expect that increasing the dose amount would increase side effects.

### 2. Tolmar's "Obvious to Try" and "Routine Optimization" Theories

Confronted with the flaws in their motivation-to-combine analysis, Tolmar's experts have tried to pivot to something akin to an "obvious to try" or "routine optimization" theory. Tolmar's pharmacokineticist, Dr. Coles, is expected to testify that a POSA could simply have mixed and matched a finite number of dosing amounts and injection sites from Kramer, NCT 548, and the knowledge of a POSA, to arrive at the claimed dosing regimen through trial and error. But the evidence at trial will show that a POSA would not have found any design or market need to solve

12

any particular problem in Kramer or NCT 548, because no such problem was apparent in these prior-art dosing regimens. Indeed, the inventors themselves, with all the information in the prior art *and more*, only identified a problem with the fixed-dose gluteal dosing regimens they were studying after seeing the unexpectedly poor results of the NCT 548 trial—results *not* in the prior art. And even if a POSA somehow knew that the prior art dosing regimens needed improvement, the evidence at trial will show that, in light of the unpredictable nature of paliperidone palmitate pharmacokinetics and clinical science in general, a POSA would not have predicted that administering 150 mg-eq., in the deltoid, followed about a week later by 100 mg-eq. in the deltoid, would have provided rapid efficacy in a clinically safe way for patients in need of treatment for psychotic disorders. Indeed, the notion of using paliperidone palmitate, and LAI antipsychotics in general, to tackle rapid and safe efficacy for this population was still in the early exploratory phase. As the trial evidence will show, nothing in the prior art would have pointed to the claimed two-dose sequence of site-specific, unequal loading doses that are independent of maintenance dosing. Without guidance and direction from the prior art as to how to achieve those goals, the claimed dosing regimen would not have been obvious to a POSA.

As the '906 patent teaches, the inventors "discovered that the absorption of paliperidone" was "far more complex than was originally anticipated," '906 patent, col. 1:64-67—a statement that is amply corroborated by the factual record. The complex, unpredictable nature of paliperidone absorption, coupled with the enormous expense and effort involved in conducting clinical trials, belies Tolmar's position that it would have been a matter of ordinary skill and routine optimization to try all the various combinations of dosing regimens to arrive at the claimed invention. To the contrary, the only way a POSA could have even approached the problem would have required collecting substantial clinical data and undertaking an extensive analysis of that data

to identify the key variables that needed to be accounted for in a dosing regimen. None of the data was available in the prior art. And, even with this data, the outcome was not predictable, as starkly shown by the failure of Janssen's Phase III clinical trials, including the trial reflected in NCT 548. In short, the prior art did not contain a "finite number of identified, *predictable* solutions" to the unsolved problem of achieving safe and rapid efficacy in a LAI antipsychotic, or indeed to any other problem identified by Tolmar. Tolmar's obviousness case fails.

B. The Formulation Claims

Because all the asserted claims include the dosing regimen invented by Janssen, the Court need not go any further to reject Tolmar's obviousness case. Claims 17-21, however, add novel formulation elements to the invention. These elements, when considered as used in the claimed dosing regimens, provide additional reasons why Tolmar's obviousness case fails.

To attack the formulation elements, Tolmar relies on the '544 patent and International Application Publication No. WO 2006/114384 ("WO 384") (JTX-21). But as the evidence will show, the formulations described in these references are designed to work as monthly maintenance doses rather than initiation doses that could be used about a week apart. Neither of these references teaches that rapid efficacy might be achieved by using the critical particle size range required in claims 17-21 of the '906 patent and used in Invega Sustenna. The '544 patent, which reflects early work on the paliperidone palmitate formulation, discloses an average particle size "d90" of less than 2000 nm, meaning that 90% of the particles are less than 2000 nm. Claims 17-21 of the '906 patent, by contrast, claim an average particle size "d50" of between 1600 and 900 nm, meaning that the median value of the particle size distribution is within that range.

As Dr. Sinko will explain, the examples of the '544 patent teach away from the specific particle size range claimed in the '906 patent. The one formulation disclosed in the '544 patent

14

that, with hindsight, can be identified as falling within the claimed range, was rejected by the '544 patent inventors for further experimentation in favor of formulations that fall outside of the range claimed in the '906 patent. And, although the WO 384 publication discloses **components** of the final Invega Sustenna formulation, it provides no information on **particle size**. As the evidence will show, particle size is yet another unpredictable pharmacokinetic-impacting variable that a POSA would need to consider in designing a dosing regimen, and is yet another impediment to arriving at claimed invention through supposed "routine optimization."

  C. <u>Objective evidence of non-obviousness</u>

The objective evidence provides further support that the claimed invention is non-obvious. The real-world evidence of the inventors' development of the claimed dosing regimen shows that the ***extraordinarily*** skilled scientists at Janssen, armed with ***proprietary*** data in addition to the prior-art teachings, could not foresee the obstacles that led them to the claimed invention. The suggestion that an ordinarily skilled artisan, equipped with only the prior art (which contained little or no paliperidone palmitate data), would have considered the claimed invention obvious, is simply not credible.

