IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV,<br><br>  Plaintiffs,<br>v.<br><br>TOLMAR, INC.,<br><br>  Defendant. | Case No. 21-01784-WCB-SRF |

**TOLMAR'S OPENING STATEMENT**

Defendant, Tolmar, Inc. (hereinafter "Tolmar"), by and through its attorneys, states as follows:

Paliperidone palmitate, sold under the brand name, Invega Sustenna, is an old drug, an old formulation, used in an obvious dosing regimen. There is nothing inventive in selecting the highest available initiation loading dose and injecting it into a patient's shoulder.

The patent-in-suit, U.S. Patent No. 9,439,906 ("the '906 patent") is a method of treatment patent using a dosing regimen taught and rendered obvious by the prior art. It is the last patent in a long line of patents that Janssen has listed in the Orange Book for Invega Sustenna. Janssen's patent monopoly over paliperidone palmitate will extend more than 40 years at the expiration of the '906 patent in 2031. However, the loading dose and maintenance dose strategy claimed in the '906 patent was previously taught in Kramer and NCT 548.

Kramer and NCT 548 Kramer and NCT 548 teach dosing regimens for administering sustained release injections of paliperidone palmitate through use of loading doses and maintenance doses. Each reference teaches administering intramuscular injections of paliperidone palmitate on Day 1 and Day 8 (the claimed first and second loading doses) and on Day 36 (the

1

claimed first maintenance dose) into the gluteal muscle. NCT 548 further teaches administering a fourth injection on Day 64 (the claimed subsequent maintenance doses). Kramer teaches administering 50 or 100 mg-eq. paliperidone to schizophrenia patients, who saw less withdrawal rates, better efficacy, and similar adverse effects with the 100 mg-eq. dosage amount as compared to the 50 mg-eq. dosage amount. NCT 548 teaches a Phase III study protocol in which schizophrenia patients were to receive four doses of 50, 100, or 150 mg-eq. paliperidone, indicating that the 150 mg-eq. dosage amount was previously found to be safe and tolerable to patients.

      The evidence will show that it would have been obvious to a person of ordinary skill in the art ("POSA") to select the 150 mg-eq. dosage amount of paliperidone palmitate for use as the first loading initiation dose. A POSA would have been motivated to increase the therapeutic levels of paliperidone palmitate rapidly by administering the highest available dose to a schizophrenia patient to decrease withdrawal rates and bolster efficacy. The evidence will also show that selecting the deltoid as the injection site instead of the gluteal muscle would have been obvious as these were the two most common sites for intramuscular injections.

      The monthly ± 7 days dosing windows are not enabled or adequately described by the '906 patent. Janssen tries to reach back to provisional application No. 61/014,918 to establish a priority date of December 19, 2007. There is no support for the "monthly ± 7 day dosing window limitations, which were added after the notice of allowance, in the '918 application. None. The first time that language is seen in the prosecution history is in December 5, 2008, found in provisional application 61/120,276. However, the 906 patent does not enable or adequately describe the full scope of the claimed 25 to 150 mg-eq. dosage amounts administered in the monthly ± 7 days (i.e., 17 day) maintenance dosing windows. The evidence will show that the

specification and figures of the 906 patent do not describe how to implement the range of claimed dosing windows and dosage amounts that would achieve therapeutic plasma levels of paliperidone for treating schizophrenia without undue experimentation. Ina addition, the evidence will show that the 906 patent does not adequately convey that the inventors had possession of the full scope of the claimed dosing windows and dosage amounts.

Each claim of the '906 patent is obvious and not enabled or adequately described. Accordingly, this Court should invalidate all the claims of the '906 patent.

**Tolmar's witnesses**.

**John Downing**. You will hear from Mr. John Downing, Director of Early Stage Formulation Development at Tolmar. Mr. Downing has a master's degree in chemistry from Kansas State University. Mr. Downing has been in the formulation group at Tolmar for 15 years.

Mr. Downing will testify about the development of Tolmar's generic paliperidone palmitate injection, including formulation development and testing of Tolmar's generic product.