The real-world evidence supports non-obviousness in multiple ways, beginning with a clear showing that the claimed invention led to unexpected results. Tolmar's expert is expected to testify that the closest prior art for purposes of unexpected results is NCT 548—the protocol that contains the failed dosing regimens—and to concede that the difference between a failed regimen and a successful regimen is, in this field, a difference in kind. As the evidence at trial will show, the invention of the claimed dosing regimen was precisely the difference between success and failure. This was both highly surprising to the inventors, who had large amounts of non-prior-art information at their disposal, and also would have been completely unexpected to a POSA. The

15

efficacy data in the disputed Kramer reference would have given no hint that the claimed dosing regimen would perform markedly better than the fixed-dose, gluteal dosing regimens disclosed in Kramer and NCT 548.  As the trial evidence will show, the success would not have been possible without the unexpected discovery by the inventors of the fast-absorption-effect of deltoid and the lower-than-expected exposure of the high loading dose. None of these would not have been obvious to a skilled artisan.  The evidence at trial will also show that the claimed regimen is superior in achieving rapid efficacy and therapeutic drug levels compared to the failed regimens of NCT 548.  Although Tolmar is expected to attempt to paint these differences as a matter of degree, both the factual record and the expert testimony will show that these results represent the difference between failure and success—the very essence of a difference in kind.

Corroborating the unexpected success in using the claimed dosing regimens, the inventors' novel dosing regimens faced skepticism from outside experts and clinical psychiatrists steeped in the conventional wisdom of "start low, go slow."  Indeed, even *after* they were informed about the (non-prior-art) clinical failures that were the impetus for Janssen's invention, and even after they were presented with the (non-prior-art) pharmacokinetic analysis that led Janssen to the claimed dosing regimen, outside experts, including Tolmar's psychiatrist expert, Dr. Dizon, continued to be skeptical of Janssen's start-high approach.  But with time, physicians and scientists in the peer-reviewed literature began to sing the praises of Invega Sustenna and its unique dosing regimen.

Finally, as Janssen's economic expert Carla Mulhern will explain, Invega Sustenna has been a spectacular commercial success, fueled in significant part by its success in meeting the important clinical objective achieved by the claimed invention: rapid efficacy that avoids the need for oral supplementation.  The documentary record is rife with direct evidence that this feature of Invega Sustenna is important to patients and prescribers.  And Ms. Mulhern's analysis of the LAI

market bears this out. For example, Invega Sustenna's LAI market share is vastly larger than that of short-acting (oral) paliperidone, demonstrating that the features of the LAI drug product rather than the underlying molecule are responsible for its commercial performance. Since Invega Sustenna's introduction, other antipsychotic manufacturers have sought to duplicate its features, expressly touting their ability to achieve rapid efficacy and avoid oral supplementation. This is powerful objective evidence that the rapid and sustained efficacy achieved by the claimed dosing regimen is a significant driver of demand for LAI antipsychotics.

The objective facts thus corroborate what an analysis of the prior art makes clear: the claimed invention is innovative and non-obvious. Tolmar will not succeed in meeting its burden of proving otherwise by clear and convincing evidence.

## IV. TOLMAR'S SECTION 112 CHALLENGES

In addition to obviousness, Tolmar contends that the asserted claims of the '906 patent are invalid under 35 U.S.C. §112. These defenses, which appear to be afterthoughts, cannot succeed. They are premised on an alleged lack of written description support and enablement for the direction to give maintenance doses monthly "±7 days" and concerning the target of the dosing regimen in some of the claims, "a psychiatric patient in need of treatment for psychotic disorder."

First, Tolmar will not be able to establish lack of enablement or written description with respect to the "±7 days" dosing window around the monthly maintenance doses. Dr. Coles is expected to testify that a POSA would need clinical data supporting the full range of dosing within the window to make and use the dosing windows without undue experimentation (enablement) or to recognize that the inventors had adequately described and were in possession of the dosing windows (written description). This misapprehends the section 112 inquiry. The asserted claims are directed to a dosing regimen requiring specific administration steps, and as the evidence at trial

17

will show, the '906 patent specification has an extensive disclosure about administration of the maintenance doses, including reciting the "±7 day" window verbatim. With these disclosures, a POSA could readily administer the claimed dosing regimen at any point within the dosing windows, and would recognize that the inventors had adequately described the dosing windows. A POSA would not need clinical study results for every permutation of the claimed invention to reach these conclusions. The law requires only a description of the claimed invention, not of the inventors' unique path to it, to show that the inventors were in possession of it.

Second, Tolmar will not be able to prove that the claims directed to "psychotic disorders" are invalid under section 112. Dr. Dizon is expected to testify that claims 4, 5, 11, 12 and 15-21 are invalid for lack of enablement or written description support because a "psychiatric patient in need of treatment for a psychotic disorder," in Dr. Dizon's view, is overbroad. But the evidence at trial will establish that a POSA would readily understand that "psychotic disorder" in the claims refer to diseases for which psychosis is a symptom, the most paradigmatic of which is schizophrenia. And because the claim is to a monthly formulation, a POSA would readily understand that it would not be indicated to treat transient psychosis. Accordingly, a POSA would be able to practice the claims without undue experimentation and would recognize that the inventors possessed a method of treatment for psychotic disorders.

## V.  CONCLUSION

The evidence to be presented at trial will demonstrate beyond reasonable dispute that the claimed dosing regimen represents a major innovation in the field of drug development. Tolmar's efforts to show that the invention was the obvious outcome of routine work will not hold water. Tolmar will not be able to satisfy its heavy burden of proving invalidity by clear and convincing

evidence.  At the conclusion of trial and post-trial briefing, Janssen will ask the Court to recognize that Tolmar has failed to meet its burden, and grant judgment to Janssen.

OF COUNSEL:

Barbara L. Mullin
Aron Fischer
Andrew D. Cohen
Meghan Larywon
Zhiqiang Liu
Jay J. Cho
Joyce L. Nadipuram
Lachlan S. Campbell-Verduyn
Anna Boltyanskiy
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
(212) 336-2000

October 8, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica NV*