**Professor Lisa Coles, Ph.D.** Dr. Coles is an Assistant Professor in the Department of Clinical and Experimental Pharmacology at the University of Minnesota. She is also Associate Director of Clinical Pharmacology and Pharmacometrics at the Center for Orphan Drug Research, whose mission is to development therapies for neurological disorders. She is an expert in the field of pharmacokinetics, pharmacodynamics, and pharmacometrics and their application to drug development.

Dr. Coles will testify that the '906 patent is not entitled to a December 17, 2007 filing date, that claims 1-16 would have been obvious to a POSA in December 2007 or 2008, and that claims 1-21 are not enabled or adequately described by the specification of the '906 patent for the full scope of administering 25 to 150 mg-eq. of paliperidone palmitate monthly plus or minus 7 days

3

from the second loading dose or administering subsequent maintenance doses at monthly plus or minus 7 days intervals.

**Dr. Jacinto Dizon, M.D**. Dr. Jacinto Dizon is a practicing neuropsychiatrist with over 30 years' experience treating patients with severe mental illnesses, including schizophrenia, schizophrenia-related conditions, and other psychotic disorders. Dr. Dizon has treated patients in the outpatient setting, inpatient setting, and long-term care. Dr. Dizon will testify that schizophrenia is an uncurable, progressive disease that worsens with time if left untreated.

Dr. Dizon will testify that claims 1, 2, 4, 6, 7, and 15 would have been obvious to a POSA and that claims 4, 5, 11, 12, and 15-21 lack enablement and written description for treating the full range of psychotic disorders with a long-acting injectable dosing regimen, which would be inappropriate and unsuitable for many psychotic disorders.

**Henry Havel, Ph.D**. Henry Havel, Ph.D. is a retired chemist from Eli Lilly. Dr. Havel has worked in the pharmaceutical industry for over 40 years, mainly in the development and characterization of pharmaceutical formulations. Dr. Havel has extensive experience in depot formulations, nanoparticle formulations, and particle sizes related to those formulations. Dr. Havel was the inaugural chair of the Nanomedicines Alliance, a cross-industry task force focused on advancing nanomedicine within the pharmaceutical industry.

Dr. Havel will testify that claims 3, 5, 10, 12, and 17-21 would have been obvious to a POSA.

**Thomas Vander Veen, Ph.D**. Dr. Vander Veen has a Ph.D. in economics from Brown University and is a Managing Director at Epsilon Economics, an economic consulting firm. He specializes in the application of economics to intellectual property, international trade, and complex commercial disputes.

He served as an economist on the staff of Commissioner Stephen Koplan, the former Chairman and Commissioner of the U.S. International Trade Commission. He was an assistant professor of economics at Skidmore College and also served as Adjunct Professor in the Department of Industrial Engineering and Management Sciences at Northwestern University.

Dr. Vander Veen will testify that Janssen fails to establish that Invega Sustenna is a commercial success as a result of the features of the '906 patent.

**The '906 patent**. The '906 patent was filed December 17, 2008 and claims priority to two provisional applications, the '918 provisional filed December 19, 2007 and the '276 provisional filed a few weeks before the '906 patent on December 5, 2008.

The '906 patent is directed to a method of treating schizophrenia and other psychotic disorders using an old drug, paliperidone palmitate, known and used to treat schizophrenia in an old formulation, an aqueous nanoparticle suspension taught, in the prior art, in a dosing regimen obvious to a person of ordinary skill in the art.

The patent has 21 claims, four of which are independent. The independent claims can be divided into two groups: (1) treating psychiatric patients with schizophrenia or, more broadly, psychotic disorders and (2) treating renally impaired psychiatric patients with the same disorders but at reduced dosage amounts. Every independent claims requires administering a first loading dose, second loading dose, and a first maintenance dose monthly plus or minus seven days after the second loading dose. The parties agreed that the term "monthly ± 7 days" means "21 to 38 days" which allows the first maintenance dose to be administered from 21 to 38 days after the second loading dose or a 17-day dosing window.

All the claims allow the first maintenance doses to be administered in a 17-day window triggered off of the second loading dose. For claims 1 and 8, since the second loading dose may

5

be administered on the 6th to about 10th day of treatment, the first maintenance dose can be administered from Day 27 to Day 48 – a 21-day window, depending on when the second loading dose is administered.

Table 1 summarizes the claimed dosing regimens of paliperidone palmitate for psychiatric patients in need of treatment for schizophrenia and other psychotic disorders.

Table 1: Claimed Dosing Regimen for Psychiatric Patients

| Claim 1 (schizophrenia) | Dosage Amount of paliperidone (mg-eq.) | Day of Treatment | Injection Site |
|---|---|---|---|
| "first loading dose" (step 1) | About 150 | 1 | Deltoid |
| "second loading dose" (step 2) | About 100 | 6 to about 10 | Deltoid |
| "first maintenance dose" (step 3) | About 25 to about 150 | 21 to 38 days after the second loading dose or from Day 27 to Day 48 of treatment | Gluteal or Deltoid |
| Claim 4 (psychotic disorders) | Dosage Amount of paliperidone (mg-eq.) | Day of Treatment | Injection Site |
| "first loading dose" (step a) | About 150 | 1 | Deltoid |
| "second loading dose" (step b) | About 100 | 8 | Deltoid |
| "first maintenance dose" (step c) | About 25 to about 150 | 21 to 38 days after the second loading dose or | Gluteal or Deltoid |

| | | from Day 29 to Day 46 of treatment | |

Table 2 summarizes the claimed dosing regiments of paliperidone palmitate for renally impaired psychiatric patients in need of treatment for schizophrenia and other psychotic disorders.

Table 2: Claimed Dosing Regimens for Renally Impaired Psychiatric Patients

| Claim 8 (schizophrenia) | Dosage Amount of paliperidone (mg-eq.) | Day of Treatment | Injection Site |
|---|---|---|---|
| "first loading dose" (step a) | About 75 | 1 | Deltoid |
| "second loading dose" (step b) | About 75 | 6 to about 10 | Deltoid |
| "first maintenance dose" (step c) | About 25 to about 75 | 21 to 38 days after the second loading dose or from Day 27 to Day 48 of treatment | Gluteal or Deltoid |
| Claim 11 (psychotic disorders) | Dosage Amount of paliperidone (mg-eq.) | Day of Treatment | Injection Site |
| "first loading dose" (step a) | About 75 | 1 | Deltoid |
| "second loading dose" (step b) | About 75 | 8 | Deltoid |
| "first maintenance dose" (step c) | About 25 to about 50 | 21 to 38 days after the second loading dose or from Day 29 to Day 46 of treatment | Gluteal or Deltoid |

**The Prosecution History**. After receiving a Notice of Allowance, Janssen decided to broaden the scope of every independent claim by expanding the maintenance dosing windows from 4 days to 17 days. The claims were allowed with a maintenance dose administered on about the 34th to about 38th day of treatment. However, each claim was amended to replace that language with "a month (+/- 7 days) after the second loading dose" in all the independent claims. Likewise, dependent claims were amended to define subsequent maintenance doses from 25 mg-eq. to 10 mg-eq. administered at "monthly (+/- 7 days) intervals."

Similarly, Janssen also added claims 17-21 after receiving a Notice of Allowance. These newly added claims are directed to specific formulations of aqueous nanoparticle suspensions of paliperidone palmitate, all of which were taken from Janssen's own prior art references that taught the same aqueous nanoparticle suspensions of paliperidone palmitate for intramuscular injection.

**The Priority Date is not December 2007**. The evidence will show that the '906 patent is not entitled to its earliest alleged filing date of December 17, 2007. The '906 patent claims priority to the December 17, 2007 '918 provisional application. The '918 provisional application, however, does not support the breadth of the claims, and in particular, the monthly maintenance dosing windows. Dr. Coles will testify that the four-day maintenance dosing windows disclosed in the '918 provisional application do not enable or adequately described the over 400% longer, 17-day maintenance dosing windows found in every claim of the '906 patent. Further, Dr. Coles will explain and show that the words "monthly plus or minus 7 days" for the maintenance doses are not present in the '918 provisional application and were only added to the later-filed December 2008 '276 provisional application. Accordingly, the evidence will show that the '906 patent is not entitled to claim priority to the '918 provisional and its effective filing date is December 2008 for purposes of prior art.

This is not to say that the '906 patent, itself, provides enablement and written description for the claimed 17-day maintenance dosing windows. Dr. Coles will explain that the '906 patent does not disclose how a person of ordinary skill in the art, a "POSA", would be able to make and use the full range of possible treatment days combined with dosage amounts ranging from 25 to 150 mg-eq. of paliperidone to treat a patient with schizophrenia. Dr. Coles will also testify that the specification of the '906 patent does not demonstrate that the inventors possessed the full scope of the maintenance dosing windows and dosage amounts claimed.

**Claims 1-21 are Obvious**. Claims 1-21 would have been obvious to a person of ordinary skill in the art at the time of the alleged invention over Kramer or NCT 548 in the following combinations of references:

- Kramer in view of NCT 548 (claims 1-7 and 15) and the '544 patent or '384 publication (claims 17-21).

- NCT 548 (claims 1, 2, 4, 6, 7, 15) and in view of the '544 patent or '384 publication (claims 3, 5, 17-21).)

- Kramer, NCT 548 in view of the renally impaired dosing prior art for paliperidone (claims 8-14 and16)

- Kramer, NCT 548, the renally impaired dosing prior art for paliperidone and the '544 patent or '384 publication (claims 17-21)

**Kramer**. The Kramer reference is a poster presentation presented at the 20th U.S. Psychiatric and Mental Health Congress (USPMHC) in Orlando, Florida on October 11-13, 2007 (the "October 2007 Conference"). Kramer taches the results of a 9-week safety and efficacy study of paliperidone palmitate intramuscular injection for the treatment of schizophrenia. Kramer discloses on its front title page that it was presented at the USPMHC conference in Orlando on

October 11-13, 2007. It also identifies that it was Poster No. 313 presented at the October 2007 Conference. Importantly, Janssen included Kramer in an information disclosure statement submitted during prosecution of the '906 patent. In the information disclosure statement, Janssen states that the poster was at the USPMHC on October 11-13, 2007.

Dr. Coles will testify that she has presented dozens of posters at scientific conferences throughout her career. She will explain that, in advance of a scientific conference, conference attendees receive abstracts, indexes, or other listings identifying the posters scheduled to be presented during the conference, along with the times for the presenters to be present by their poster to answer questions. Dr. Coles will also explain that posters are usually large, three or four feet in length and width, so that attendees can easily view and read the studies presented. In addition, she will explain that the posters are normally set up for display before the conference begins for the day and are left up for the entire day until the conference ends. Dr. Dizon will testify that scientific posters are displayed at conferences for as long as possible.

Janssen has argued that there is no evidence that Kramer was actually presented even though it was cited by Janssen's attorney during prosecution of the '906 patent and was identified as being presented from October 11-13, 2007. However, the evidence will show that an inference can be drawn that Kramer was publicly displayed at the USPMHC Conference in October 2007 and was intended to be viewed by attendees without any obligation of confidentiality. Accordingly, the evidence will show that Kramer was publicly accessible and is prior art under 35 U.S.C. 102(b) as it was presented and publicly accessible more than a year before the December 5, 2008 filing date of the '276 provisional application.

Janssen seeks to exclude Kramer as prior art because it teaches almost every aspect of the claims and provides motivation to select a higher first loading dose when initiating treatment with

paliperidone palmitate. Kramer teaches administering 50 or 100 mg-eq. injections of an aqueous nanoparticle suspension of paliperidone palmitate to schizophrenia patients on Day 1, Day 8, and Day 36 of treatment. The intramuscular injections are administered in the gluteal muscle. Table 3 shows the dosing regimen taught by Kramer:

Table 3: Dosing Regimens Taught by Kramer

| Dosage Amount of Paliperidone (mg-eq.) | Day of Treatment | Injection Site |
|---|---|---|
| 50 or 100 | 1 | Gluteal |
| 50 or 100 | 8 | Gluteal |
| 50 or 100 | 36 | Gluteal |

Kramer teaches that the most common reason patients withdrew from the study was due to lack of efficacy. Twenty nine percent of patients withdrew from the 50 mg.-eq. treatment arm due to lack of efficacy as compared with only 17% for the 100 mg-eq. treatment arm. Kramer also teaches that the clinical response in terms of efficacy was greater for the 100 mg-eq. treatment group than compared with the 50 mg-eq. treatment group. As for adverse effects, Kramer teaches that treatment-emergent adverse effects were observed in 65% of patients receiving 50 mg-eq. and 60% receiving 100 mg-eq. Discontinuation from the study due to treatment-emergent adverse effects was 3% for the 50 mg-eq. group and 2% for the 100 mg-eq. group.

Dr. Dizon will explain that Kramer teaches that efficacy increases as the dose of paliperidone palmitate increases and increasing the dosage from 50 to 100 mg-eq. equivalents lowers the withdrawal rate, an important factor in this patient population, who routinely struggle with taking their medications. Dr. Dizon will also explain that the risk of increased adverse effects with increased dose was negligible. Accordingly, Dr. Dizon will testify that a POSA would have

a reasonable expectation of success in improving the clinical response of patients by administering a higher first loading dose in an effort to reduce the patient withdrawal rate and further relieve the symptoms of schizophrenia at the outset of treatment.

Similarly, Dr. Coles will testify that a POSA would have a reasonable expectation of success in selecting a higher first loading dose to increase efficacy and prevent patients from withdrawing from the study. Dr. Coles will also explain that because study discontinuation occurred more frequently with placebo than the treatment groups, this would not impact a POSA's motivation and expectation of selecting a higher first loading dose for schizophrenia patients.

**NCT 548**. The NCT 548 clinical study discloses a phase III clinical trial protocol for treating schizophrenia patients with paliperidone palmitate. The study was conducted over approximately 14 weeks in which four injections of 50, 100, or 150 mg-eq. paliperidone palmitate were administered in the gluteal muscle on Day 1, Day 8, Day 36, and Day 64. The dosing regimen taught by NCT 548 is set forth below in Table 4.

Table 4: Dosing Regimens Taught by NCT 548

| Dosage Amount of Paliperidone (mg-eq.) | Day of Treatment | Injection Site |
|---|---|---|
| 50, 100, or 150 | 1 | Gluteal |
| 50, 100, or 150 | 8 | Gluteal |
| 50, 100, or 150 | 36 | Gluteal |
| 50, 100, or 150 | 64 | Gluteal |

Drs. Dizon and Coles will explain that a POSA would have understood that a Phase III clinical trial studies safety and efficacy of the dosing regimen. They will also explain that safety and toxicology studies would have already been performed for the 50, 100, and 150 mg-eq. dosage

amounts before the Phase III study was initiated, teaching a POSA that the 150 mg-eq. dose had been determined to be a safe treatment for use in the Phase III trial.

Thus, Dr. Dizon an Dr. Coles will testify that it would have been obvious to select the 150 mg-eq. first loading dose taught by NCT 548 in the 100 mg-eq. dosing regimen taught by Kramer or the 100 mg-eq. dosing regimen taught by NCT 548. Dr. Dizon will explain that selecting the next highest dosing interval for the first loading dose would be one of a small number of choices for alleviating symptoms, which allows patients to think more clearly and improve their insight, both of which lead to better patient compliance with treatment. Conversely, Dr. Dizon will explain that a patient not treated or undertreated may experience breakthrough symptoms, which can lead to patient noncompliance with treatment.

Dr. Coles will explain that by selecting the next highest dosage amount for the first loading dose, a POSA would reasonably expect an increase in efficacy and would not be dissuaded by concerns with safety based on the teachings of Kramer and that NCT 548 was a Phase III clinical trial studying the 150 mg-eq. dosing regimen.

**Deltoid Injections**. The evidence will also show that it was well known in the prior art that deltoid and gluteal injections were the most common injection sites for intramuscular injections. This is not seriously disputed. Several journal articles and textbooks teach that deltoid and gluteal injections are the most common. In addition, Dr. Dizon will testify that the deltoid muscle was commonly used for intramuscular injections of antipsychotics due to its ease of administration as compared to the gluteal muscle and patient preference and modesty. Dr. Coles will testify that these factors along with the deltoid muscle's increased perfusion and potential for better early drug absorption would lead a POSA to select a deltoid injection as an obvious choice. Accordingly, the

13

evidence will show it would have been obvious for a POSA to select deltoid instead of gluteal injections for the first and second loading doses.

**Renally Impaired Patients**. The prior art teaches that paliperidone is mainly eliminated through the kidneys and renal impairment will impact the clearance of paliperidone from a patient's system. For example, Cleton46, a study addressing the "effects of renal impairment on the pharmacokinetic profile of Paliperidone extended release tablets," teaches that renal clearance of paliperidone decreased with increasing degree of renal impairment. Dr. Coles will testify that it is routine to reduce the dose of dosage amounts by a percentage related to renal impairment. Cleton46 teaches that exposure of paliperidone was 1.5 to 3.4 times higher for renally impaired patients. Dr. Coles will explain that this would lead a POSA to reduce the dosage amount for renally impaired patients by about a half or about a third. Accordingly, Dr. Coles will testify that it would have been obvious to reduce the dosage amounts taught by Kramer or NCT 548 by about a half or a third for renally impaired patients.

**'544 Patent and '384 Publications**. The '544 patent teaches aqueous nanoparticle suspensions of paliperidone palmitate formulated for intramuscular injection. The '544 patent further teaches these formulations are therapeutically effective to treat schizophrenia for about a month. The '544 patent also teaches particle size distributions of paliperidone palmitate of 2,000 nanometers or less. Dr. Havel will explain that the '544 patent teaches the same aqueous nanoparticle formulations described and claimed in the '906 patent.

Much like the '544 patent, the '384 publication teaches methods to aseptically manufacture aqueous nanoparticle suspensions of paliperidone palmitate formulated for intramuscular injection. The aqueous nanoparticle suspensions are formulated for monthly injections. Dr. Havel

will explain that the '384 publication teaches the identical formulation (Table 6) described and claimed in the '906 patent (Table 2).

| Table 6 | | | |
|---|---|---|---|
| Name | Amount Required | | |
| | Per ml | | Quantity for 24 L |
| Paliperidone palmitate (sterile grade) | 156 | mg | 3.744 kg |
| Polysorbate 20 parenteral | 12 | mg | 288 g |
| Citric acid monohydrate parenteral | 5 | mg | 120 g |
| Disodium hydrogen phosphate anhydrous parenteral | 5 | mg | 120 g |
| Sodium dihydrogen phosphate monohydrate parenteral | 2.5 | mg | 60 g |
| Sodium Hydroxide all use | 2.84 | mg | 68 g |
| Polyethylene Glycol 4000 parenteral | 30 | mg | 720 g |
| Water for injections q.s. ad | 1000 | µl | 24 L |

| TABLE 2 | | | |
|---|---|---|---|
| Name | Amount Required | | |
| | Per ml | | Quantity for 24 L |
| Paliperidone palmitate (sterile grade) | 156 mg | | 3.744 kg |
| Polysorbate 20 parenteral | 12 mg | | 288 g |
| Citric acid monohydrate parenteral | 5 mg | | 120 g |
| Disodium hydrogen phosphate anhydrous parenteral | 5 mg | | 120 g |
| Sodium dihydrogen phosphate monohydrate parenteral | 2.5 mg | | 60 g |
| Sodium Hydroxide all use | 2.84 mg | | 68 g |
| Polyethylene Glycol 4000 parenteral | 30 mg | | 720 g |
| Water for injections q.s. ad | 1000 µl | | 24 L |

In addition, Dr. Havel will explain that the particle size ranges taught by the '384 publication overlap with the claimed particle size ranges. Dr. Havel will testify that it would have been a matter of routine experimentation to mill (*i.e.*, grind) the paliperidone palmitate particles to achieve a desired particle size distribution for monthly injections using either the '544 patent or '384 publication's teachings. Accordingly, Dr. Havel will testify that the formulation claims of the '906 patent would have been obvious to a POSA in view of the teachings of the '544 patent or '384 publication.

**No Unexpected Results**. Janssen alleges unexpected results based on failed clinical studies. However, the evidence will show that the alleged failures related to test kit errors for placebo and the 150 mg-eq. dosage amount. The alleged failures are also related to improper injection of paliperidone palmitate into the adipose tissue surrounding the gluteal muscle. The evidence will show that the alleged failures were not related to performance of the paliperidone palmitate injections, or the dosing regimens studied if properly injected into the muscle tissue. Dr. Coles will also testify that none of the alleged failures were published or publicly available and were therefore not available to a POSA.

Dr. Dizon and Dr. Coles will testify that the effects of deltoid versus gluteal injections were not unexpected in the art. Rather, Dr. Dizon will explain that moving an injection to the deltoid from the gluteal muscle was a matter of routine choice and a POSA would have understood that faster absorption rates in the deltoid have the potential to play a role in achieving therapeutic drug levels more quickly.

**No Commercial Success**. Dr. Vander Veen will testify that Janssen's expert analysis of Invega Sustenna's sales and sales growth, Invega Sustenna's marketing and promotion, Janssen's pharmaceutical portfolio, Invega Sustenna's market penetration, Invega Sustenna's discounts, rebates, and samples are flawed and unreliable. Dr. Vander Veen will also testify that Janssen failed to establish that Invega Sustenna is a commercial success as a result of the patented features of the '906 patent. Dr. Havel will testify that practicing the claims of the '906 patent would also practice claims of Janssen's other Orange Book listed patents, including the '544 patent, U.S. Patent No. 5,254,556, and U.S. Patent No. 6,077,843.

**Remaining Secondary Considerations**. The remainder of the secondary considerations Janssen alleges do not outweigh the strong case of obviousness here.

**No Copying.** Dr. Havel will testify that Tolmar did not copy the ingredients or particle size distribution of Invega Sustenna in developing its generic product. Mr. Downing will testify that Tolmar followed FDA guidance in developing its generic product to meet regulatory requirements and achieve a bioequivalent product to Invega Sustenna. Dr. Havel will testify that Tolmar proposed a formulation for its product that was based on the prior art, and in particular, the formulation taught in the '384 publication. In addition, Dr. Havel and Mr. Downing will testify that achieving a similar particle size distribution as Invega Sustenna for Tolmar's generic product was to achieve bioequivalence of Tolmar's product.

**No Long-Felt Unmet Need**. Dr. Dizon will explain that Invega Sustenna® did not fulfil an unmet industry need for a long-acting injectable formulation that provides rapid efficacy without the need for oral supplementation during treatment. Dr. Dizon will explain that both oral and long-acting injectables were available before Invega Sustenna for treating schizophrenia. Dr. Dizon will explain that these drugs were safe, convenient, and are still in widespread use even after the introduction of Invega Sustenna. Dr. Dizon will also testify that oral antipsychotics are still the most common and overwhelming prescribed treatment for schizophrenia. Dr. Dizon will explain that eliminating oral supplementation was not a long felt need, and that Kramer and NCT 548 teach dosing regimens for paliperidone palmitate that do not require supplementation of oral paliperidone during treatment.

**No Industry Skepticism**. Dr. Dizon will testify that there is no evidence of industry skepticism in the prior art for the loading dose strategy claimed in the '906 patent. Dr. Dizon will explain that the concept of "start low and go slow" applies to newly diagnosed schizophrenia patients, which would receive oral antipsychotics, not long acting injections. Dr. Dizon will testify that the start low and go slow dosing strategy begins when establishing tolerability of a medication and

**No Industry Praise**. Dr. Dizon will testify that industry praise does not apply here, where the industry praise relied on by Janssen's expert relates to articles authored or sponsored by Janssen or the articles do not praise the claimed dosing regimen. Dr. Dizon will testify that there is no industry praise related to Invega Sustenna and the '906 patent.

**All the Claims Lack Enablement and Written Description**. The '906 patent allows for the first and subsequent maintenance doses of 25 to 150 mg-eq. to be given monthly plus or minus seven days, equating to a 17-day dosing window for maintenance doses. Besides using the words

17

"monthly +/- 7 days," Dr. Coles will testify that the '906 patent does not provide any example or disclosure of how to make and use the full range of the claimed dosing window for the first and subsequent maintenance doses. Dr. Coles will explain that the examples in the '906 patent disclose administering the first maintenance dose on Day 36 of treatment and a subsequent maintenance dose on Day 64 of treatment.

However, the claims cover both a dosing regimen in which a patient would receive four doses of paliperidone palmitate by Day 48 (Day 1, Day 6, Day 27, and Day 48), whereas another patient would receive four doses of paliperidone by Day 48 (Day 1, Day 10, and Day 86). Coupling that with the range of doses of 25 mg-eq. to 150 mg. eq., leads to a patient receiving 550 mg.-eq. by Day 48 (150, 100, 150, 150 mg-eq.) and the other patient receiving only 300 mg-eq. of paliperidone by Day 86 (150, 100, 25). The evidence will show that the '906 patent does not disclose or adequately describe how to treat a schizophrenic patient with these dramatically different dosing regimens.

Dr. Coles will also testify that the pharmacokinetic simulations provided in Figures 1-3 only show administering paliperidone palmitate on Days 1, 8, 36, and 64 of treatment. Dr. Coles will explain that Figures 1-3, and the corresponding disclosure in the '906 patent, do not provide guidance or direction on how to achieve therapeutic plasma levels over the full range of the dosing window and dosage amounts without undue experimentation. Dr. Coles will explain that further clinical trials studying the dosage amounts across the full range of the dosing window or additional pK simulations would be required, which amounts to undue experimentation.

Further, Dr. Coles will testify that the information found in Figures 1-3 could not be re-created or used to generate additional pK simulations of dosing days beyond the days simulated. The '906 patent does not describe the population pK model used to generate Figures 1-3 or the

parameters associated with the model. As such, Dr. Coles will explain that a POSA would not be able to reproduce the model used to generate Figures 1-3 without undue experimentation. Instead, Dr. Coles will explain that absent information for the model or additional population pK simulations, a person skilled in the art would not be able to implement the dosing windows in a way that would achieve target levels of therapeutic efficacy without undue experimentation.

Dr. Coles will also testify that the specification of the '906 patent, including Figures 1-3, does not convey that the inventors had possession of the full scope of the dosing windows claimed in the '906 patent. Dr. Coles will explain, as for enablement, the '906 patent does not provide any plasma concentration data, clinical data, or pharmacokinetic simulations that show dosing at amounts between 25 and 150 mg-eq. over the full range of the 17-day dosing window, let alone whether those dosage amounts over the full range of the dosing window would result in therapeutically effective plasma levels of paliperidone. Thus. Dr. Coles will testify that the full scope of claims 1-21 of the '906 patent are not enabled or adequately described.

**Psychotic Disorders**. Dr. Dizon will testify that the '906 patent does not enable or adequately describe treating all "psychotic disorders" with the claimed dosing regimen. The '906 patent discloses a long list of psychotic disorders besides schizophrenia and schizophrenia-like disorders. Dr. Dizon will explain that it is inappropriate to treat many of the psychotic disorders, such as those that may last less than 6 months, with a long-acting injectable dosing regimen that is claimed in the '906 patent. Thus, Dr. Dizon will testify that those claims reciting treatment of psychotic disorders is not enabled or adequately described.

For the reasons set forth above, Tolmar respectfully submits that the evidence will show that all the claims of the '906 patent should be found invalid.

Respectfully submitted,

Dated: October 8, 2023          By: /s/ *Adam W. Poff*
　　　　　　　　　　　　　　　　　Adam W. Poff (SBN 3990)
　　　　　　　　　　　　　　　　　Pilar G. Kraman (SBN 5199)
　　　　　　　　　　　　　　　　　**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
　　　　　　　　　　　　　　　　　Rodney Square
　　　　　　　　　　　　　　　　　1000 North King Street
　　　　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　　　　Phone: (302) 571-6600
　　　　　　　　　　　　　　　　　APoff@YCST.com
　　　　　　　　　　　　　　　　　PKraman@YCST.com

　　　　　　　　　　　　　　　　　Kevin P. Shortsle
　　　　　　　　　　　　　　　　　**HOWARD & HOWARD ATTORNEYS PLLC**
　　　　　　　　　　　　　　　　　200 South Michigan Avenue, Suite 1100
　　　　　　　　　　　　　　　　　Chicago, Illinois 60604
　　　　　　　　　　　　　　　　　(312) 456-3682 | Fax: (312) 939-5617
　　　　　　　　　　　　　　　　　KShortsle@HowardandHoward.com

　　　　　　　　　　　　　　　　　***Attorneys for Defendant/Counterclaim Plaintiff***