**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

JANSSEN PHARMACEUTICALS, INC. and
JANSSEN PHARMACEUTICA NV,
     Plaintiffs,
       v.

TOLMAR, INC.,
              Defendant.

C.A. No. 21-cv-01784-WCB-SRF

PUBLIC VERSION
Filed December 5, 2023

## <u>TOLMAR'S POST TRIAL BRIEF</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................. vi

TABLE OF ABBREVIATIONS ....................................................................... xi

INTRODUCTION ...........................................................................................1

I.    KRAMER IS PRIOR ART UNDER 102(B) AND EXHIBITS
SUPPORTING THAT FINDING WERE PROPERLY ADMITTED
AT TRIAL ...........................................................................................2

    A.    Background With Respect to Kramer ................................................2

    B.    Janssen's Routine Business Practice for Poster Presentations
..........................................................................................................5

    C.    Kramer Was Presented at the October 2007 Medical
Conference ......................................................................................8

        1.    Press Release.........................................................................8

        2.    Dr. Hough's Testimony .......................................................9

        3.    Janssen's Statements in the IDS ...........................................9

        4.    The Poster Index ................................................................10

        5.    The October 11 Email ........................................................10

    D.    Kramer Is a Printed Publication.......................................................11

        1.    Kramer Was Displayed for Sufficient Time for Attendees to Retain Its
Information ........................................................................11

    E.    Kramer's Target Audience Consists of POSAs of the '906
Patent................................................................................................12

        1.    There Is No Evidence of an Expectation that Conference Attendees Would
Keep Kramer's Contents Confidential....................................12

        2.    Kramer's Information Was Easily Retained or Copied by Conference
Attendees............................................................................14

    F.    The Kramer Evidence Is Admissible .................................................14

        1.    The October Emails .............................................................14

        2.    The Poster Index Was Sufficiently Authenticated ...................18

       3.     Exclusion of the European Opposition is Unwarranted............................21

II.    THE '906 PATENT IS NOT ENTITLED TO THE DECEMBER 2007 FILING DATE OF THE '918 PROVISIONAL APPLICATION...............................................................................................24

    A.    The 4-day Dosing Window Disclosed in the '918 Provisional Does Not Provide Adequate Written Description for the Claimed 17-Day Dosing Window ........................................................25

    B.    The 4-day Dosing Window Disclosed in the '918 Provisional Fails to Enable the Claimed 17-Day Dosing Window .........................................27

III.   CLAIMS 1-21 OF THE '906 PATENT ARE INVALID AS OBVIOUS OVER THE PRIOR ART...............................................28

    A.    Scope and Content of the Prior Art...................................................29

        1.     Kramer Teaches a Dosing Regimen for Intramuscular Injections of Paliperidone Palmitate on Days 1, 8 and 36 of Treatment.......................29

        2.     NCT 548 Teaches a Phase 3 Clinical Trial Dosing Regimen for Intramuscular Injections of Paliperidone Palmitate on Days 1, 8, 36, and 64 of Treatment .........................................................................31

        3.     The Gluteal and Deltoid Muscles Were the Only Two Intramuscular Injection Sites for Antipsychotic Drugs...................................................32

        4.     Aqueous Nanoparticle Suspensions of Paliperidone Palmitate Were Known in the Prior Art for Monthly Dosing.............................................32

        5.     It Was Known to Reduce Doses for Renally Impaired Patients Taking Paliperidone ......................................................................................33

    B.    Person of Ordinary Skill in the Art ...................................................34

    C.    Claims 1-7 and 15 Are Obvious Over Kramer in View of NCT 548...............................................................................................35

        1.     There Was Strong Motivation to Select a Higher First Initiation Loading Dose in Kramer With a Reasonable Expectation of Achieving Increased Blood Levels of Paliperidone More Rapidly Due to Lack of Efficacy....36

        2.     It Would Have Been Obvious to Select the Deltoid as an Injection Site in the Dosing Regimens Disclosed by Kramer and NCT 548 ....................39

        3.     The Prior Art Does Not Teach Away From a 150 mg-eq. Dose on Day 141

        4.     The Prior Art Does Not Teach Away from Using Deltoid Injections ......41

5.      Dependent Claims 2, 3, 5-7 and 15 Are Taught By Kramer and NCT 548 ...........................................................................................43

D.      Claims 1, 2, 4, 6, 7, and 15 Are Obvious over NCT 548 .....................................43

1.      Claims 3 and 5 Would Have Been Obvious Over NCT 548 and the '544 Patent and '384 publication ...................................................46

E.      Claims 8-14 and 16 Would Have Been Obvious Based on the Teachings of Kramer or NCT 548, and the Renally Impaired Dosing Prior Art for Paliperidone ..........................................................46

F.      Claims 17-21 Would Have Been Obvious over the Combinations of Kramer and NCT 548 Discussed Above in View of the '544 Patent and '384 Publication ......................................48

IV.     SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS DO NOT OUTWEIGH THE OBVIOUSNESS OF CLAIMS 1-21 ...............................51

A.      There Are No Unexpected Results Supporting Non Obviousness ...................................................................................................51

1.      Janssen's Private, Internal Data is Not Relevant to Unexpected Results 51

2.      Kit Error and BMI Data Do Not Show Unexpected Results as They Are Unrelated to the Claimed Dosing Regimen ...............................52

3.      Kramer and NCT 548 Taught No Oral Supplementation was Needed and Loading Doses Were Known in the Art ....................................54

4.      The Increased Deltoid Concentration in the '906 Patent's Example 2 Is Not a Difference in Kind..........................................................54

B.      There Was No Skepticism Because the Start Low and Go Slow Adage Is Not Applicable To Long-Acting Injectable Antipsychotic Medication ...................................................................56

C.      There Was No Long-Felt Need for The Claimed Dosing Regimen ...........................................................................................57

D.      There Was No Industry Praise of the Claimed Dosing Regimen ...........................................................................................59

E.      There is No Evidence that Tolmar Copied the Claimed Dosing Regimen...........................................................................59

F.      Janssen Failed to Establish Commercial Success as a Result of the Claimed Dosing Regimen..........................................................60

|  |  | 1. | Invega Sustenna's Sales and Revenues | 61 |
|  |  | 2. | Janssen's Marketing Messages | 62 |
|  |  | 3. | Janssen's Portfolio Drives Invega Sustenna's Alleged Commercial Success | 62 |
|  |  | 4. | Janssen's Discounting, Sampling and Market Spending Drive Invega Sustenna's Sales | 62 |
|  |  | 5. | Blocking Patents Discount Any Evidence of Commercial Success | 63 |
| V. |  |  | CLAIMS 1-21 OF THE '906 PATENT ARE INVALID FOR FAILING TO SATISFY THE ENABLEMENT AND WRITTEN DESCRIPTION REQUIREMENTS | 64 |
|  | A. |  | Administering Maintenance Doses, a Month (± 7 Days) After the Second Loading Dose or at Monthly (± 7 days) Intervals Is Not Enabled or Adequately Described by the '906 Patent | 65 |
|  |  | 1. | Administering a First Maintenance Dose of 25-150 mg-eq. Throughout the 17-Day Dosing Window Is Not Enabled and Requires Undue Experimentation | 65 |
|  |  | 2. | The '906 Patent Fails to Adequately Describe that the Inventors Possessed a Dosing Regimen in which 25-150 mg-eq. Are Administered 21 to 38 Days After the Second Loading Dose | 72 |
|  |  | 3. | Administering Subsequent Maintenance Doses Is Not Enabled or Adequately Described | 74 |
|  | B. |  | The '906 Patent Fails to Adequately Describe and Enable Treating a Psychiatric Patient with the Full Scope of Disorders Encompassed by "Psychotic Disorders" | 74 |
|  |  | 1. | The Examiner And Prosecution History Agree That The Scope of Psychotic Disorders Are Not Enabled or Adequately Described | 75 |
|  |  | 2. | A Person Skilled in the Art Would Not Be Able to Treat the Full Scope of "Psychotic Disorders" Without Undue Experimentation | 76 |
|  |  | 3. | Treatment of Psychotic Disorders Which Have Different Causes Than Schizophrenia Are Not Enabled | 77 |
|  |  | 4. | Treatment of Transient Psychotic Disorders With a Long-Acting Injectable Are Not Enabled | 78 |

5.      The '906 Patent Failes to Adequately Demonstrate the Inventors Possessed a Dosing Regimen for Treating the Full Scope of Psychotic Disorders Claimed ...................................................................................................80

VI.    CONCLUSION............................................................................................................81

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.,* 759 F.3d 1285 (Fed. Cir. 2014) ................................................................................ 72

*Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765 (Fed. Cir. 2018) .......................................................................................................... 11

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310 (Fed. Cir. 2018) .......................................................................................................... 63

*Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366 (Fed. Cir. 2009) ........................................ 72

*AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234 (Fed. Cir. 2003) ............................................... 66

*Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180 (Fed. Cir. 2014) ....................................... 64

*Allergan v. Sandoz*, 726 F.3d 1286 (Fed. Cir. 2013) .................................................................. 38

*Alza Corp. v. Andrx Pharm., LLC,* 2008 WL 1886042 (D. Del. Apr. 28, 2008) ......................................................................................................... 23

*Amgen Inc. v. Sanofi*, 987 F. 3d 1080 (Fed. Cir. 2021) ............................................................. 76

*Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) ................................ 64, 72

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.,* 752 F.3d 967 (Fed. Cir. 2014) .......................................................................................................... 54

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120 (Fed. Cir. 2000) ................................................................................ 36

*Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341 (Fed. Cir. 2011) ..................................................................................................... 26, 72

*Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330 (Fed. Cir. 2013) ................................... 69

*Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560 (Fed. Cir. 1988) ................................ 7

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009) ................................................................................................ 43

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356 (Fed. Cir. 2006) ................................................................ 36

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996 (Fed. Cir. 2018) .......................................................................................................... 44

*Eiselstein v. Frank*, 52 F.3d 1035 (Fed. Cir. 1995) ................................................................. 26

*EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81 (D. Del. 2016) ........................................ 23

*Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528 (Fed. Cir. 1991) ....................................... 28

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340 (Fed. Cir. 2019) .......................................................................................................... 27

*Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023 (Fed. Cir. 2016) .............................................................................................................. 54

*Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928 (Fed. Cir. 2019) .............................................................................................................. 52

*FWP IP ApS v. Biogen MA, Inc.*, 749 Fed. Appx. 969 (Fed. Cir. 2018) ..................................... 72

*FWP IP ApS v. Biogen MA., Inc.*, 749 F. App'x 969, 975-976 (Fed. Cir. 2018) .............................................................................................................. 80

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1; 86 S. Ct. 684; 15 L. Ed. 2d 545 (1966) ............................................................................... 29

*Hoffmann-LaRoche Inc. v. Apotex Inc.*, 748 F.3d 1326 (Fed. Cir. 2014) ................... 38, 39, 41, 55

*Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 777 F. Supp. 330 (D. Del. 1991), *aff'd*, 972 F.2d 1354 (Fed. Cir. 1992) ..................... 69

*In re Aller*, 220 F.2d 454 (C.C.P.A. 1955) ............................................................... 50

*In re Applied Materials, Inc.*, 692 F.3d 1289 (Fed. Cir. 2012) ....................... 44, 45, 50

*In re Boesch*, 617 F.2d 272 (C.C.P.A. 1980) ........................................................... 45

*In re Corkill*, 771 F.2d 1496 (Fed. Cir. 1985) ......................................................... 38

*In re DBC*, 545 F.3d 1373 (Fed. Cir. 2008) ............................................................. 61

*In re Fulton*, 391 F.3d 1195 (Fed. Cir. 2004) ......................................................... 43

*In re Geisler*, 116 F.3d 1465 (Fed. Cir. 1997) ....................................................... 50

*In re Gurley*, 27 F.3d 551 (Fed. Cir. 1994) ........................................................... 42

*In re Hall*, 781 F.2d 897 (Fed. Cir. 1986) ............................................................... 9

*In re Harris*, 409 F.3d 1339 (Fed. Cir.2005) ......................................................... 55

*In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574; 106 S. Ct. 1348; 89 L. Ed. 2d 538 (1986), and *abrogated by Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist., Bd. of Sch. Directors for Marion Ctr. Area Sch. Dist.*, 917 F.2d 779 (3d Cir. 1990) .............................................................................................. 19, 20

*In re Klopfenstein*, 380 F.3d 1345 (Fed. Cir. 2004) ....................... 11, 12, 13, 14

*In re Kubin*, 561 F.3d 1351 (Fed. Cir. 2009) ................................................... 28, 42

*In re Malagari*, 499 F.2d 1297 (CCPA 1974). ....................................................... 50

*In re Merck & Co.*, 800 F.2d 1091 (Fed. Cir. 1986) ............................................. 56

*In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003) ............................................. 45, 50

*In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) ................................................. passim

*In re Woodruff*, 919 F.2d 1575 (CCPA 1990) ....................................................... 50

*In re Wright*, 866 F.2d 422 (Fed. Cir. 1989 ......................................................... 73

*In re Wright*, 999 F.2d 1557 (Fed. Cir. 1993) ............................................................... 65

*Indenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149 (Fed. Cir. 2019) ................... 26

*Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, No. CV 15-819-LPS-CJB, 2017 WL 11558096 (D. Del. Dec. 11, 2017) ................... 17

*INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 2013 WL 3216109 (D. Del. June 25, 2013) ................................................................................................. 16

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed. Cir. 2004) ................. 55

*Jockmus v. Leviton*, 28 F.2d 812 (2d Cir. 1928) ............................................................ 12

*Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963 (Fed. Cir. 2006) ................................... 51

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710 (3d Cir. 1997) ......................... 16, 23

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ......................................... 28, 39, 40

*M&K Holdings, Inc. v. Samsung Elecs. Co.*, 985 F.3d 1376, 1379 (Fed. Cir. 2021) ........................................................................................................... 11

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377 (Fed. Cir. 2012) ........................................................................................................... 27

*McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916 (3d Cir. 1985) ............................. 19, 20

*McRO, Inc. v. Bandai Namco Games Am., Inc.*, 959 F.3d 1091 (Fed. Cir. 2020) ........................................................................................................... 76

*Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157 (Fed. Cir. 2006) .............................. 36, 40

*Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804 (Fed. Cir. 1989) ............... 38, 52

*Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356 (Fed. Cir. 2017) ................... 51

*Mutual Life Ins. v. Hillmon*, 145 U.S. 285 (1892) ........................................................ 19

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190 (Fed. Cir. 1999) ................................................................................... 66

*nCube Corp. v. SeaChange Int'l, Inc.*, 809 F. Supp. 2d 337 (D. Del. 2011) ................ 22

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290 (Fed. Cir. 2002) ........................................................................................................... 24

*Novartis AG v Torrent Pharms., Ltd.*, 853 F.3d 1316 (Fed. Cir. 2017) ......................... 53

*Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006) ..................... 36, 42, 61

*Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309 (Fed. Cir. 1985) ....................... 61

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007) .................................... 38, 40

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007) ........................................................................................................... 38

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568 (D. Del. 2008) ........................................................................... 22

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008) .............................. 24, 25

*Promega Corp. v. Life Technologies Corp.*, 773 F. 3d 1338 (Fed. Cir. 2014) ............................................................................................................................... 65

*Regents of the Univ. of Cal. v. Howmedica, Inc.*, 530 F.Supp. 846 (D. N.J. 1981) ............................................................................................................................. 12

*Santarus, Inc. v. Par Pharm., Inc.*, 720 F. Supp. 2d 427 (D. Del. 2010) *aff'd in relevant part by* 694 F.3d 1344 (Fed. Cir. 2012) ...................................... 60

*Spectra Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524 (Fed. Cir. 1987) ....................... 68

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186 (Fed. Cir. 2008) .................... 13

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364 (Fed. Cir. 2011) ............................................................................................................................. 24

*Tracinda Corp. v. DaimlerChrysler AG*, 362 F.Supp.2d 487 (D. Del. 2005) ......... 16, 23

*United States v. Goichman*, 547 F.2d 778 (3d Cir. 1976) .............................................. 20

*United States v. Turner*, 718 F.3d 226 (3d Cir. 2013) .................................................. 20

*Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916 (Fed. Cir. 2004) .................... 72

*Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364 (Fed. Cir. 2021) ................. 10, 13

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ................................... 25, 64

*WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308 (Fed. Cir. 2018) ............................................................................................................................. 61

*White Consol. Indus., Inc. v. Vega Servo-Control, Inc.*, 713 F.2d 788 (Fed. Cir. 1983) ...................................................................................................................... 69

*Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340 (Fed. Cir. 2000).......................... 36

*Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010) ......................................... 53

*Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F3d 1380 (Fed. Cir. 2013) ...................... 27

*Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370 (Fed. Cir. 2007)....................... 24

## Statutes

35 U.S.C. § 102(a) .......................................................................................................... 31

35 U.S.C. § 102(b) ............................................................................................... 11, 14, 31

35 U.S.C. § 103(a) .......................................................................................................... 28

35 U.S.C. § 112 ......................................................................................................... 69, 73

35 U.S.C. § 112(a) (pre-AIA first paragraph) ................................................................ 64

**Other Authorities**

*Subtests of "Nonobviousness": A Nontechnical Approach to Patent*
*Validity*, 112 U. PA. L. REV. 1169, 1177 (1964) ........................................................................ 63

**Rules**

37 C.F.R. § 1.98(b)(5) ........................................................................................................... 9

Fed. R. Evid. 702(b) .............................................................................................................. 58

Fed. R. Evid. 901 ................................................................................................................... 22

Fed. R. Evid. 901(b) .............................................................................................................. 19

Fed. R. Evid. 901(b)(4) ......................................................................................................... 19

## TABLE OF ABBREVIATIONS

| Abbreviation | Exhibit No. | Description |
|---|---|---|
| '144 application | | U.S. Patent Application No. 12/337,144 |
| '276 provisional | JTX-007 | U.S. Provisional Application No. 61/120,276 |
| '384 publication | JTX-021 | WO Pub. No. 2006/114384 to Spittaels *et al.* |
| '544 patent | JTX-020 | U.S. Patent No. 6,555,544 to Francois *et al.* |
| '556 patent | DTX-433 | U.S. Patent No. 5,254,556 |
| '843 patent | DTX-434 | U.S. Patent No. 6,077,843 A to Marc K. J. Francois *et al.* |
| '906 patent | JTX-001 | U.S. Patent No. 9,439,906 |
| '918 provisional | JTX-022 | U.S. Provisional Application No. 61/014,918 |
| AE(s) | | Adverse event(s) |
| Cleton 46 | JTX-029 | Cleton *et al.*, PII-46 Abstract: Effects of Renal Impairment on the Pharmacokinetic Profile of Paliperidone Extended Release Tablets, Clin. Pharm. & Ther., Vol. 81(1), S63 (Mar. 2007) |
| Desai | JTX-030 | Desai, Ph.D. *et al.*, Parenteral Drug Delivery, Gibaldi Drug Delivery Systems in Pharmaceutical Care, Chap. 8, 104-122 (May 2007) |
| DMS-IV | JTX-216 | Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition |
| EPS | | Extrapyramidal symptoms |
| European Opposition | DTX-062 | Notice of Opposition filed by Hoffmann Eitle against Janssen's European Patent No. EP 2234617, titled "Dosing regimen associated with long acting injectable paliperidone esters" |
| Evans | JTX-032 | Evans *et al.*, "Blood flow in muscle groups and drug absorption", Clinical Pharmacology & Therapeutics, Vol. 17, No. 1, Jan. 1975, pp. 44-47. |
| FRE | | Federal Rule of Evidence |
| IDS | | Information Disclosure Statement |
| i.m. | | Intramuscular |
| Invega Label | JTX-167 | Invega® (paliperidone) Extended Release Tablets label, initial U.S. Approval 2006, label versions submitted to FDA for approval and revised December 2007 (2006) |
| Kamienski | JTX-034 | M. Kamienski *et al.*, Drug Action and Drug Interaction, Pharmacology Demystified, Chap. 2, 23-39 (2006) |
| Kramer | JTX-036 | Poster presentation authored by Michelle Kramer, Robert Litman, Rosanne Lane, Pilar Lim, David Hough, Jospeh Palumbo, and Marielle Eerdekens titled "Efficacy and Tolerability of Two Fixed Dosages of Paliperidone Palmitate in the Treatment of Schizophrenia: Results of a 9-Week, Placebo-Controlled Trial" |
| LAI(s) | | Long-Acting Injectable(s) |

| Abbreviation | Exhibit No. | Description |
|---|---|---|
| Lawrence Change to Labbate | JTX-280 | Labbate *et al.*, Ch. 2: Drugs for the Treatment of Psychotic Disorders, in Handbook of Psychiatric Drug Therapy (6th Ed. 2010) |
| NCT 548 | JTX-023 | Clinical study protocol NCT00210548 entitled "A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Dose-Response Study to Evaluate the Efficacy and Safety of 3 Fixed Doses (50 mg-eq., 100 mg-eq., and 150 mg-eq.) of Paliperidone Palmitate in Subjects with Schizophrenia" |
| NICE | | National Institute for Health and Care Excellence |
| October 2007 Medical Conference | | The 20th U.S. Psychiatric and Mental Health Congress in Orlando, Florida, October 11-14, 2007 |
| October 1 Email | DTX-698 | Email dated October 1, 2007, from Ambre Morley, Janssen's Manager, U.S. Psychiatry Communications to David Hough *et al.* regarding Updated Palmitate Release |
| October 11 Email | DTX-697 | Email dated October 11, 2007, from Dr. Maria Kyriazis-Christidou to David Hough *et al.* regarding USP&MHC 2007 posters – Part 4 |
| October Emails | | Collectively the October 1 Email and the October 11 Email (DTX-0697 and DTX-0698). |
| PANSS | | Positive and Negative Syndrome Scale |
| POSA | | Person Having Ordinary Skill in the Art |
| Poster Index | DTX-039 | The Poster Index for the 20th U.S. Psychiatric and Mental Health Congress in Orlando, Florida, October 11-14, 2007 |
| Press Release | DTX-698 at 3-6. | Press Release authored by Janssen announcing Kramer's presentation at the 20th U.S. Psychiatric and Mental Health Congress in Orlando, Florida, October 11-14, 2007 |
| RLD | | Reference Listed Drug |
| Snoeck | JTX-160 | Snoeck *et al.*, Abstract – Influence of age, renal and liver impairment on the pharmacokinetics of risperidone in man, Psychopharamacology, Vol. 122(3), 223-229 (Dec. 1995) |

## **INTRODUCTION**

The '906 patent is a method of treatment patent using a dosing regimen of paliperidone palmitate taught and rendered obvious by the prior art. Paliperidone palmitate, sold under the brand name, Invega Sustenna, is an old drug formulated in an old long-acting intramuscular depot injection. A POSA was already taught that schizophrenia could be treated with a therapeutically effective amount of an aqueous nanoparticle suspension of paliperidone palmitate administered as a once monthly intramuscular injection.

Kramer and NCT 548 teach dosing regimens for administering the old long-acting intramuscular injections of paliperidone palmitate through use of loading doses and maintenance doses. Each reference teaches administering intramuscular injections of paliperidone palmitate on Day 1 and Day 8 (the claimed first and second loading doses) and on Day 36 (the claimed first maintenance dose) into the gluteal muscle. NCT 548 further teaches administering a fourth injection on Day 64 (the claimed subsequent maintenance doses).

Kramer teaches that the highest paliperidone palmitate dose studied, 100 mg-eq., was more efficacious and had the least withdrawal rates due to efficacy than 50 mg-eq., all while exhibiting only a slight increase in adverse events. NCT 548 teaches a dosing regimen from a Phase 3 study in which 150 mg-eq. paliperidone palmitate is administered on Days 1, 8, 36, and 64.

A POSA would have been motivated to increase the plasma levels of paliperidone palmitate rapidly by administering the highest available dose (150 mg-eq.) to a schizophrenia patient to decrease withdrawal rates and bolster efficacy. A POSA also understood that deltoid (shoulder) injections instead of gluteal injections would have been obvious as these were the two most common sites for intramuscular injections. There was nothing inventive in selecting the highest available initiation loading dose and injecting it into a patient's shoulder.

The '906 patent does not enable or adequately describe the full scope of the claimed 25 to 150 mg-eq. dosage amounts administered in monthly ± 7 days (i.e., 17 day) maintenance dosing windows. The specification and figures of the '906 patent do not describe how to implement the range of claimed dosing windows and dosage amounts that would achieve therapeutic plasma levels of paliperidone for treating schizophrenia without undue experimentation. In addition, the 906 patent does not adequately convey that the inventors had possession of the full scope of the claimed dosing windows and dosage amounts. Accordingly, this Court should invalidate all claims of the 906 patent as obvious and not enabled or adequately described.

I.    **KRAMER IS PRIOR ART UNDER 102(B) AND EXHIBITS SUPPORTING THAT FINDING WERE PROPERLY ADMITTED AT TRIAL**

There is a factual dispute on whether one of Tolmar's prior art references, Kramer, was publicly displayed and accessible at an October 2007 medical conference. The Court conditionally admitted four exhibits (DTX-039, DTX-062, DTX-697, DTX-698) Tolmar submitted into evidence over Janssen's objections and invited briefing on their admissibility. Kramer was publicly accessible at the October 2007 medical conference and the four exhibits are admissible.

A.    **Background With Respect to Kramer**

Kramer is a poster presentation authored by Michelle Kramer, David Hough *et al.* titled "Efficacy and Tolerability of Two Fixed Dosages of Paliperidone Palmitate in the Treatment of Schizophrenia: Results of a 9-Week, Placebo-Controlled Trial" that was presented at the 20th U.S. Psychiatric and Mental Health Congress in Orlando, Florida, on October 13, 2007. Kramer discloses a nine (9)-week double blind study regarding efficacy and tolerability of a long-acting injectable formulation of paliperidone palmitate in schizophrenia patients. JTX-036. Kramer

teaches patients were randomized to receive either placebo, 50 or 100 mg-eq. doses of paliperidone palmitate injections (without oral supplementation) on days 1, 8, and 36 of the study. *Id.* at 2.[1]

During prosecution of the '906 patent, in an IDS dated April 11, 2011, Janssen cited Kramer and identified it as a "POSTER AT THE 20TH US PSYCHIATRIC AND MENTAL HEALTH CONGRESS (USPMHC), ORLANDO, FLORIDA, USA, OCTOBER 11-14, 2007." JTX-002 at 183. Janssen also provided a copy of Kramer in the IDS. *Id.* at 236-242.[2] Kramer discloses that it was a poster at the October 2007 Medical Conference on the title page Janssen submitted in the IDS. *Id.* at 236; *see also* JTX-036 at 1. Kramer has seven sections titled: Abstract, Introduction, Objectives, Methods, Results, and Conclusions. JTX-036 at 2-7; JTX-002 at 236-242; DTX-697 at 7. At the end of Kramer, it discloses that it was "Poster No. 313 ***presented at*** USP&MHC, October 11-14, 2007."  JTX-002 at 242; JTX-036 at 7; DTX-697 at 7. (emphasis added).

The Poster Index confirms that Poster No. 313 is Kramer. DTX-039 at 2 (listing Poster No. 313 as authored by Kramer M, Litman R, Lane R *et al.* and titled "Efficacy and Tolerability of Two Fixed Dosages of Paliperidone Palmitate in the Treatment of Schizophrenia: Results of a 9-Week, Placebo-Controlled Trial"). The Poster Index indicates that Kramer, along with 25 other posters, were to be presented in the Exhibit Hall of the meeting venue on the afternoon of October 13, 2007, from 2:15 p.m. to 5:15 p.m. *Id.* at 1-2. The Poster Index also identifies 28 poster presentations to be presented on October 11, 2007, and 27 posters presentations to be presented on

---

[1] JTX-XXX at # refers to page numbers identified as JTX-00000#. This also applies to Plaintiffs' Trial Exhibits and Defendant's Trial Exhibits.

[2] JTX-036 is a copy of Kramer that was produced by Tolmar. As discussed in Section B, JTX-036 is the same document Janssen provided in the IDS (JTX-002 at 236-242). During trial, Janssen's counsel confirmed that they contain the same material. Day 1 Tr. 116:1-6. The copies of Kramer produced by Tolmar and submitted by Janssen in the IDS contain the same information as the final version of the Kramer poster attached to the email shown in DTX-697 at 7.

October 12, 2007. *Id.* All the poster titles indicate the topics presented related to diagnosis and treatment of mental health disorders, such as depression, mania, and schizophrenia. *Id.*

On October 1, 2007, Ambre Morley, Janssen's Manager, U.S. Psychiatry Communications, sent an email to various persons, including David Hough, an author of Kramer. DTX-698. In her email, Ms. Morley states that she has attached an updated Press Release for U.S. Psych. *Id.* at 1. The Press Release indicates that, "[p]aliperidone palmitate, an investigational once-monthly, long-acting injectable, was more effective than placebo in treating patients with acutely exacerbated schizophrenia, according to data presented for the first time today at the 20th Annual U.S. Psychiatric and Mental Health Congress in Orlando, Florida[]" and includes a footnote citing Kramer. *Id.* at 3, 6. In addition, the Press Release discloses that schizophrenia patients were randomized to receive either placebo, 50 or 100 mg-eq. doses of paliperidone palmitate injections (without oral supplementation) on days 1, 8, and 36 of the study. *Id.* at 3. Janssen further states that Kramer showed that a monthly injection of paliperidone palmitate improved symptoms of schizophrenia in patients with acute symptomatic schizophrenia and was well tolerated. *Id.*

David Hough, a fact witness for Janssen, testified that he has seen press releases prepared by Janssen and that the Press Release is a normal, routine press release that Janssen sent out. Day 2 Tr. 329:22-330:6.[3] He further testified that, "[i]f [posters] were not presented, likely the press release would not have been made. *Id.* at 331:21-22.

On October 11, 2007, Dr. Maria Kyriazis-Christidou sent an email to various individuals, including David Hough, stating, "[w]e are attaching the final USP&MHC 2007 posters for your file." DTX-697 at 1. The second attachment to the email is Kramer. *Id.* at 7. The other posters attached to the October 11 Email are all listed in the Poster Index. *Id.* at 6, 8-10; DTX-039 at 2.

---

[3] There were four days of trial in this case. All citations to "Day X Tr. _" refer to the corresponding transcript from that particular day of trial.

At trial, following Janssen's counsel's examination of Dr. Hough on redirect, the Court asked Dr. Hough several questions regarding Kramer:

| THE COURT: | Do you recognize that reference as something that you assisted at least in preparing? |
|---|---|
| THE WITNESS: | Yes. |
| THE COURT: | And is that poster of the material that we have, which is asserted to be the material that was on the poster in some form, is that accurate in your view as to something that you prepared? |
| THE WITNESS: | Yes, because typically what would happen would be once the study results were in and analyzed, a poster would be developed, but it would be broadly reviewed by all the stakeholders, statisticians, pharmacologists, physicians, and even maybe one level up. |
| | So everybody would review that for accuracy to make sure that it was exactly what the data showed. We didn't want to present anything that was inaccurate. |
| THE COURT. | And the exhibit that we have, which contains purportedly the contents of that poster, is the material that you reviewed? |
| THE WITNESS. | Yes, it is the material that I reviewed, and at the time, it would have been it would have been as accurate a presentation as we know. |

Day 2 Tr. 332:4-12. Thus, Dr. Hough confirmed that the information contained in Kramer and the October 11 Email is the information presented at the October 2007 Medical Conference.

**B.      Janssen's Routine Business Practice for Poster Presentations**

Three copies of the Kramer reference were submitted into evidence at trial. Tolmar produced its own copy of Kramer. JTX-036. In addition, the second attachment to the October 11 Email is a copy of Kramer in its final single-page poster format. DTX-697 at 7. Janssen also produced a copy of Kramer that it disclosed in the IDS. JTX-002 at 236-242.

Dr. Hough confirmed that he recognized Kramer as something that he assisted in preparing. Day 2 Tr. 332:9-12. Dr. Hough testified that the Kramer poster is accurate as the poster that was prepared and reviewed for accuracy. *Id.* at 332:13-333:4. He also confirmed that Kramer is the material he reviewed. *Id.* at 333:5-12. Dr. Hough's testimony confirms that Kramer is the material presented at the October 2007 Medical Conference.

The only textual difference between the three copies of the Kramer presentation is that Tolmar's copy and the copy Janssen submitted in the IDS include a statement above the title that it is a poster at the October 2007 Medical Conference. *Compare* JTX-036 at 1 *and* JTX-002 at 236, *with* DTX-697 at 7. With respect to formatting, Tolmar's copy and Janssen's copy of Kramer submitted in the IDS have the subject matter of the poster enlarged and spread out over several pages, whereas the final poster presentation attached to the October 11 Email contains the same subject matter in one page. *Compare* JTX-036 *and* JTX-002 at 236-242, *with* DTX-697 at 7.

In addition to Dr. Hough's testimony, the prosecution history of the '906 patent shows that Janssen's routine business practice is to present data in the format of a poster, with the information in the poster organized in columns. JTX-002 at 247, 252, 269. Janssen's routine business practice is further shown in the other posters attached to the October 11 Email. *See* DTX-697 at 6, 8-10. Dr. Hough's testimony also evidences Janssen's routine business practice of presenting study results in the format of a poster. Day 2 Tr. 332:19-21 ("…[T]ypically what would happen would be once the study results were in and analyzed, a poster would be developed….").

When submitting posters in an IDS, Janssen has a routine business practice of providing the contents of the poster spread out over the span of several pages. This routine business practice is evidenced in Janssen's IDS for Kramer. In the IDS, Janssen discloses Kramer's authors, title, place of presentment and the dates of the October 2007 Medical Conference. JTX-002 at 183.

While the copy of Kramer attached to the October 11 Email shows Kramer's contents on a single sheet of paper, in the IDS, Janssen provided Kramer by spreading the poster's columns over the course of several pages. *Id.* at 236-242; DTX-697 at 7. In the IDS, Janssen submitted the poster presentation such that the title is reflected on the first page, the Abstract, Introduction, and Objectives are on the second page, a portion of the Methods is on the third page, the remainder of the Methods and the beginning of the Results are on the fourth page, the Results continue on the fifth, sixth, and seventh pages, and the Conclusions are on the seventh page. JTX-002 at 236-242.

By way of further example of Janssen's routine business practice, in the IDS, Janssen identifies the authors, title, place of presentation and dates for the poster titled "Cost-effectiveness of Paliperidone Palmitate Versus Oral Atypicals in the US" (*Id.* at 185) and provides the poster presentation on a single page with columns (*Id.* at 269), as well as a copy of the poster with its columns spread out over the span of several pages (*Id.* at 270-274). Similarly, in the IDS, Janssen discloses the authors, title, place of presentation and dates for the poster presentation titled "Effects of Paliperidone Palmitate in Acutely Ill Subjects with a Marked to Severe Exacerbation of Schizophrenia" (*Id.* at 185) and submits the poster presentation on a single page with multiple columns (*Id.* at 275), as well as a copy of the poster spread out over several pages (*Id.* at 276-280).

Janssen's submission of Kramer in the IDS is not a one-off occurrence. Rather, the prosecution history for the '906 patent shows that Janssen has a routine business practice of presenting data in the form of posters at conferences and then disclosing the posters in an IDS. *See Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1569 (Fed. Cir. 1988) (holding that evidence of routine business practice can be used to show that a reference was accessible). Based on Janssen's routine business practice of displaying data in posters and disclosing the posters in

an IDS, Kramer was presented at the October 2007 Medical Conference and the data presented there is the same data that was submitted by Janssen in the IDS with respect to Kramer.

### C.      Kramer Was Presented at the October 2007 Medical Conference

There is strong evidence that Kramer was presented at the October 2007 Medical Conference. First, the Press Release corroborates that Kramer's subject matter was presented at the October 2007 Medical Conference, beginning at 2:15 p.m. on October 13, 2007. Second, Dr. Hough's testimony confirms that Kramer's subject matter is the subject matter presented at the October 2007 Medical Conference. Dr. Hough further testified the creation of the Press Release makes it likely Kramer was presented.  Third, Janssen's own statements in the IDS corroborate that the Poster was presented at the October 2007 Medical Conference. Fourth, the Poster Index identifies Kramer's poster number, publication date, and location. Fifth, the October 11 Email provides additional evidence that Kramer's subject matter is what was presented at the October 2007 Medical Conference.

### 1.      Press Release

The Press Release prepared by Janssen expressly provides that Kramer was presented on October 13, 2007 at the 20th U.S. Psychiatric and Mental Health Congress.  DTX-698 at 3, 6 n.1 The Press Release is set to be released on October 13, 2007 at 2:15 p.m., the exact time that Kramer is slated for presentment in the Poster Index. *Id.* at 3; DTX-0039. In addition, the Press Release's description of the information presented at the October 2007 Medical Conference is consistent with the data shown in Kramer. DTX-698 at 3, 4.  Moreover, the Press Release was sent to at least fourteen people with "High Importance." It is unlikely that Janssen would take the time to prepare a press release regarding presentment of data, send it to fourteen people, including two authors (David Hough and Joseph Palumbo), for their review with a designation of "High Importance" and then not actually present the data. DTX-698 at 1.

### 2.     Dr. Hough's Testimony

Dr. Hough testified that he has seen press releases prepared by Janssen and that the Press Release in the October 1 Email is a normal, routine press release that Janssen has sent out. Day 2 Tr. 329:22-330:6. He further testified that, "[i]f [posters] were not presented, likely the press release would not have been made. *Id.* at 331:21-22.

"The probative value of routine business practice has long been recognized." *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986) (citing sources). In *Hall*, the Federal Circuit found that an affiant's statement that a reference "most probably was available for general use toward the beginning of the month" was persuasive evidence that the reference was accessible in the affiant's library prior to the critical date, because the affidavits revealed that the affiant relied on his library's general practice for indexing, cataloging, and shelving theses in making his estimation. *Id.* Here, Dr. Hough likewise relied on his knowledge of Janssen's routine business practice of preparing press releases regarding data presented in posters when he testified that if a poster was not presented, it was likely that the press release would not have been made.

In addition, Dr. Hough authenticated the contents of Kramer as what was prepared for presentment at the October 2007 Medical Conference. Day 2 Tr. 332:9-333:12. Dr. Hough's testimony is persuasive evidence that Kramer was presented at the October 2007 Medical Conference on October 13, 2007.

### 3.     Janssen's Statements in the IDS

An applicant is required to provide a date and place of publication for each reference listed in an IDS. 37 C.F.R. § 1.98(b)(5). In the IDS dated April 11, 2011, Janssen specifically states that Kramer is a "POSTER AT THE 20TH US PSYCHIATRIC AND MENTAL HEALTH CONGRESS (USPMHC), ORLANDO, FLORIDA, USA, OCTOBER 11-14, 2007." JTX-002 at 183. In the IDS, Janssen also submitted a copy of Kramer which states on its face that it is a poster

presented October 11-14, 2007 at the 20th US Psychiatric and Mental Health Congress (USPMHC), Orlando, Florida. *Id.* at 236-242.

It is settled that submission of an IDS does not constitute an admission that the reference is material prior art. However, Janssen's IDS is significant not because of the inclusion of Kramer but because of Janssen's express representation that Kramer's date of publication is October 11-14, 2007 and place of publication is the 20th U.S. Psychiatric and Mental Health Congress in Orlando, Florida. *See Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1375 (Fed. Cir. 2021) (finding an information disclosure statement significant because the applicants stated in the IDS that the reference was published in the year 2010). Janssen was legally required to list Kramer's publication date and publication location. It is unlikely Janssen listed inaccurate information or information it did not believe to be true.

### 4.    The Poster Index

The Poster Index provides that Kramer will be presented on October 13, 2007, from 2:15-5:15 p.m., at the 2007 U.S. Psychiatric and Mental Health Conference. DTX-039 at 1, 2. The Poster Index lists Kramer as Poster No. 313, which is the same poster number listed on Kramer itself. *Id.* at 2; JTX-036 at 7; JTX-002 at 242. Dr. Coles testified that the Poster Index is very similar to other poster indexes she has received at conferences. Day 1 Tr. 124:18-22. Dr. Coles further testified that abstract books listing the posters that will be presented are provided to conference attendees in advance of the conference or at the time of check-in so attendees can determine which posters they want to see. *Id.* at 103:9-24.

### 5.    The October 11 Email

The October 11 Email shows that on the morning of the first day of the October 2007 Medical Conference, a final version of the Kramer poster presentation was sent to approximately fifty individuals. DTX-697 at 1.  The October 11 Email notes that it is with respect to "USP&MHC

2007" which is the 2007 U.S. Psychiatric and Mental Health Congress. *Id.* Furthermore, the copy of Kramer attached to the October 11 Email is the same subject matter as Janssen's submission of Kramer in the IDS. *Id.* at 7; JTX-002 at 236-242. The copy of Kramer attached to the October 11 Email also states on its face that it was Poster No. 313 presented at the USP&MHC: Orlando, October 11-14, 2007. DTX-697 at 7.

While Tolmar bears the burden of proof on showing Kramer was publicly displayed, it is telling that Janssen has not come forth with any evidence suggesting that Kramer was <u>not</u> presented at the October 2007 Medical Conference. Based on all of the foregoing evidence, it is clear that Kramer was displayed and publicly accessible at the October 2007 Medical Conference.

### D.    Kramer Is a Printed Publication

The touchstone of whether a reference qualifies as a printed publication under 35 U.S.C. § 102(b) is public accessibility. *M&K Holdings, Inc. v. Samsung Elecs. Co.*, 985 F.3d. 1376, 1379 (Fed. Cir. 2021) (citing *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004) and *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 772 (Fed. Cir. 2018)).  In determining whether a temporarily displayed reference is a printed publication, courts must consider the following factors: (1) "the length of time the display was exhibited"; (2) "the expertise of the target audience"; (3) "the existence (or lack thereof) of reasonable expectations that the material displayed would not be copied"; and (4) "the simplicity or ease with which the material displayed could have been copied." *Klopfenstein*, 380 F.3d at 1350.

### 1.    Kramer Was Displayed for Sufficient Time for Attendees to Retain Its Information

The length of the time a reference was displayed is relevant for determining the opportunity the public had in capturing and retaining the information disclosed in the reference. *Id.* at 1351. For example, a reference was determined to not be a printed publication when the reference consisted of a presentation of displayed projections of slides showing pictures and drawings of the

knee that were limited in duration. *Regents of the Univ. of Cal. v. Howmedica, Inc.*, 530 F.Supp. 846, 860 (D. N.J. 1981); *see also Klopfenstein*, 380 F.3d at 1350-51 (citing *Howmedica* for the proposition that the more transient a display, the less likely it is a printed publication). Kramer was presented at the October 2007 Medical Conference on October 13, 2007, at least from 2:15-5:15 p.m. DTX-039. Three hours is more than enough time for members of the public to review, process, and take notes on or photograph Kramer's contents. In addition, Dr. Coles testified that presenters typically get up early to hang their posters before the conference starts (Day 1 Tr. 104:19-23), so it is likely Kramer was on display all day.

### E.   Kramer's Target Audience Consists of POSAs of the '906 Patent

"The expertise of the intended audience can help determine how easily those who viewed it could retain the displayed material." *Klopfenstein*, 380 F.3d at 1351. When the target audience consists of persons having ordinary skill in the art of the patent in suit, even an ephemeral reference may be a printed publication. *Id.* (citing *Jockmus v. Leviton,* 28 F.2d 812, 813–14 (2d Cir. 1928)). The conference at which Kramer was presented was the U.S. Psychiatric and Mental Health Congress. All of the poster titles at the October 2007 Medical Conference indicate the topics presented relate to diagnosis and treatment of mental health disorders, such as depression, mania, and schizophrenia. DTX-039. The October 2007 Medical Conference was also a CME or "Continuing Medical Education," so psychiatrists and physicians would be in attendance. *Id.* at 1. Thus, it is reasonable to presume that the intended audience of Kramer at the October 2007 Medical Conference was persons having ordinary skill in the art of the '906 patent.

### 1.   There Is No Evidence of an Expectation that Conference Attendees Would Keep Kramer's Contents Confidential

In this case, there is no evidence showing the existence of reasonable expectations that the information disclosed in Kramer would not be copied. Rather, the evidence here shows an

expectation that the information reach the general public. "Where parties have taken steps to prevent the public from copying temporarily posted information, the opportunity for others to appropriate that information and assure its widespread public accessibility is reduced." *Klopfenstein*, 380 F.3d at 1351. In contrast, evidence of the intent to publicize the information in a reference weighs in favor of a finding that the reference was publicly accessible. *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1196 (Fed. Cir. 2008); *see also Valve Corp*, 8 F.4th at 1374 (noting that public accessibility is indicated when the reference's purpose is "dialogue with the intended audience"). In *Klopfenstein*, the reference was displayed at professional conferences and "printed for the entire purpose [of] public communication of the relevant information." *SRI Int'l*, 511 F.3d at 1196 (citing *Klopfenstein*, 380 F.3d at 1347-50)).

Just as in *Klopfenstein*, Kramer was displayed at a professional conference with the goal of conveying its information to the target audience. Kramer's purpose of dialogue with the target audience is further evidenced by the Press Release Janssen prepared disclosing that Kramer had been presented at the October 2007 Medical Conference. DTX-697. If Janssen expected Kramer's contents presented at the October 2007 Medical Conference to remain confidential, it certainly would not have prepared the Press Release. Furthermore, Kramer is devoid of any disclaimer discouraging attendees from copying it. *See Klopfenstein*, 380 F.3d at 1351 (finding it relevant that the reference did not contain a disclaimer discouraging copying). Dr. Coles testified that when she or her colleagues have presented posters at scientific meetings, there are no restrictions on what a person can look at or take from the poster. Day 1 Tr. 126:23-127:4. Dr. Dizon testified that a "poster's main purpose is to advertise" the presentation. *Id.* at 444:15-17.

### 2.   Kramer's Information Was Easily Retained or Copied by Conference Attendees

Furthermore, Kramer is sufficiently simple such that members of the public were capable of effectively processing and/or taking notes on it. In *Klopfenstein*, the Federal Circuit determined that a reference made up of 14 separate slides was not too difficult for members of the public to process. *Id*. Likewise, here, the information in Kramer is succinctly organized under separate headings and columns with bullet points making it easy to review. JTX-036; DTX-697 at 7. Kramer also includes an abstract where the information is briefly summarized. JTX-036 at 2; DTX-697 at 7. In addition, Dr. Coles testified that a presenter typically is expected to answer questions and discuss the research presented in the poster (Day 1 Tr. 104:11-18), making it easier for attendees to retain and understand the data. She further explained that posters are usually around three-foot by four-foot, either in width or length. *Id.* at 105:16-19.

Based on all of the foregoing, there is sufficient evidence in the record to conclude that Kramer was publicly available and is a printed publication under pre-AIA 35 U.S.C. § 102(b).

### F.   The Kramer Evidence Is Admissible

Given the importance of Kramer to Tolmar's obviousness defense, it is not surprising that each of the evidentiary issues at trial concerned Tolmar's evidence showing Kramer is a printed publication. Janssen objected to the admission of four exhibits Tolmar sought to introduce into evidence at trial. Day 1 Tr. 7:12-8:3, 106:7-11, 107:2-23, 116:22-117:2, 120:9-13, 124:3-12, 345:23-346:10; Day 2 Tr. 313:22-313:24, 323:24-324:2, 326:9-14. For the reasons set forth below, each of these exhibits should be admitted.

### 1.   The October Emails

In Plaintiffs' Initial Disclosures, Janssen listed Dr. Hough as an individual likely to have discoverable information. Janssen's summary of information possibly known by Dr. Hough makes

no reference to Kramer. *Id.* In Plaintiffs' Witness List, Janssen's description for Dr. Hough is also

void of any reference to Kramer. D.I. 132, Ex. 9 at 2. In response to Plaintiffs' Witness List, Tolmar

specifically objected to Dr. Hough presenting any testimony regarding Kramer being prior art. *Id.*

at 4-5. Thus, Janssen failed to disclose any information giving Tolmar notice Dr. Hough may testify

regarding Kramer at trial.

      Despite giving Tolmar no indication that Dr. Hough would testify regarding Kramer,

Janssen's counsel opened the evidentiary door by engaging in a line of questioning with Dr. Hough

regarding Kramer and its presentation at the October 2007 Medical Conference. Day 2 Tr. 230:1-

16. Dr. Hough initially testified on direct examination that he did not know whether Kramer was

presented at the October 2007 Medical Conference. *Id.* at 230:12-16. On cross-examination,

Tolmar's counsel also questioned Dr. Hough regarding Kramer and its presentation. *Id.* at 310:18-

311:24. Dr. Hough confirmed that internal documents sent to him during the relevant timeframe

would help refresh his recollection as to whether Kramer was presented. *Id.* at 311:20-24.[4]

      The first document Tolmar's counsel provided to Dr. Hough is the October 11 Email

Janssen produced from Maria Kyriazis-Christidou to various individuals, including Dr. Hough,

stating, "[w]e are attaching the final USP&MHC 2007 posters for your file." DTX-697 at 1

(JANUS01717965–1717974). The second attachment to the email is Kramer. *Id.* at 7. After

reviewing the October 11 Email, Dr. Hough testified that the second attachment looks like the

Phase 2 study SCH 201 results (Kramer). Day 2 Tr. 321:10-19.

      The second document Tolmar's counsel gave to Dr. Hough to review is the October 1 Email

produced by Janssen, from Ambre Morley, Janssen's Manager, U.S. Psychiatry Communications,

---

[4] Dr. Hough testified that in the weeks leading to trial he refreshed his memory of several clinical trials related to paliperidone palmitate that he could not testify about during his deposition because it had been many years since he had last seen those studies. Day 2 Tr. 286:17-288:19, 311:16-19.

to various persons, including Dr. Hough. DTX-698 (JANUS01622881–1622886). In Ms. Morley's email, she states that she has attached an updated press release for U.S. Psych. *Id.* at 1. The Press Release announces that the data contained in Kramer was presented at the October 2007 Medical Conference on October 13, 2007. *Id.* at 3. Dr. Hough testified that he has seen press releases prepared by Janssen (Day 2 Tr. 329:22-330:1) and that the Press Release in the October 1 Email was a normal, routine press release that Janssen sends out. *Id.* at 330:2-6. Dr. Hough further testified that if posters were not presented, likely press releases would not have been made. *Id.* at 331:17-22.

Tolmar moved to admit the October Emails into evidence and the Court admitted them conditionally. *Id.* at 343:12-16. Janssen objects to the admission of the October Emails on the grounds of non-impeachment and to their use for any purpose other than impeachment, on the basis that they were not disclosed as trial exhibits prior to Dr. Hough's cross-examination. *Id.* at 326:24-327:1-2, 332:26:9-11.

District courts should consider the following factors in determining whether a party's alleged untimely disclosure of evidence warrants the "extreme" sanction of exclusion: (1) the prejudice or surprise of the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the extent to which admitting the evidence would disrupt trial; (4) the bad faith or willfulness involved; and (5) the importance of the evidence. *INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 2013 WL 3216109, at *2 (D. Del. June 25, 2013) (citing *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) and *Tracinda Corp. v. DaimlerChrysler AG,* 362 F.Supp.2d 487, 506 (D. Del. 2005)). "[E]xclusion should be reserved for circumstances amounting to 'willful deception or flagrant disregard of a court order by the proponent of the evidence.'" *Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, No. CV 15-819-LPS-CJB, 2017 WL

11558096, at *4 (D. Del. Dec. 11, 2017) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 792 (3d Cir. 1994)).   In this case, the Court allowed for a good cause exception to the notion that evidence not called to the attention of the other party at the time the exhibit lists were submitted is inadmissible. Day 2 Tr. 317:9-16; Pretrial Conference Tr. 16:2-3.

The drastic measure of exclusion is not warranted here. If any party has suffered incurable prejudice or surprise, it is Tolmar because Janssen never disclosed that Dr. Hough had discoverable information or would testify regarding Kramer's presentation. As stated by Tolmar's counsel at trial, Tolmar had no way of knowing that documents concerning Kramer would be useful during its cross-examination of Dr. Hough. Day 2 Tr. 313:12-13. Furthermore, Janssen produced the October Emails, so it was aware of their existence and contents prior to trial. Janssen engaged in its own line of questioning on the October Emails with Dr. Hough on redirect examination. After Dr. Hough's cross-examination, the Court ordered that Janssen could recall a witness (which Janssen did not do) or make other use of the October Emails in any way it saw fit during its case in chief. *Id.* at 337:10-19. Janssen has not suffered any incurable prejudice or surprise.

In addition, the use of the October Emails did not cause disruption or seriously impede the trial. While Janssen was given the opportunity to recall witnesses for questioning on the October Emails, it chose to not do so. Save a few minutes of discussion regarding objections, the introduction of the October Emails at trial did not cause delay and the trial continued in an orderly and efficient manner.

Furthermore, there is no evidence here of willful deception or flagrant disregard of a Court Order. As discussed above, Janssen failed to give Tolmar notice that Dr. Hough would testify regarding Kramer. Thus, in the months leading up to trial, Tolmar did not have reason to prepare its cross-examination of Dr. Hough with respect to Kramer. In addition, Tolmar's counsel

represented to the Court that it discovered the October Emails late in the night during its final preparations for the second day of trial. *Id.* at 316:7-11, 316:24-317:1. While Tolmar takes heed to the Court's remarks that evidence a party thinks it might use at trial should be called to the attention of the other party, it respectfully submits that it had a reasonable belief that Dr. Hough would not testify regarding Kramer's presentation and the October Emails would have no use in his cross-examination. Under these circumstances, Tolmar's actions with respect to disclosure of the October Emails are excusable and certainly do not rise to willful deception or flagrant disregard.

Lastly, as shown throughout this brief, the October Emails are important evidence for Tolmar's obviousness defense. The October 1 Email provides evidence that Dr. Hough received a copy of the final format of Kramer for the October 2007 Medical Conference. DTX-697. The October 11 Email shows that a press release was created regarding Kramer's presentment at the October 2007 Medical Conference (DTX-698), and Dr. Hough testified that if posters were not presented, press releases likely would not be made. Day 2 Tr. 331:17-22. Based on Dr. Hough's testimony regarding press releases, in his viewpoint, it is likely that Kramer was presented.

For all the above reasons, Tolmar respectfully submits that the extreme sanction of exclusion is not warranted, and the October Emails should be admitted.

### 2.    The Poster Index Was Sufficiently Authenticated

Dr. Lisa Coles, Tolmar's pharmacokinetics expert, testified that the Poster Index is a poster index for the U.S. Psychiatric and Mental Health Congress Conference. Day 1 Tr. 106:2-4, 117:8-11. Dr. Coles further testified that the conference in the Poster Index is the same conference referenced in Kramer. *Id.* at 117:12-14 (referring to JTX-036). She explained that the dates on the Poster Index correspond to the poster presentation date in Kramer. *Id.* at 117:15-22; DTX-039; JTX-036 at 1, 7. In addition, Dr. Coles testified that the Poster Index, "lists all of the posters and abstracts that were to be presented and the dates and the times as shown here." Day 1 Tr. 118:3-5.

The Poster Index reports that, "[t]he posters listed below will be presented during Exhibit Hall hours." DTX-039 at 1. It shows that Poster No. 313 by Kramer M, Litman R, Lane R *et al.* and entitled "Efficacy and Tolerability of Two Fixed Dosages of Paliperidone Palmitate in the Treatment of Schizophrenia: Results of a 9-Week, Placebo-Controlled Trial" was to be presented on Saturday, October 13th at 2:15-5:15 p.m. *Id.* at 1-2.

Janssen has lodged objections to the Poster Index as inadmissible hearsay under FRE 802 and lacking authentication under FRE 901. With respect to Janssen's hearsay objection, the Court has determined that the Poster Index falls under the hearsay exception found in FRE 803(3) and the *Hillmon* Doctrine. *See Mutual Life Ins. v. Hillmon*, 145 U.S. 285, 296 (1892); Pretrial Conference Tr. 94:4-5 ("…I don't think there's an 802 issue here."); Day 1 Tr. 10:15-16 ("So as far as the hearsay problem, I don't see a problem.").

FRE 901 is also satisfied, as there is sufficient evidence in the record to infer that the Poster Index is a poster index of the posters to be presented at the 2007 U.S. Psychiatric and Mental Health Congress. For authentication, "[a]ll that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 928–29 (3d Cir. 1985) (quoting *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574; 106 S. Ct. 1348; 89 L. Ed. 2d 538 (1986), and *abrogated by Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist., Bd. of Sch. Directors for Marion Ctr. Area Sch. Dist.*, 917 F.2d 779 (3d Cir. 1990)).  Circumstantial evidence is sufficient to authenticate a document. *McQueeney*, 779 F.2d at 928. Under FRE 901(b), authenticity may be inferred from "appearances, contents, substance, internal patterns or other distinctive characteristics, taken in conjunction with circumstances." Fed. R. Evid. 901(b)(4). The list in FRE 901(b) is non exhaustive and other

circumstantial evidence may also be relied upon to authenticate documents. *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013) (citing cases). Tolmar has met its slight burden in authenticating the Poster Index. *Id.* (citing *McQueeney*, 779 F.2d at 928).

First, the Poster Index appears on its face to be a poster index for the 2007 U.S. Psychiatric and Mental Health Congress and has the appearance typical of poster indexes for conferences. *See Turner*, 718 F.3d at 233 (stating that the appearance of documents supported their authentication because they "have the official appearance of bank records," "bear the insignia of foreign bank records," and "contain the type of transaction data typically present on bank records"); *Japanese Elec. Prods.,* 723 F.2d at 285 (determining documents claimed to be minutes of an association's monthly meetings were shown to be authentic and noting that, "they have the appearance…typical of minutes"). Dr. Coles testified that the Poster Index is very similar to other poster indexes that she has received at conferences and that there is nothing in the Poster Index that tells her it is not what it says it is. Day 1 Tr. 124:18-125:1. Moreover, it is on letterhead that states across the top, "2007 U.S. Psychiatric and Mental Health Congress" and bears insignias for Continuing Medical Education and the U.S. Psychiatric and Mental Health Congress. DTX-039. It expressly discloses that it is a "Poster Index. . . .The posters listed below will be presented during Exhibit Hall hours" and lists a multitude of posters regarding psychiatric and mental health matters. *Id.* Dr. Coles' testimony was not rebutted by any evidence and no witness testified in opposition to her testimony. Dr. Coles' testimony is the only testimony before the Court on this subject.

Furthermore, the contents of the Poster Index are consistent with other evidence in this case. *See United States v. Goichman*, 547 F.2d 778, 784 (3d Cir. 1976) (finding document sufficiently authentic when it referred to children having the same name as the defendant's and its contents were further corroborated by bank statements and another exhibit). The Poster Index

shows that the title and authors listed for Poster No. 313 is consistent with the information shown in the IDS and Kramer. JTX-002 at 183, 236-242; JTX-036 at 1, 7. The prosecution history of the '906 patent shows that Janssen submitted Kramer's authors, title, and that it is a Poster at the October 2007 Medical Conference, as prior art in the IDS. JTX-002 at 183. The prosecution history further contains a copy of Kramer in the IDS. *Id.* at 236-242. The Poster Index is consistent with the October 11 Email, in which its author states, "[w]e are attaching the final USP&MHC 2007 posters for your files." DTX-697 at 1. Each poster attached to the email is consistent with the contents of the Poster Index. *Id.* at 6-10; DTX-039 at 2 (showing the October 11 Email posters are consistent with Poster Nos. 301, 302, 310, 313, and 314 on the Poster Index). The Press Release attached to the October 1 Email indicates that it is embargoed for release until October 13, 2007 at 2:15PM EST—the date and time that the Poster Index shows that the Kramer Poster is to be presented. DTX-698 at 3; DTX-039. The press release further provides that the data was "presented for the first time today at the 20th Annual U.S. Psychiatric and Mental Health Congress in Orlando, Florida" and has a footnote to Kramer. DTX-698 at 3, 6.

Lastly, the source of the Poster Index, is a notice of opposition filed against European Patent No. EP 2234617, titled "Dosing regimen associated with long acting injectable paliperidone esters". DTX-062. In the European Opposition, the Poster Index is disclosed specifically in connection with Kramer. *Id.* The European Opposition is self-authenticating under FRE 902(3) and (4). Fed. R. Evid. 902. It is unlikely that the opponent of a patent would submit information in its opposition that is not accurate. Based on the foregoing, Tolmar has satisfied its slight burden in authenticating the Poster Index such that it should be admitted.

### 3.   Exclusion of the European Opposition is Unwarranted

The European Opposition was filed against the European counterpart of the '906 patent. *Id.* Janssen is the proprietor of the patent and Hoffmann Eitle is the opponent. *Id.* Following

Janssen's objection at trial to the Poster Index under FRE 901, Dr. Coles testified that the Poster Index was found in the European Opposition. Day 1 Tr. 106:19-22. Janssen objects on the basis that the European Opposition was not disclosed as a material considered in connection with Dr. Coles's expert report. *Id.* at 107:17-19.

In her expert report, Dr. Coles clearly discloses her opinion and reliance on the Poster Index. In addition, Dr. Coles cites Tolmar's Invalidity Contentions filed June 10, 2022 and accompanying exhibits as a material considered in connection with her Report. *Id.* Tolmar's Invalidity Contentions disclose the European Opposition. *Id.* ¶ 5. After having her memory refreshed with her Opening Expert Report, Dr. Coles testified that she considered Tolmar's invalidity contentions in connection with her Report. Day 1 Tr. 338: 20-23. Therefore, Dr. Coles's consideration of the European Opposition is sufficiently disclosed in her Report.

Even if Dr. Coles did not disclose her consideration of the European Opposition in her Report (she did), it should be admitted because Dr. Coles's testimony regarding the European Opposition was limited to identifying it as the source of the Poster Index. "When determining whether an expert's testimony is beyond the scope of the expert's written report, courts do not require 'verbatim consistency with the report, but ... allow[ ] testimony which is consistent with the report and is a reasonable synthesis and/or elaboration of the opinions contained in the expert's report.'" *nCube Corp. v. SeaChange Int'l, Inc.*, 809 F. Supp. 2d 337, 347 (D. Del. 2011) (quoting *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 585 F. Supp. 2d 568, 581 (D. Del. 2008)). A "key consideration" is whether the contents of the expert's report and elaborations made during deposition testimony gave the objecting party notice of the subject matter of the testimony. *nCube Corp.*, 809 F. Supp. 2d at 347 (citing *Power Integrations,* 585 F. Supp. 2d at 581)). It is undisputed that the Poster Index was disclosed in Dr. Coles's Report. The location at which the

Poster Index was found, the European Opposition, is a reasonable synthesis or elaboration of Dr. Coles's opinions regarding the Poster Index contained in her Report.

Furthermore, the drastic measure of exclusion of the European Opposition is not warranted. "The purpose of the disclosure requirements of Rule 26 'is to prevent a party from being unfairly surprised by the presentation of new evidence.'" *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 92 (D. Del. 2016) (quoting *Alza Corp. v. Andrx Pharm., LLC,* 2008 WL 1886042, at *2 (D. Del. Apr. 28, 2008)). To determine whether an allegedly untimely or improper disclosure warrants the "extreme" sanction of exclusion, courts consider the following factors: (1) the prejudice or surprise of the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the extent to which admitting the evidence would disrupt trial; (4) the bad faith or willfulness involved; and (5) the importance of the evidence. *INVISTA*, 2013 WL 3216109, at *2 (citing *Konstantopoulos v. Westvaco Corp*., 112 F.3d 710, 719 (3d Cir. 1997) and *Tracinda,* 362 F. Supp. 2d at 506).

Janssen will not suffer any incurable prejudice or surprise as a result of the admission of the European Opposition. The European Opposition was produced by Tolmar in fact discovery, and if reviewed by Janssen, would have revealed the Poster Index. It is also listed on Tolmar's Exhibit List in the Pretrial Order and Janssen did not object. D.I. 132, Ex. 8. As stated above, Dr. Coles testified with respect to the European Opposition for the sole purpose of explaining where the Poster Index was found. Dr. Coles's opinions on the Poster Index are disclosed in her Report and Janssen had the opportunity to question Dr. Coles as to where she found the Poster Index at her deposition. In contrast, Tolmar would be prejudiced by exclusion of the European Opposition and Dr. Coles's testimony regarding the same, because it is evidence in support of authentication of the Poster Index, which is a key piece of evidence for Tolmar's obviousness defense.

Lastly, there is no evidence that Tolmar acted willfully or in bad faith regarding Dr. Coles's testimony that the Poster Index was found in the European Opposition and its submission of the European Opposition into evidence. All the above-referenced factors favor a finding that the extreme sanction of exclusion is unwarranted, and the European Opposition is admissible.

## II.  THE '906 PATENT IS NOT ENTITLED TO THE DECEMBER 2007 FILING DATE OF THE '918 PROVISIONAL APPLICATION

The '906 patent claims a priority filing date of December 19, 2007 based on the '918 provisional. Day 1 Tr. 80:13-21; JTX-001. It also claims priority to the '276 provisional, filed December 5, 2008. *Id.* The '918 provisional lacks written description and enablement to support the full breadth of the '906 patent claims that each require administering a range of maintenance doses "a month (± 7 days) after the second loading dose" or "at monthly (± 7 days) intervals." Day 1 Tr. 81:5-82:20, 88:10-19.

Janssen bears the burden of proving it is entitled to claim priority to the filing date of an earlier application. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1303-06 (Fed. Cir. 2008). In order to gain the benefit of the filing date of an earlier application, the earlier application must comply with the written description and enablement requirements. *Zenon Env'tl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007); *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002) (holding a provisional application must contain a written description of the invention and the manner and process of making and using it, in exact terms to enable a POSA to practice the invention claimed in the non-provisional application); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1371 (Fed. Cir. 2011) (noting the written description of the provisional must enable a POSA to practice the invention claimed in the non-provisional application). Here, the '918 provisional does not support the claims of the '906 patent and Janssen has failed to carry its burden.

All independent claims 1, 4, 8 and 11 of the '906 patent include the requirement of administering a first maintenance dose "a month (± 7 days) after the second loading dose." JTX-001 at Col. 32:11-Col. 33:47. Dependent claims 2, 9, 15, and 16 further require administering subsequent maintenance doses "at monthly (± 7 days) intervals." *Id*. at Col. 32:31-Col. 34:14. The parties agreed during claim construction that "monthly (± 7 days)" means 21 to 38 days, *i.e.*, a 17-day dosing window to account for differences in days of a month. D.I. 132, ¶ 8.

Dr. Sinko, Janssen's formulation and pK expert, did not offer any opinion whether the '906 patent is entitled to the December 2007 filing date of the '918 provisional. Day 3 Tr. 231:3-7. On the other hand, Dr. Coles, the only witness or expert to testify on priority, concluded claims 1-21 of the '906 patent were not supported by the disclosure of the '918 provisional because the '918 provisional failed to adequately describe or enable claims 1-21. Day 1 Tr. 84:1-21.

**A. The 4-day Dosing Window Disclosed in the '918 Provisional Does Not Provide Adequate Written Description for the Claimed 17-Day Dosing Window**

The '918 provisional included claims reciting maintenance doses administered on about the 34th to about the 38th day of treatment. JTX-022 at 33, 38; Day 1 Tr. 83:6-23. The specification included similar discussion of day 34 to day 38 dosing windows for maintenance doses. *See, e.g.*, JTX-022 at 6:23-26, 7:2-5, 13-16, 25-28. The '918 provisional discloses administering maintenance doses once a month or every four weeks. *Id*. at 9:9-10, 10:1-4. The language "a month (± 7 days)" and "monthly (± 7 days) intervals" is not found in the '918 provisional. Day 1 Tr. 85:7-18.

To satisfy the written description requirement, the inventors must demonstrate they had possession of the invention at the time the priority application was filed, and all the claim limitations must appear in the specification of the priority application. *PowerOasis*, 522 F.3d at 1306; *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991). Possession requires an

objective inquiry into the four corners of the specification. *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011). The patentee must convey with reasonable clarity to those skilled in the art that, as of the filing date sought, they were in possession of the invention as demonstrated by the disclosure in the specification. *Indenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1161 (Fed. Cir. 2019).

Here, the '918 provisional does not include any discussion of maintenance dosing windows extending from 21 to 38 days after the second loading dose. Day 1 Tr. 85:7-18. Rather, the '918 provisional included independent claims 1 and 17 and related discussion in the specification which recite 4-day dosing windows—administering the maintenance dose on the 34th to 38th day of treatment. JTX-022 at 33 (claim 1), 37-38 (claim 17), 6:23-26, 7:2-5, 13-16, 25-28 (specification). The '918 provisional also disclosed administering maintenance doses on Day 36 of treatment, monthly, and once every four weeks. *Id.* at 9:6-10, 9:34-10:4. The examples in the '918 provisional discuss administering maintenance doses on Day 36, Day 64, or monthly, and do not discuss dosing windows for maintenance dosing. *Id.* at 25:19-24, 28 (Table 4, reporting dosing regimen of PSY-1001 study as Days 1, 8, 36 and 64), 29: (Table 5, reporting monthly i.m. injections throughout).

Disclosing a narrow, 4-day maintenance dosing window is insufficient to satisfy the written description requirement for the claimed 17-day dosing window in the '906 patent. *In re Wertheim*, 541 F.2d 257, 263-264 (C.C.P.A. 1976) (holding claimed range of "at least 35%" not entitled to benefit of earlier application disclosing "25-60%" for lack of written description); *see also Eiselstein v. Frank*, 52 F.3d 1035, 1040 (Fed. Cir. 1995) (holding claimed range of "about 50% to about 60% of the alloy" not entitled to benefit of grandparent application disclosing a range of "45-55%" for lack of written description). There is no disclosure in the '918 provisional regarding monthly (± 7 days) dosing windows for maintenance dosing, and thus no evidence that the

inventors had possession of a 17-day dosing maintenance dosing window at the time the '918 provisional was filed.

Accordingly, the '918 provisional does not provide adequate written description of the claimed 17-day maintenance dosing window and the '906 patent is not entitled to its December 19, 2007 filing date.

**B.     The 4-day Dosing Window Disclosed in the '918 Provisional Fails to Enable the Claimed 17-Day Dosing Window**

Turning to lack of enablement, the '918 provisional does not enable a person skilled in the art to make and use the full range of doses and dosing days within the 17-day maintenance dosing window. Enablement requires the specification teach those skilled in the art how to make and use the invention claimed without undue experimentation. A patentee choosing broad claim language is at the risk of not enabling the full scope of the claims. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012). At the time of the filing date of the patent, a claim is not enabled if a person of ordinary skill in the art could not practice the full scope of the claimed invention without undue experimentation. *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F3d 1380, 1384 (Fed. Cir. 2013).

Courts consider several factors set forth by *In re Wands* when determining whether undue experimentation would be required to practice the full scope of the claimed invention. *Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1345-46 (Fed. Cir. 2019) (citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)).

Here, the '918 provisional does not enable the claimed 17-day maintenance dosing windows without undue experimentation. As discussed above, the '918 provisional provides no disclosure or guidance on how to administer a range of 25-150 mg-eq. paliperidone in the claimed 17-day dosing window. The '918 provisional discloses a narrow dosing window instead, and

27

provides examples with dosing on Days 36 and 64 (28-day intervals), monthly, or every four weeks. JTX-022 at 33, 37-38. Disclosing a single embodiment within a broad range does not satisfy the enablement requirement. *Ferring Pharms. Inc. v. Serenity Pharms., LLC*, 2020 U.S. Dist. LEXIS 1562197 at \*153, \*159-60 (S.D.N.Y. April 21, 2022) (distinguishing mechanical cases such as *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1533 (Fed. Cir. 1991)). As Dr. Coles explained, a 4-day dosing window would not support a 17-day dosing window because "a person of ordinary skill in the art would understand that that's a substantial increase in dosing window and further, they would understand the drug concentrations that would be attained or could be attained with such a large window would be affected, and a person of ordinary skill in the art also wouldn't know whether those drug concentration are now within an effective therapeutic window." Day 1 Tr. 84:8-22.[5]

Thus, the '918 provisional does not enable the full range of doses to be administered within the 17-day claimed maintenance dosing window found in the '906 patent. Therefore, the '906 patent is not entitled to the December 19, 2007 filing date of the '918 provisional.

## III.   CLAIMS 1-21 OF THE '906 PATENT ARE INVALID AS OBVIOUS OVER THE PRIOR ART

Invalidity based on obviousness under 35 U.S.C. § 103(a) is a question of law based on underlying findings of fact. *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). The underlying factual findings are (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, such as commercial success, unexpected results, long felt but unsolved needs, skepticism, copying, and industry praise. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007)

---

[5] While Dr. Coles was asked about written description, her testimony applies with equal force to enablement. *See, e.g.*, Day 1 Tr. 81:5-12, 88:10-19.

(citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18; 86 S. Ct. 684; 15 L. Ed. 2d 545 (1966)).

Claims 1-21 of the '906 patent would have been obvious over the following: (1) Kramer in view of NCT 548 (claims 1-7 and 15) and the '544 patent or '384 publication (claims 17-21); (2) NCT 548 (claims 1, 2, 4, 6, 7, 15) and in view of the '544 patent or '384 publication (claims 3, 5, 17-21); (3) Kramer, NCT 548 in view of the renally impaired dosing prior art for paliperidone (claims 8-14 and 16); and (4) Kramer, NCT 548, the renally impaired dosing prior art for paliperidone and the '544 patent or '384 publication (claims 17-21).[6]

### A. Scope and Content of the Prior Art

### 1. Kramer Teaches a Dosing Regimen for Intramuscular Injections of Paliperidone Palmitate on Days 1, 8 and 36 of Treatment

Kramer was made publicly accessible on October 13, 2007, more than a year before the December 2008 filing date of the '906 patent, and therefore qualifies as prior art under pre-AIA 35 U.S.C. § 102(b). *Supra* Part II.D; *see also* Day 1 Tr. 98:15-99:18, JTX-036 at 1, 7. Kramer teaches a 9-week safety and efficacy study of paliperidone palmitate intramuscular injection for the treatment of schizophrenia. Day 1 Tr. 99:1-5, 137:20-138:11. Kramer teaches the injections were formulated as aqueous nanoparticle suspensions of paliperidone palmitate. *Id.* at 138:19-139:5; JTX-036 at 2. Kramer further teaches that patients received gluteal injections of placebo, 50 mg-eq., or 100 mg-eq. of paliperidone as paliperidone palmitate on Days 1, 8, and 36 of treatment. Day 1 Tr. at 138:4-18, 383:23-384:7; JTX-036 at 2. Table 1 below summarizes the dosing regimen taught by Kramer.

---

[6] Because claims 17-21 are multiple dependent claims, which depend from independent claims 1, 4, 8 or 11, they are included separately for each combination, but will be discussed together below as each combination uses the teachings of the '544 patent and '384 publication, which teach every formulation element of claims 17-21.

| Table 1: Dosing Regimens Taught by Kramer | | |
|---|---|---|
| **Dosage Amount of Paliperidone (mg-eq.)** | **Day of Treatment** | **Injection Site** |
| 50 or 100 | 1 | Gluteal |
| 50 or 100 | 8 | Gluteal |
| 50 or 100 | 36 | Gluteal |

Kramer provides results on efficacy and safety. JTX-036 at 4-6. Kramer reports that treatment with 50 mg-eq. or 100 mg-eq. paliperidone was more effective than placebo as measured by PANSS scores. Day 1 Tr. 142:12-20; JTX-036 at 4. Kramer also teaches that the percentages of patients achieving a clinical response (a greater than or equal to 30% change in PANSS scores at the end of treatment) was significantly greater than placebo for both the 50 mg-eq. and 100 mg-eq. treatment group. Day 1 Tr. 142:12-20; JTX-036 at 5. The 100 mg-eq. treatment group achieved a greater response (36.8%) than the 50 mg-eq. treatment group (33.3%). *Id.*

However, Kramer reports that only 51% of patients completed the study, and the most common reason for study withdrawal (*i.e.*, dropouts) was lack of efficacy. Day 1 Tr. 139:14-140:1, 384:16-385:9; JTX-036 at 4. In particular, Kramer reports that 43% of patients receiving placebo, 29% of patients receiving 50 mg-eq., and 17% of patients receiving 100 mg-eq. withdrew from the study due to lack of efficacy. *Id.*

Kramer also reports on discontinuation of patients due to treatment-emergent AEs. Day 1 Tr. 141:13-142:5, 384:16-385:9; JTX-036 at 4, 6. Kramer reports that 10% of patients receiving placebo, 4% of patients receiving 50 mg-eq., and 2% of patients receiving 100 mg-eq. paliperidone discontinued from the study due to AEs. *Id.* Kramer further teaches that no patient discontinued from the study due to the AE associated with EPS. JTX-036 at 7.

2.    **NCT 548 Teaches a Phase 3 Clinical Trial Dosing Regimen for Intramuscular Injections of Paliperidone Palmitate on Days 1, 8, 36, and 64 of Treatment**

NCT 548 is entitled "A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Dose-Response Study to Evaluate the Efficacy and Safety of 3 Fixed Doses (50 mg-eq., 100 mg-eq., and 150 mg-eq.) of Paliperidone Palmitate in Subjects with Schizophrenia." JTX-023 at 1; Day 1 Tr. 127:5-10, 127:21-128:4. NCT 548 was updated and publicly accessible on the clinicaltrials.gov website on September 20, 2005 and is prior art under 35 U.S.C. § 102(b). Day 1 Tr. 127:11-14.[7] NCT 548 teaches a Phase 3 dose proportionality study in which 50, 100, or 150 mg-eqs. of paliperidone were to be administered to schizophrenia patients on Days 1, 8, 36, and 64 of treatment. *Id.* at 127:18-128:8; JTX-023 at 1. Paliperidone was to be administered as an intramuscular injection of paliperidone palmitate into the gluteal muscle. Day 1 Tr. 143:21-144:10. Additionally, given the 28-day dosing intervals taught by NCT 548 after the Day 8 dose, the paliperidone palmitate formulation used in NCT 548 must be a sustained release formulation. *Id.* at 157:2-158:2. NCT 548 teaches that each of the three doses of paliperidone palmitate were expected to be more efficacious than placebo in treating patients with schizophrenia. JTX-023 at 1; Day 1 Tr. 252:16-253:1. Table 2 below summarizes the dosing regimen taught in NCT 548.

| Table 2: Dosing Regimens Taught by NCT 548 | | |
|---|---|---|
| **Dosage Amount of Paliperidone (mg-eq.)** | **Day of Treatment** | **Injection Site** |
| 50, 100, or 150 | 1 | Gluteal |
| 50, 100, or 150 | 8 | Gluteal |
| 50, 100, or 150 | 36 | Gluteal |
| 50, 100, or 150 | 64 | Gluteal |

---

[7] Janssen has not challenged any reference cited by Tolmar as qualifying as prior art except Kramer. Accordingly, each reference relied on herein, including NCT 548, qualifies as prior art under 35 U.S.C. § 102(b), 102(a), or both.

### 3. The Gluteal and Deltoid Muscles Were the Only Two Intramuscular Injection Sites for Antipsychotic Drugs

The prior art teaches three muscles where intramuscular injections are administered—deltoid (shoulder), vastus lateralis (thigh), and gluteus (buttocks). JTX-032 at 3; JTX-030 at 6; Day 1 Tr. 169:20, 170:13. Of the three, the deltoid and gluteal muscles are the most common, while the thigh is normally only used for self-injected medications and not used in psychiatry to deliver antipsychotic injections. Day 1 Tr. 151:17-22, 171:14-172:7, 368:19-369:16.

The prior art also taught differences in blood flow between injection sites. For example, Evans, published in 1975, teaches that blood flow per volume of muscle tissue (*i.e.*, perfusion) is greater in the deltoid than the gluteus. JTX-032 at 4 (Fig. 2); Day 1 Tr. 133:7-24, 150:10-22. Kamienski, published in 2006, teaches that the rate at which drugs particles are absorbed is determined by the amount of blood vessels in the area where the drug is administered. JTX-034 at 9, Day 1 Tr. 134:6-17, 150:23-151:5. Kamienski teaches that drugs are absorbed faster in the deltoid that the gluteal muscle because there are more blood vessels in the deltoid. *Id*.

Desai, published in 2007, teaches two main sites for intramuscular injections—deltoid and gluteal muscles—and that both immediate-release formulations and sustained release depot formulations are available for intramuscular injection. JTX-030 at 6 (Table 1), 7; Day 1 Tr. 134:20-7, 151:8-16. Desai further teaches that intramuscular injections are absorbed faster in the deltoid than the gluteal due to increased blood flow in the deltoid and lower blood flow in the gluteal muscle, which also has a high content of adipose tissue. JTX-030 at 7; Day 1 Tr. 403:1-11.

### 4. Aqueous Nanoparticle Suspensions of Paliperidone Palmitate Were Known in the Prior Art for Monthly Dosing

The '544 patent and '384 publication both teach aqueous nanoparticle suspensions of paliperidone palmitate formulated for monthly intramuscular injection. Day 2 Tr. 55:3-56:3, 58:10-59:11, 62:12-63:14, 69:5-19; Day 3 Tr. 234:4-236:4; JTX-020 at Col. 1:7-29, Col. 2:38-43; JTX-

021 at 3:1-3, 18:1-19:15. Both references teach the sustained release formulations are therapeutically effective for treating schizophrenia for about a month. *Id.* Both references teach the same aqueous nanoparticle suspensions described and claimed in the '906 patent. Day 2 Tr. 63:15-64:8, 72:10-97:1. For example, Table 2 of the '384 publication teaches the identical formulation described in Table 6 and claimed in the '906 patent.

| Table 6 Name | Amount Required Per ml | | Amount Required Quantity for 24 L | | TABLE 2 Name | Amount Required Per ml | | Amount Required Quantity for 24 L | |
|---|---|---|---|---|---|---|---|---|---|
| Paliperidone palmitate (sterile grade) | 156 | mg | 3.744 | kg | Paliperidone palmitate (sterile grade) | 156 | mg | 3.744 | kg |
| Polysorbate 20 parenteral | 12 | mg | 288 | g | Polysorbate 20 parenteral | 12 | mg | 288 | g |
| Citric acid monohydrate parenteral | 5 | mg | 120 | g | Citric acid monohydrate parenteral | 5 | mg | 120 | g |
| Disodium hydrogen phosphate anhydrous parenteral | 5 | mg | 120 | g | Disodium hydrogen phosphate anhydrous parenteral | 5 | mg | 120 | g |
| Sodium dihydrogen phosphate monohydrate parenteral | 2.5 | mg | 60 | g | Sodium dihydrogen phosphate monohydrate parenteral | 2.5 | mg | 60 | g |
| Sodium Hydroxide all use | 2.84 | mg | 68 | g | Sodium Hydroxide all use | 2.84 | mg | 68 | g |
| Polyethylene Glycol 4000 parenteral | 30 | mg | 720 | g | Polyethylene Glycol 4000 parenteral | 30 | mg | 720 | g |
| Water for injections q.s. ad | 1000 | µl | 24 | L | Water for injections q.s. ad | 1000 | µl | 24 | L |

JTX-021 at 18; JTX-001 at Col. 15:25-40.

The '384 publication teaches the concentration of paliperidone palmitate in the formulation does not change (156 mg paliperidone palmitate/ml), and the volume of the formulation administered will depend on the dose needed. The '384 publication teaches a range from 0.25 ml to 1.5 ml as the target dose volume, which equates to 25 mg-eq. to 150 mg-eq. paliperidone.

Both references teach the paliperidone palmitate particles are milled to achieve desired average particle size ranges of less than 2,000 nm and lower. JTX-020; JTX-021.

### 5. It Was Known to Reduce Doses for Renally Impaired Patients Taking Paliperidone

Oral paliperidone extended-release tablets (Invega) were FDA-approved for treating schizophrenia in December 2006. JTX-167 at 2; Day 3 Tr. 271:19-22. The prior art taught that paliperidone is mainly excreted renally and reported on pharmacokinetic studies assessing varying degrees of renal impairment. JTX-029 at 1; Day 1 Tr. 162:1-16, 339:5-10. Dr. Coles explained that

33

paliperidone is the active drug found in both oral and injectable paliperidone palmitate, and clearance from the body by the kidneys would not be affected by the route of administration. Day 1 Tr. 129:22-130:5, 339:11-340:2.

One study, Cleton 46 published in March 2007, teaches that renally impaired patients experienced greater maximum paliperidone plasma concentrations (Cmax) and total exposure (AUC, area under the curve) was 1.5 to 3.4 times higher than patients with normal kidney function depending on mild, moderate, or severe renal impairment. Day 1 Tr. 159:20-160:13; JTX-029 at 1. Cleton 46 teaches that different levels of renal impairment impacted clearance of paliperidone from the body, in which total clearance was reduced by 32% in mild, 64% in moderate, and 71% in severe renal impairment compared to healthy subjects. Day 1 Tr. 162:7-12, 164:6-10; JTX-029. Dr. Coles explained that higher paliperidone concentrations, higher total exposure of paliperidone, and lower clearance meant that the dose needs to be decreased for renally impaired patients to achieve similar exposure as patients with normal kidney function. Day 1 Tr. 160:15-161:4, 162:7-16. Moreover, based on the data provided in Cleton 46, Dr. Coles testified that a one-third to two-thirds reduction in dose would be appropriate depending on the severity of renal impairment. *Id.*

Another study, Snoeck published in 1995, teaches that for patients with moderate to severe renal impairment, clearance of paliperidone decreased by 50%, which correlated to a 50% reduction in dose. *Id.* at 130:6-131:20, 161:5-22, 162:17-163:12, 163:24-164:5; JTX-160 at 2 (Abstract). The FDA-approved label for oral Invega (paliperidone), published December 2006, also taught reducing the maximum dose of paliperidone by about half for patients with mild renal impairment and by 75% for patients with moderate to severe renal impairment. Day 1 Tr. 131:24-133:5, 164:18-166:11; JTX-167 at 29.

### B.    Person of Ordinary Skill in the Art

There are no material differences between the parties' proposed definitions of a POSA. Day 1 Tr. 76:6-23; Day 3 Tr. 139:2-14; Pretrial Order, D.I. 132, Ex. 1 (Uncontested Facts), ¶¶ 16 and 17. Any differences would not change the opinions or analysis of the parties' experts regarding validity. D.I. 132, Ex. 1, ¶ 18. Thus, under either party's definition of a POSA, claims 1-21 of the '906 patent would have been obvious at the time of the alleged invention.

### C.    Claims 1-7 and 15 Are Obvious Over Kramer in View of NCT 548

Independent claims 1 and 4 are directed to a method for treating psychiatric patients with schizophrenia (claim 1) or, more broadly, psychotic disorders (claim 4). JTX-001 at Col. 32:10-57. Each claim requires administering a first loading dose, a second loading dose, and a first maintenance dose monthly (± 7 days) after the second loading dose. *Id.* at Col. 32:25-30, 52-57; Day 1 Tr. 136:9-14. The parties agreed "monthly (± 7 days)" means "21 to 38 days" allowing the first maintenance dose to be administered in a 17-day dosing window. D.I. 132, Ex. 1, ¶ 14.

Kramer teaches administering 50 mg-eq. or 100 mg-eq. of an aqueous nanoparticle suspension of paliperidone palmitate in the gluteal muscle of schizophrenia patients on Days 1, 8, and 36 of treatment. Day 1 Tr. 138:4-18, 383:23-384:7; JTX-036 at 2. NCT 548 teaches administering 50 mg-eq., 100 mg-eq., or 150 mg-eq. of a sustained release formulation of paliperidone palmitate in the gluteal muscle of schizophrenia patients on Days 1, 8, 36, and 64 of treatment. Day 1 Tr. 127:18-128:8, 390:13-391:2; JTX-023 at 1. Dr. Coles testified, and Dr. Sinko did not dispute, that Kramer teaches all the elements of claims 1 and 4 besides a Day 1 initiation dose of 150 mg-eq. and injections into the deltoid. Day 1 Tr. 167:4-169:7, 170:14-24, 172:18-173:8, 176:2-11, 177:11, 178:6-16, 179:1-17.   It would have been obvious to a POSA to select a Day 1 initiation dose of 150 mg-eq. in light of the teachings of NCT 548 and inject it, along with the Day 8 dose, into the deltoid muscle. *Id.* at 169:8-170:13, 171:1-9, 173:14-174:8, 177:12-178:5, 178:21-24, 180:3-9.

1. **There Was Strong Motivation to Select a Higher First Initiation Loading Dose in Kramer With a Reasonable Expectation of Achieving Increased Blood Levels of Paliperidone More Rapidly Due to Lack of Efficacy**

Whether there is a motivation to combine references is a question of fact. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1348 (Fed. Cir. 2000). Evidence of motivation to combine prior art references may flow from the prior art references themselves, knowledge of one of ordinary skill in the art, or, in some cases, from the nature of problem to be solved. *Medichem*, 437 F.3d at 1165 (citing *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000)).  A suggestion, teaching, or motivation to combine the relevant prior art teachings to achieve the claimed invention do not have to be found explicitly in the prior art references sought to be combined, but rather "may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1362 (Fed. Cir. 2007) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006)); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1307–08 (Fed. Cir. 2006) .  Here, the motivation to select the 150 mg-eq. Day 1 initiation dose taught by NCT 548 flows from the teachings of Kramer, knowledge of a POSA, and the problem of treatment withdrawal rates.

Kramer teaches the higher dose (100 mg-eq.) had the least dropout rate with only a slight increase in AEs. Day 1 Tr. 385:10-16. Kramer teaches that only 51% of patients completed the study and the most common reason was study withdrawal was due to lack of efficacy. Day 1 Tr. 139:14-140:1; JTX-036 at 4. Dr. Coles explained that the significance of study withdrawal—patients not taking medication cannot effectively be treated for schizophrenia. Day 1 Tr. at 140:2-8. She further explained that there would be motivation to achieve effective drug concentrations more rapidly by increasing the loading initiation dose to improve patient study compliance by

reducing patient withdrawal. *Id*. at 140:9-19. Dr. Coles then explained that selecting a higher first loading dose would be expected to attain a higher paliperidone concentrations more rapidly because it's a higher dose over a short period of time leading to more rapid efficacy and lowering withdrawal rates of patients for lack of efficacy. *Id*. at 140:20-141:12.

Kramer also teaches that discontinuation of patients due to AEs was low and not why patients were withdrawing from the study. Day 1 Tr. 141:13-142:5. Kramer further teaches that discontinuation due to AEs was lowest in the 100 mg-eq. treatment group. *Id*. at 386:8-23. Dr. Coles explained Kramer teaches a POSA there were no apparent safety concerns with the 100 mg-eq. dose. *Id.* at 142:6-11. Dr. Coles concluded that Kramer teaches a POSA that increasing the dose from 50 mg-eq. paliperidone to 100 mg-eq. paliperidone there is a trend toward decreasing withdrawal rates due to lack of efficacy and that would have motivated a POSA to further increase the loading dose to continue that trend of reducing withdrawal rates without safety concerns. *Id.* at 142:21-143:10. Dr. Dizon, a neuropsychiatrist, taught that the first priority is to treat schizophrenia, and worry about side effects, such as EPS afterwards. *Id.* at 386:24-387:23, 389:9-20. In addition, unlike dyskinesia, EPS symptoms are temporary and can be treated with medication. *Id*. at 387:11-388:11.

NCT 548 teaches a Phase 3 study in which schizophrenia patients were to receive four doses of placebo, 50 mg-eq., 100 mg-eq., or 150 mg-eq. paliperidone intramuscular injections on Days 1, 8, 36, and 64. Day 1 Tr. 169:14-19. Dr. Coles and Dr. Dizon explained, and several Janssen witnesses agreed, that a Phase 3 study indicated to a POSA that there was enough clinical information to have an expectation that the dosages studied will be safe. Day 1 Tr. 144:23-145:10, 145:16-147:16, 391:14-392:4. Moreover, the expectation for the study was that each dose would be effective in treating schizophrenia. JTX-023 at 1.

37

Dr. Coles explained that a POSA would have understood that Kramer teaches a motivation to select a higher loading dose to attain target drug concentrations more quickly and that NCT 548 teaches that a POSA can administer 150 mg-eq. on the Day 1 initiation dose. Day 1 Tr. 148:17-149:5. Further, Dr. Coles explained that a POSA would not simply change the entire regimen taught by Kramer to 150 mg-eq. for each dose because the reason for the loading dose is to achieve effective concentrations earlier in therapy, so there would be no reason to change the maintenance doses. *Id.* at 149:6-15. Similarly, she testified that the Day 8 dose has to last as long as the maintenance doses (*i.e.*, 28 days until the Day 36 dose), so there would be no reason to change the Day 8 dose in Kramer, which was shown to be effective. *Id.* at 149:16-23, 255:23-257:14, 258:18-259:5.

There would have been a reasonable expectation of success in selecting the next highest available dose, 150 mg-eq., as the Day 1 initiation dose to increase blood concentrations more rapidly to achieve efficacious drug levels more quickly to reduce patient withdrawal rates due to lack of efficacy. Day 1 Tr. 173:14-174:5. Obviousness cannot be avoided by showing some degree of unpredictability in the art so long as there was a reasonable probability of success. *Allergan v. Sandoz*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) (citing *Pfizer*, 480 F.3d at 1364; *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989). Conclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success. *Hoffmann-LaRoche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014) (citing *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1363-64 (Fed. Cir. 2007)).

Kramer and NCT 548 teach dosing regimens for administering a long-acting injectable formulation of paliperidone palmitate to schizophrenia patients in doses ranging from 50 mg.-eq. to 150 mg-eq. paliperidone. Day 1 Tr. 137:15-139:5, 143:11-10; JTX-036 at 2; JTX-023 at 1. Each

reference teaches administering doses on Days 1, 8, and 36 and NCT 548 teaches an additional dose at Day 64. *Id.* Kramer teaches efficacy increased and withdrawal rates due to lack of efficacy decreased with increasing the dosage from 50 mg-eq. to 100 mg-eq. Day 1 Tr. 139:11-140:8. NCT 548 teaches 150 mg-eq. Day 1 initiation dose, which a POSA would have understood was reasonably expected to be safe based on prior Phase 1, Phase 2, and animal studies. *Id.* at 144:23-145:10, 146:14-147:18. Accordingly, a POSA would have had a reasonable expectation of achieving increased efficacy at an earlier treatment time point to further reduce withdrawal rates by selecting the next highest available dosage amount for the Day 1 initiation dose. *Id.* at 148:17-149:2, 173:14-174:8. Moreover, it would have been obvious to try the 150 mg-eq. dose as the Day 1 initiation dose in Kramer as it was the next highest available dose and had already been proposed as a Day 1 initiation loading dose. *Id.* at 173:14-174:8; *KSR*, 550 U.S. at 421 (holding it obvious to try when there were only a "finite number of identified, predictable solutions."); *Hoffman-LaRoche*, 748 F.3d at 1332 (holding that a monthly treatment of 150 mg dose was obvious to try).

### 2.      It Would Have Been Obvious to Select the Deltoid as an Injection Site in the Dosing Regimens Disclosed by Kramer and NCT 548

Kramer and NCT 548 teach gluteal injections. It would have been obvious to select the deltoid as the injection site for administering paliperidone palmitate in the dosing regimens taught by Kramer and NCT 548.

Besides being the two most common sites for intramuscular injections, there are distinct advantages of deltoid injections over gluteal injections. Day 1 Tr. 151-155. For example, ease of administration and patient preference favor the deltoid. *Id.* The location of the deltoid in the upper arm makes it easier to administer the injection than compared with the gluteal. *Id.* In addition, patients with modesty concerns about gluteal injections prefer the deltoid. *Id.* Tellingly, Dr. Vermeulen testified that Janssen conducted clinical trials assessing gluteal versus deltoid injections

due to known modesty concerns of patients. Day 2 Tr. 194:1-4, 216:9-217:8. The volume of the drug injected is also a minor factor, which is not important for the volume of drug administered in the prior art. Day 1 Tr. 152:7-10.

Evans, Kamienski, and Desai teach the absorption kinetics of a drug can be impacted by deltoid versus gluteal injections. Dr. Coles explained that a POSA would expect injection of paliperidone palmitate in the deltoid to provide the same or slightly better (*i.e.*, a modest increase) absorption of paliperidone compared with a gluteal injection. Day 1 Tr. 153:1-154:17; Day 4 Tr. 39:24-41:17. Similarly, Dr. Sinko testified that while differences in absorption of paliperidone in the deltoid or gluteal would not be "significant," a POSA would not expect absorption of paliperidone to be slower if injected into the deltoid as compared to the gluteal muscle. Day 3 Tr. 200:9-16. Dr. Coles agreed and explained that it would be possible to have slightly better absorption at early time points, which is important to get higher drug concentrations earlier in treatment. Day 1 Tr. 154:2-13.

Here, moving the injection site from the gluteal to the deltoid muscle would have been an obvious choice with predictable results. *KSR*, 550 at 421. First, a POSA would have been motivated to select an injection site with known benefits—ease of administration—and known patient preferences—modesty of certain patients with gluteal injections. Day 1 Tr. 151:23-152:6. Second, there would have been a reasonable expectation of achieving the same or slightly better (*i.e.*, modest) increase in paliperidone concentrations earlier in treatment. Day 1 Tr. 153:1-9; *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007); *Medichem*, 437 F.3d at 1165. Third, it would have been obvious to try—there were only two injection sites for intramuscular injection of antipsychotic drugs, and each would yield predictable results, namely the same or slightly better (but not worse) absorption in the deltoid muscle. Day 1 Tr. 153:1-154:17; *KSR*, 550 U.S. at 421.

Therefore, claims 1 and 4 would have been obvious over the combination of Kramer, NCT 548 and the knowledge of a POSA in the art, as evidenced by Evans, Kamienski, Desai, and trial testimony of experts and inventors.

### 3. The Prior Art Does Not Teach Away From a 150 mg-eq. Dose on Day 1

Kramer, NCT 548, and the other prior art in this case, do not discourage or lead a POSA in a direction away from selecting 150 mg-eq. as the Day 1 initiation dose. To the contrary, these references provide a POSA with a reasonable expectation of success in selecting 150 mg-eq. as the next highest dose. The dosage amount is specifically taught in at least NCT 548 and the '384 Publication. JTX-023 at 1; JTX-021 at 19. Dr. Sinko admits that a 1.5 milliliter volume of paliperidone palmitate (equivalent to 150 mg-eq. of paliperidone palmitate) is a reasonable volume to inject intramuscularly into a patient's deltoid or gluteal muscle. Day 3 Tr. 244:4-11. Additionally, the teachings in Kramer and/or NCT 548 of dosage amounts of 100 mg-eq. on Days 1, 8, 36 and 64 (NCT 548) do not dissuade or teach a POSA away from selection of the 150 mg-eq. dose on Day 1. A POSA would still be motivated and have a reasonable expectation of success in trying the higher dose of 150 mg-eq. as the next available dose. A prior art reference defining a lower effective dose is not a teaching away from using anything other than the lower effective dose. *Hoffmann-LaRoche*, 748 F.3d at 1332-33.  Further, as Dr. Dizon testified, the prior art does not teach a start low and go slow approach for dosing second-generation LAIs and as such, does not teach away from increasing the first loading dose in Kramer to 150 mg-eq. Day 1 Tr. 394:13-396:2; JTX-036 at 2; JTX-023 at 1. Therefore, the prior art does not teach away from selecting 150 mg-eq. as the Day 1 dose amount in claims 1 and 4.

### 4. The Prior Art Does Not Teach Away from Using Deltoid Injections

Desai, Evans, and Kamienski, and expert testimony show that the deltoid and gluteal muscle are the two main injection sites for intramuscular injection, and the only two used for

antipsychotic drugs. Day 1 Tr. 150:3-151:22, 368:19-369:15, 369:20-24; JTX-030 at 6; JTX-032; JTX-034. None of these references teach away from using the deltoid muscle instead of the gluteal muscle. As Dr. Coles testified, a POSA understood that deltoid injections would have been expected to provide the same or slightly better absorption, but certainly not worse absorption as compared with gluteal injections. Day 1 Tr. 154:18-155:4; JTX-030; JTX-032; JTX-034. "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Ormco*, 463 F.3d at 1308; *see also In re Kubin*, 561 F.3d at 1357; *In re Gurley,* 27 F.3d 551, 553 (Fed. Cir. 1994).

None of Evans, Kamienski, Desai or the knowledge in the art would discourage or lead a POSA in a direction away from using the deltoid muscle. Instead, these references provide reasons why using the deltoid would be a viable alternative option compared to the gluteal muscle. Dr. Coles testified that for sustained release formulations, a POSA would not expect worse absorption in the deltoid muscle than in the gluteal muscle and would expect the same or slightly better absorption in the deltoid muscle than in the gluteal muscle. Day 1 Tr. 152:24-153:11; JTX-030; JTX-032; JTX-034. And although Dr. Dizon acknowledged that deltoid injections may be more painful than gluteal muscle injections and may lead to higher fluctuations in peak to trough blood levels, a POSA understood that patients still prefer deltoid injections over gluteal injections because of modesty concerns. Day 1 Tr. 370:10-16, 435:2-437:1, 438:6-10; JTX-030; JTX-032; JTX-034.

Although Dr. Sinko testified that for long-acting suspensions, the deltoid may not lead to greater absorption than the gluteal muscle, a POSA would not understand this possibility as a criticism against using the deltoid as an injection site. Day 3 Tr. 198:16-24. As Dr. Sinko admitted,

absorption would not be expected to be slower in the deltoid compared to the gluteal muscle. *Id.* at 200:9-16. A POSA would also not understand Dr. Sinko's testimony as discouraging a POSA to try the deltoid muscle because it does not contradict the express teachings of the references set forth above. "A reference does not teach away, however, if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (citing *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004)).  Therefore, the prior art does not teach away from using the deltoid as the injection site for the Day 1 and Day 8 injections of claims 1-21.

### 5. Dependent Claims 2, 3, 5-7 and 15 Are Taught By Kramer and NCT 548

Dr. Coles testified and explained that each element of claims 2, 3, 5-7 and 15 are taught by Kramer and NCT 548. Day 1 Tr. 174:9-176:1, 180:12-183:8; JTX-036 at 2; JTX-023 at 1. Thus, dependent claims 2, 3, 5-7, and 15 would have been obvious as taught by Kramer and NCT 548.

### D. Claims 1, 2, 4, 6, 7, and 15 Are Obvious over NCT 548

NCT 548 and the knowledge of a POSA render obvious claims 1, 2, 4, 6, 7, and 15 of the '906 patent. NCT teaches administering a schizophrenia patient four doses of a sustained release injectable formulation of paliperidone palmitate containing 50 mg-eq., 100 mg-eq., or 150 mg-eq. paliperidone on Days 1, 8, 36, and 64. JTX-023 at 1; Day 1 Tr. 155:18-22, 157:2-23. The title of NCT 548 characterizes the study as a "dose-response" study to evaluate effectiveness and safety of three different doses of paliperidone palmitate—50 mg-eq, 100 mg-eq. and 150 mg-eq. paliperidone. JTX-023 at 1. In essence, NCT 548 teaches a range of doses from 50 mg-eq. to 150 mg-eq. administered on Days 1, 8, 36, and 64 for treating schizophrenia. *Id.*

A POSA would be motivated to select 150 mg-eq. as the first Day 1 initiation loading dose with a reasonable expectation of success to achieve effective concentrations of paliperidone safely and as soon as possible. Day 1 Tr. 155:23-156:10, 173:23-174:8. A POSA would also be motivated and have a reasonable expectation of success in keeping the subsequent maintenance doses, including the Day 8 dose, at 100 mg-eq. Day 1 Tr. 149:6-23.

The dose ranges taught by NCT 548 also create a presumption that renders the dosage amounts set forth in claims 1 and 4 obvious. *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006-07 (Fed. Cir. 2018) (holding ranges taught in the prior art overlapped with the claimed ranges were presumptively obvious); *Galderma Labs. L.P., v. Tolmar*, 737 F.3d 731, 737-38 (Fed. Cir. 2013) (holding that where there is a range disclosed in the prior art (0.01 to 1 weight percent), and the claimed invention falls within that range (0.3 weight percent), there is a presumption of obviousness and the burden of production falls on the patentee to come forward with evidence of teaching away, unexpected results, or other pertinent secondary considerations). Similarly, here, the Day 1 initiation loading dose (150 mg-eq.) and the Day 8 dose (100 mg-eq.) claimed in the '906 patent fall within the range disclosed in NCT 548—50 mg-eq. to 150 mg-eq.—creating a presumption of obviousness for those doses. Janssen has not set forth any teaching away, unexpected results or other secondary considerations to rebut this presumption and, therefore, the claims are obvious.

It would also have been obvious to optimize the dosage amounts set forth in the ranges taught by NCT 548 to achieve the optimum combination of efficacy and safety for schizophrenia patients. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1296 (Fed. Cir. 2012) (holding it was obvious to optimize "result effective variables" through routine optimization). Here, the dose amount administered on each day of treatment is a result-effective variable directly impacting

safety and efficacy. Day 1 Tr. 155:23-156:10, 144:23-145:10. Having the dose range identified and the day of dosing fixed, all while administering the same sustained release formulation, it was not inventive to select an optimal value for the Day 1 and Day 8 dose falling within the range. "The normal desire of scientists and artisans to improve upon what is already generally known provides motivation to determine where in a disclosed set of ranges is the optimum combination." *Applied Materials*, 692 F.3d at 1295 (internal ellipses omitted) (quoting *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003)). Because the claimed dosage amounts fall within the ranges disclosed by NCT 548, a POSA would have been motivated to optimize the dosage amounts, which is not an inventive contribution and therefore is obvious. *Id.*

Turning to the injection site location, it would have been obvious to select the deltoid as the site of injection for the reasons set forth above in Section III.C.2. In addition, injection site is also a result-effective variable that may impact drug absorption. Day 1 Tr. 151:23-152:6, 153:1-154:13. Having only two sites of injection to choose from, identifying the optimum injection site for a particular dosing regimen or dosing day would have been within the level of skill in the art. *Applied Materials*, 692 F.3d at 1295 (citing *In re Boesch*, 617 F.2d 272, 276 (C.C.P.A. 1980) ("[D]iscovery of an optimum value of a result effective variable is ordinarily within the skill in the art." (internal ellipses omitted)).

Thus, for at least these reasons, claims 1 and 4 would have been obvious to a POSA at the time of the alleged invention. Dr. Coles testified and further explained that each element of claims 2, 4, 6, 7 and 15 are taught by NCT 548. Day 1 Tr. 174:9-176:1, 181:8-183:8, 197:1-18; JTX-023 at 1. Thus, dependent claims 2, 4, 6, 7 and 15 would have been obvious as taught by NCT 548.

1. **Claims 3 and 5 Would Have Been Obvious Over NCT 548 and the '544 Patent and '384 publication**

Claims 3 and 5 require that the sustained release formulation of paliperidone palmitate be an aqueous nanoparticle suspension. JTX-001 at Col. 32:37-38, 58-59. Dr. Havel testified that it would have been obvious to use the aqueous nanoparticle sustained release suspensions taught by the '544 patent and '384 publication in the dosing regimen of NCT 548. Day 2 Tr. 67:11-18. Each reference teaches aqueous nanoparticle suspensions of paliperidone palmitate for monthly administration to schizophrenia patients. Day 2 Tr. 55:2-56:3, 58:10-23, 62:12-63:14; JTX-020 at Col. 1:5-29, 2:38-43; JTX-021 at Col. 3:1-5, 7:23-28, 18:5 (Table 5). NCT 548 discloses a dosing regimen using a sustained release formulation of paliperidone palmitate injected every 28 days after the initiation dosing. Day 2 Tr. 66:20-67:10; JTX 023 at 1. Therefore, it would have been obvious to utilize the aqueous nanoparticle suspensions taught by the '544 patent and '384 publication in the dosing regimen taught by NCT 548. Day 2 Tr. 69:2-70:3. Accordingly, claims 3 and 5 would have been obvious over NCT 548 and the '544 patent and '384 publication.

E. **Claims 8-14 and 16 Would Have Been Obvious Based on the Teachings of Kramer or NCT 548, and the Renally Impaired Dosing Prior Art for Paliperidone**

Independent claims 8 and 11 of the '906 patent are directed to methods of treating renally impaired psychiatric patients with schizophrenia (claim 8) or psychotic disorders (claim 11) but at reduced dosage amounts compared with patients with normal renal function. JTX-001 at Col: 32:66-33:47; Day 1 Tr. 159:1-14.

For the reasons set forth above in claims 1 and 4, Kramer and NCT 548 or NCT 548 alone teach dosing regimens of sustained release formulations of paliperidone palmitate on Days 1, 8, 36, and 64, which would have been obvious to administer into the deltoid muscle. *Supra* Section

III.C.2. It would have been obvious to reduce the dosage amounts taught in Kramer and NCT 548 for renally impaired patients. Day 1 Tr. 160:15-161:4, 166:12-167:3.

It was well known in the art to reduce dosages for renally impaired patients taking paliperidone. *Id.* at 160:15-164:10; JTX-029 at 1; JTX-160 at 2; JTX-167 at 29. For example, Cleton 46 teaches about a third to two thirds reduction in dose based on severity of renal impairment. *Id.* at 159:20-161:4. Snoeck teaches a 50% reduction in dose for moderate to severe renal impairment. *Id.* at 164:18-166:11. Likewise, the Invega Label teaches a 50% reduction in dose for mild renal impairment and a 75% reduction for moderate to severe. *Id.* at 166:12-167:3. Dr. Coles testified information regarding oral paliperidone clearance would be instructive of clearance of paliperidone injected as paliperidone palmitate because once in the body, the drug is the same. *Id.* at 129:22-130:5. Dr. Sinko agreed that Dr. Coles was correct in using clearance rate of paliperidone to adjust dosing of renally impaired patients. Day 3 Tr. 208:23-209:22 ("I think that that's absolutely all true … again, about clearance, you know, being a constant is correct."). Dr. Coles testified that about a third to two thirds reduction in dose would be appropriate, depending on the severity of renal impairment (mild, moderate, or severe). Day 1 Tr. 162:7-16, 185:6-16. Dr. Sinko agreed that a dose reduction in that range would be appropriate and that "she's right in that broad range." Day 3 Tr. 206:24-207:21.

Dr. Coles testified it would have been obvious to start with the dosing amounts taught in Kramer or NCT 548 and reduce them by a third to two-thirds, for example a half, to achieve a suitable dosage amount for renally impaired patients. Day 1 Tr. 166:12-167:3. Selecting a particle amount to reduce is within the level of skill in the art and a POSA would adjust. *Id.* at 186:1-11, 187:15-188:1. Applied to the NCT 548 study and Kramer, a POSA would arrive at the claimed dosage amounts for Days 1 and 8 of 75 mg-eq. by reducing the 150 mg-eq. dosage amount by 50%

47

or Kramer's 100 mg-eq. dosage amount by about a third depending on the severity of renal impairment. *Id.* at 186:12-188:1. Therefore, it would have been obvious to a POSA at the time of the alleged invention who would have been motivated to select a dosage amount for renally impaired patients reduced from the dosage amounts taught in Kramer and NCT 548 with a reasonable expectation of success in treating renally impaired schizophrenia patients as taught by Cleton 46, Snoeck, and the Invega Label. Day 1 Tr. 160:21-161:4, 166:12-167:3, 184:16-185:16, 188:5-189:8, 189:15-190:2, 191:15-194:2.

Thus, claims 8 and 11 would have been obvious over Kramer, NCT 548 and the renally impaired paliperidone dosing prior art. In addition, Dr. Coles testified and explained that each element of dependent claims 9, 10, 12-14 and 16 are taught by Kramer and NCT 548. Day 1 Tr. 174:9-176:1, 190:3-191:13, 194:3-196:24, 197:19-198:14. Thus, dependent claims 9, 10, 12-14 and 16 would have been obvious over Kramer, NCT 548 and the renally impaired paliperidone dosing prior art.

### F.    Claims 17-21 Would Have Been Obvious over the Combinations of Kramer and NCT 548 Discussed Above in View of the '544 Patent and '384 Publication

Claims 17-21 require an aqueous nanoparticle suspension of paliperidone palmitate with ingredients and amounts specified. JTX-001 at Col. 34:15-51. Claims 17 and 19 are multiple dependent claims depending from independent claims 1, 4, 8, or 11. Accordingly, the analysis set forth herein regarding obviousness of claims 1, 4, 8 and 11 is applicable here. Day 2 Tr. 26:8-27:5. Claim 18 depends from claim 17 and claims 20 and 21 depend from claim 19. JTX-001 at Col. 34:29-51.

As discussed above in Section III.D.1, Dr. Havel testified that it would have been obvious to use the aqueous nanoparticle sustained release suspensions taught by the '544 patent and '384 publication in the dosing regimen taught by NCT 548. Day 2 Tr. 69:20-70:3. He also explained

that it would have been obvious to use these same formulations in the Kramer dosing regimen. *Id.* Kramer teaches that aqueous nanoparticle suspensions of paliperidone palmitate were used in the study. *Id.* at 66:5-19; JTX-036 at 2. Therefore, it would have been obvious to utilize the aqueous nanoparticle suspensions taught by the '544 patent and '384 publication in the dosing regimen taught by Kramer, each reference teaching the same kind of sustained release injectable paliperidone palmitate formulation. Day 2 Tr. 67:11-18, 69:20-70:3.

Dr. Havel explained that each element of claims 17-21 is taught by the '544 patent and the '384 publication. *Id.* at 72:10-97:13. The '544 patent and '384 publication teach that the paliperidone palmitate has an average particle size of less than 2,000 nanometers. Day 2 Tr. 74:4-20, 76:20-77:6; JTX-020 at Col. 3:65-4:2; JTX-021 at Col. 6:23-25. Dr. Havel explained a POSA would have understood that to mean a d50 of less than 2,000 nanometers. Day 2 Tr. 135:13-24, 136:11-137:8. The '544 patent and '384 publication also teach paliperidone palmitate having an "effective" average particle size, defined as a d90, of less than 2,000 nanometers. JTX-020 at Col. 5:15-25, JTX-021 at 8:25-31. Dr. Havel explained that either a d50 or d90 of less than 2,000 nanometers includes the claimed range of 1600 to 900 nanometers. Day 2 Tr. 74:7-75:11, 76:3-9, 77:7-17, 86:12-87:6. The particle size range of the paliperidone palmitate would be understood to impact dissolution, with larger particles dissolving more slowly and smaller particles dissolving more rapidly. *Id.* at 59:15-24, 51:16-52:9; JTX-035 at 6 (Figure 3).

Dr. Havel explained that it would be fairly routine for a POSA to achieve the claimed particle size range based on the teachings of the '544 patent and '384 publication using laboratory equipment. Day 2 Tr. 75:20-76:2. When analyzing the '906 patent, Dr. Havel testified that the '906 patent does not describe a range of 1600 nm to 900 nm as ideal or preferable. *Id.* at 87:7-19. Further, Dr. Havel explained that the formulation taught in the '384 publication is identical to the

49

formulation disclosed in the '906 patent. *Id.* at 64:5-11; JTX-001 at Col. 15:25-40. Dr. Sinko agreed, testifying that the formulations found in Table 6 and the '906 patent were identical. Day 3 Tr. 239:5-8. He further agreed that the instructions for milling to a desired particle size were the same as between the '384 publication and '906 patent and that a POSA could mill paliperidone palmitate based on these instructions to achieve the claimed particle size. Day 3 Tr. 246:24-248:10.

A prima facie case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art. *Peterson*, 315 F.3d at 1329 (citing *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997)); *In re Woodruff*, 919 F.2d 1575, 1578 (C.C.P.A. 1990); *In re Malagari*, 499 F.2d 1297, 1303 (C.C.P.A. 1974). When, as here, the claimed particle size ranges are completely encompassed by and fall entirely within, the particle size ranges taught in the prior art, the conclusion is even more compelling than in the case of mere overlap. *Peterson*, 315 F.3d at 1330.

An overlap of ranges itself provides sufficient motivation to optimize the ranges. *Applied Materials*, 692 F.3d at 1295; *Peterson*, 315 F.3d at 1330. It is not inventive to discover the optimum or workable ranges by routine experimentation. *Applied Materials*, 692 F.3d at 1295 (citing *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955)). Here, both parties' experts agree that a POSA would have known how to mill to achieve the claimed particle size range for monthly dosing of paliperidone palmitate based on the instructions found in the '544 patent and '384 publication. Day 2 Tr. 75:12-76:2, 77:7-17; Day 3 Tr. 246:24-248:10. Therefore, claims 17-21 would have been obvious based on the teachings of the '544 patent and '384 publication when combined with Kramer, NCT 548 and the renally impaired dosing prior art (claims 8 and 11).

For the foregoing reasons, Tolmar has shown by clear and convincing evidence that claims 1-21 of the '906 patent would have been obvious to a POSA at the time of the alleged invention and are invalid.

## IV.   SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS DO NOT OUTWEIGH THE OBVIOUSNESS OF CLAIMS 1-21

### A.   There Are No Unexpected Results Supporting Non Obviousness

### 1.   Janssen's Private, Internal Data is Not Relevant to Unexpected Results

Janssen alleges unexpected results are shown by its private internal data collected during its clinical studies. But the results were internal to Janssen and not publicly available to a POSA. Dr. Vermeulen testified that the USA-3 study showed a surprising difference between concentrations in the deltoid and the gluteal muscle, and that the PSY-3004 and PSY-3003 (NCT 548) studies saw a high amount of patient drop-outs and inadequate efficacy. Day 2 Tr. 165:17-166:10, 171:19-172:2, 173:17-174:17, 178:18-179:10; JTX-600 (USA-3); JTX-595 (PSY-3003 Clinical Study Report); JTX-594 (PSY-3004 Clinical Study Report). Dr. Hough confirmed Dr. Vermeulen's testimony regarding the disappointment related to PSY-3003 and PSY-3004. Day 2 Tr. 235:21-236:17, 239:22-24. Dr. Gopal testified that the results of PSY-3003 and PSY-3004 were considered to be a failure. Day 3 Tr. 396:8-14. Thus, Janssen believed that the Phase III clinical studies, particularly PSY-3003 (NCT 548) and PSY-3004, failed to achieve rapid and sustained efficacy in the general population and were unexpected failures.

However, Janssen's witnesses claimed that none of the clinical data was publicly available when the '906 patent was filed. Day 2 Tr. 166:11-14, 236:20-237:6. When unexpected results are used as evidence of non-obviousness, the results must be shown to be unexpected compared with the closest prior art. *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir. 2017) (citing *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006)). "Unexpected results

are shown in comparison to what is known, not what was unknown." *Millennium*, 862 at 1368 (citing *Pfizer*, 480 F.3d at 1370-71). *See also Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 937 (Fed. Cir. 2019) (reversing a finding of unexpected results because a POSA could not have been surprised that a particular route of administration did not result in cardiotoxic effects, a problem and solution only known to the inventors, because a POSA would not have been aware that other routes of administration result in cardiotoxic effects). Further, Janssen provides no evidence of what a POSA would have expected. "[I]n order to properly evaluate whether a superior property was unexpected, the court should have considered what properties were expected." *Pfizer, Inc.*, 480 F.3d at 1371 (citing *Merck*, 874 F.2d at 808).

Janssen's proprietary data was not known to a POSA and was not part of the prior art. To the extent that any of the proprietary data related to development hurdles related to either Invega Sustenna or the claimed dosing regimen, a POSA would not be aware of these hurdles and would only be concerned with what was taught and expected by the prior art as a whole. Because none of the data relied upon by Janssen was part of the prior art, it is not relevant to unexpected results.

### 2. Kit Error and BMI Data Do Not Show Unexpected Results as They Are Unrelated to the Claimed Dosing Regimen

Janssen alleges unexpected results based on failed clinical studies. However, these failed clinical studies are due to a kit error and inaccurate BMI data due to short needle length. Dr. Vermeulen testified that the PSY 3003 (NCT 548) study, had a medication kit error. Day 2 Tr. 201:6-11. This error was relevant to the data collected by Janssen as not all patients who were supposed to receive 150 mg-eq. were in fact given 150 mg-eq. and were instead given placebo. *Id.* at 201:12-24. Drs. Hough and Gopal confirmed Dr. Vermeulen's testimony. *Id.* at 241:9-242:13; Day 3 Tr. 387:9-22. Dr. Hough testified that Janssen had to eliminate the analysis of nearly all the patients in the 150 mg-eq. group due to the error and Dr. Gopal testified that statistical tests were

not conducted because the sample size was too small. Day 2 Tr. 241:9-242:13; Day 3 Tr. 387:23-388:3. Further, Dr. Gopal testified that the kit error did not have anything to do with the science of paliperidone palmitate and instead was related to randomization discrepancies in the computer program used by Janssen's vendor. Day 3 Tr. 392:4-393:15. As such, because the number of patients who actually received the 150 mg-eq. dose was much less than originally planned, the data collected from this reduced number of patients is not reliable or relevant to show unexpected results.

Dr. Vermeulen testified that claim 1 of the '906 patent would not be practiced if paliperidone palmitate was partially injected into adipose tissue. Day 2 Tr. 203:5-24.  Relatedly, Dr. Hough testified that the PSY-3003 study showed that U.S. subjects showed no efficacy benefit while non-U.S. subjects did show benefit. *Id.* at 236:1-17. This result, Dr. Hough explained, was due to the injection not being able to get through the adipose tissue to the gluteal muscle for U.S. patients. *Id.* at 306:11-18.

These results are not probative of non-obviousness, because injection into the adipose tissue is not part of the claimed invention. That is, the claimed invention is not practiced when a full or partial injection is made into the adipose tissue. "For objective indicia evidence to be accorded substantial weight, we require that a nexus must exist 'between the evidence and the merits of the claimed invention.'" *Novartis AG v Torrent Pharms., Ltd.*, 853 F.3d 1316, 1329-30 (Fed. Cir. 2017) (finding that unexpected results evidence was not commensurate in scope with the claims because the relevant claims did not include dosage limitation) (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)). *See also In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (finding that where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the

claimed invention); *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1034 (Fed. Cir. 2016) (finding nexus must be tied to the novel features of a combination of prior art elements, not unclaimed features or prior art feature in isolation). As such, Janssen's data from these failed clinical trials is irrelevant to unexpected results due to the claimed invention.

### 3.    Kramer and NCT 548 Taught No Oral Supplementation was Needed and Loading Doses Were Known in the Art

Janssen alleged that a dosing regimen requiring no oral supplementation was an unexpected benefit of the '906 patent claims. However, Dr. Sinko admitted that Kramer teaches no oral supplementation. Day 3 Tr. 262:7-21; JTX-036 at 2. Further, Dr. Sinko admits that loading doses were known in the prior art and once-monthly injectables could be improved with loading doses. Day 3 Tr. 263:9-265:14. Additionally, Dr. Vermeulen testified that loading doses are one solution of reaching steady state faster for long-acting injectable products. Day 2 Tr. 215:4-8. "To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.,* 752 F.3d 967, 977 (Fed. Cir. 2014).

Here, based on Janssen's own witnesses' testimony, it is clear that a POSA understood that loading doses could replace oral supplementation in order to achieve steady state faster. Therefore, Janssen has not shown any unexpected results with respect to the claimed dosing regimen requiring no oral supplementation.

### 4.    The Increased Deltoid Concentration in the '906 Patent's Example 2 Is Not a Difference in Kind

Dr. Sinko asserted that injection into the deltoid muscle leads to unexpected results when compared with the injection into the gluteal muscle. Specifically, Dr. Sinko testified that Example 2 of the '906 patent showed that Cmax for the deltoid was 30% higher than Cmax for the gluteal

54

muscle, and that the AUC was 20% higher.  Day 3 Tr. 224:13-225:1; JTX-001 at Col. 17:16-19. Dr. Sinko also testified that this amount was a difference in kind when compared to NCT 548. Day 3 Tr. 225:3-9. Dr. Sinko's testimony mischaracterizes the disclosure of the '906 patent. The increase in Cmax was only shown after the second and forth doses. JTX-001 at Col. 17:12-15. Further, after all four doses on Days 1, 8, 36 and 64, the AUC values were similar between deltoid and gluteal muscle injections. *Id.*

To the extent that Example 2 does show a difference, those differences are differences in degree and not differences in kind. Unexpected results that are probative of nonobviousness are those that are "different in kind and not merely in degree from the results of the prior art." *Galderma Labs.*, 737 F.3d at 739 (citing *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004) (citation omitted)). Results which differ by percentages are differences in degree rather than kind, where the modification of the percentage is within the capabilities of one skilled in the art at the time. *See In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005) (finding increased efficacy, measured by percentages, to be a difference of degree and not of kind).

Dr. Coles testified that a 30% difference in Cmax and a 20% difference in AUC between gluteal and deltoid is a difference in degree, not a difference in kind. Day 4 Tr. 33:6-22. Dr. Coles explained that the FDA has determined that differences in systematic drug exposure up to 20% are not clinically important. Day 4 Tr. 31: 2-24; JTX-001 at 16. Dr. Coles explained that Tmax values between deltoid and gluteal are reported in Example 2 and a POSA would expect both a change in Tmax and Cmax if there was a large difference in drug exposure to be similar, which there was not. Day 4 Tr. 33:6-22; JTX-001 at 16. Improved efficacy, somewhat greater than what would have been expected, does not rebut a strong showing that the claimed invention was obvious over the prior art. *See Hoffmann-LaRoche*, 748 F.3d at 1334; *In re Merck & Co.*, 800 F.2d 1091, 1099 (Fed.

Cir. 1986)(finding that evidence of superior efficacy did nothing to undercut the teaching of the prior art to select a 150 mg monthly dose, even if the level of success may have turned out to be somewhat greater than what would have been expected).

**B.     There Was No Skepticism Because the Start Low and Go Slow Adage Is Not Applicable To Long-Acting Injectable Antipsychotic Medication**

Janssen asserts that its alleged evidence of industry skepticism weighs in favor of non-obviousness. Janssen specifically asserts that industry skepticism existed for the claimed dosing regimen because a high loading dose, in combination with a second dose a week later, would cause concern for side effects (*e.g.*, EPS) that would pose a problem for future adherence. Day 3 Tr. 50:8-18. Dr. Kohler asserted that a high loading dose is counter to a prevailing start low and go slow adage for antipsychotic medication prevalent among POSAs. *Id.* at 28:22-24, 29:1-3, 48:4-24. While it may be true that the start low and go slow adage is applicable to new patients treated for the first time with <u>oral</u> antipsychotic medication, there is no evidence that such an adage translates to chronic patients moved to a <u>long-acting injectable</u> antipsychotic medication, particularly to <u>second-generation</u> atypical long-acting injectable antipsychotic medication.

Dr. Kohler testified that the purpose of starting low and going slow with oral antipsychotics is to avoid side effects, which is important when the patient has never been exposed to an antipsychotic before. *Id.* at 107:17-24, 108:1-6. However, a new patient is not characteristic or representative of the typical patients who are moved to a long-acting injectable antipsychotic medications – instead, long-acting injectables are given to chronic patients who have already been diagnosed with schizophrenia and who have proven to be non-compliant with their oral medication. *Id.* at 108:18-24, 109:1-11. Dr. Kohler further admitted that for chronic patients, who have already been on an oral antipsychotic medication and who have become less sensitive to EPS, administration of a long-acting injectable medication can be advanced at a more rapid rate because

these chronic patients "will be less sensitive to side effects in that situation." *Id.* at 109:14-24, 110:1-2. For a chronic patient, there is no need to start low and go slow with a long-acting injectable antipsychotic medication.

Even on the rare occasion that the patient has not received oral antipsychotic medication, the Invega Sustenna Label requires practitioners for "patients naïve to oral paliperidone or oral or injectable risperidone, [to] establish tolerability with oral paliperidone or oral risperidone prior to initiating treatment with INVEGA SUSTENNA®." JTX-190 at 1. However, consistent with the Invega Sustenna label, out of an abundance of caution, a practitioner must administer a test dose to establish tolerability to the underlying paliperidone. Dr. Kohler explained that the "test dose decreases that chance of acute EPS after a single dose." Day 3 Tr. 102:21-24. Typically, EPS with oral antipsychotics are seen very quickly after initiation of treatment—thus, the test dose mitigates concerns that there would be emergence of EPS with the long-acting injectable form of the underlying paliperidone. *Id.* at 103:2-13.

Dr. Kohler agreed that it is important to treat schizophrenia early on to increase efficacy and therapy. *Id.* at 110:11-15. In fact, Dr. Kohler agrees that if he has a patient that needs acute treatment for diagnosed schizophrenia, he would want to treat that patient as quickly as possible with whatever treatment mode is available to him. *Id.* at 86:2-8. This includes treatment of a patient with a safe, high loading dose of paliperidone palmitate followed by a second dose a week later. A POSA would have no skepticism of doing so.

### C.    There Was No Long-Felt Need for The Claimed Dosing Regimen

Dr. Kohler alleges two long-felt needs for antipsychotic medications. Day 3 Tr. 55:11-21. The first long-felt need was for an effective and tolerable long-acting injectable medication without side effects. *Id.* at 55:16-24; 56:1-13. The second long-felt need was for a long-acting injectable

medication meant for patients early within the course of their illness to stave off chronicity of illness. *Id.* at 56:14-21.

The first alleged long-felt need is illogical for several reasons. As Dr. Kohler explicitly admits, Risperdal Consta was a second generation long-acting injectable already available on the market "which we [POSAs] were very happy to have." *Id.* at 55:22-24, 56:1-5. Furthermore, as Dr. Gopal explained, both fluphenazine and haloperidol were dosed at monthly intervals, as were "virtually all" of the long-acting injectable antipsychotic medications on the market in 2006. *Id.* at 378:20-24; 379:1-17.

It is clear that an effective and tolerable long-acting injectable medication was already available to POSAs in the form of Risperdal Consta, which is a long-acting injectable form of risperidone. JTX-168. As Dr. Kohler explained, risperidone is metabolized in the liver to hydroxy risperidone, which is paliperidone, and which exhibits antipsychotic properties. Day 3 Tr. 58:18-24, 59:1-24, 60:1-24, 61:1-5.

The second alleged long-felt need also does not hold weight. Dr. Kohler cites no documents, and provides no reasoning, as to why other long-acting injectable antipsychotic medications such as Risperdal Consta could not be used early within the course of a patient's illness to stave off chronicity of illness. Such unsupported testimony is not probative of non-obviousness of the '906 patent. *See* Fed. R. Evid. 702(b) (requiring testimony by expert witnesses to be "based on sufficient facts or data"). Beyond Dr. Kohler's failure to provide support for his conclusory testimony, he testified that oral antipsychotics are always the first consideration for treatment.  Day 3 Tr. 96:4-24; 97:1-24; 98:1-9.

Additionally, Dr. Kohler admits it is clear that the claimed dosing regimen of the '906 patent does not teach or require a lack of oral run-in or oral supplementation. Day 3 Tr. 110:16-24,

111:1-9. Neither does the '906 patent teach or require a lack of polypharmacy, such as administering another drug or a different oral antipsychotic, as Dr. Kohler also admits. *Id.* at 111:5-9. As such, it is inappropriate to attribute a long-felt need of a lack of oral run-in or oral supplementation to a claimed dosing regimen which is completely silent as to an oral run-in or oral supplementation. There is no nexus between the supposed long-felt need and the claimed dosing regimen of the '906 patent.

### D.    There Was No Industry Praise of the Claimed Dosing Regimen

Dr. Kohler asserts that the literature supported industry praise of the claimed dosing regimen. *Id.* at 52:10-13. In support of the proposition of industry praise, Dr. Kohler discusses three articles, all of which include authors having varying degrees of affiliation with Janssen itself. *Id.* at 52:14-24, 53:1-24, 54:1-23; JTX-228; PTX-223 at 17; PTX-227 at 9.

The fact that, out of the entire world of literature on Invega Sustenna, Dr. Kohler focuses his testimony on three articles authored by those with close affiliation with Janssen as supposed evidence of industry praise betrays that such praise is simply stemming from Janssen itself. Stated simply, Dr. Kohler confuses self-praise with industry praise. These are considerations that the Court should account for when deciding if conflicts of interest have tainted the supposed evidence of industry praise offered by Dr. Kohler.

### E.    There is No Evidence that Tolmar Copied the Claimed Dosing Regimen

Dr. Sinko alleges that, based on Mr. Downing's testimony, it was Tolmar's goal to match the particle size distribution of Invega Sustenna. Day 3 Tr. 227:8-12. Dr. Sinko further alleges that Tolmar did not attempt to develop a paliperidone palmitate formulation having a different particle size distribution than that found in Invega Sustenna. *Id.* at 227:17-23. Although Dr. Sinko admits that the FDA requires a generic drug manufacturer to establish bioequivalence to the RLD, Dr.

Sinko further states that the FDA does not require a generic drug manufacturer to copy or match the particle size distribution of Invega Sustenna. *Id.* at 226:10-18.

Evidence of alleged copying has little value in the context of Hatch-Waxman ANDA litigation. *Santarus, Inc. v. Par Pharm., Inc.*, 720 F. Supp. 2d 427, 458 (D. Del. 2010) *aff'd in relevant part by* 694 F.3d 1344 (Fed. Cir. 2012) (holding that "[a]s several courts have noted, however, a showing of copying is not compelling evidence of non-obviousness in Hatch-Waxman cases due to the nature of the ANDA process").

Mr. Downing, however, did not state that it was Tolmar's goal to copy the particle size distribution of Invega Sustenna—instead, Mr. Downing explained that Tolmar designed its product to have an equivalent particle size that would provide a bioequivalent product. Day 1 Tr. 52:10-16. Without showing bioequivalence to the RLD, Mr. Downing explained that Tolmar would not receive approval from the FDA. *Id.* at 46:23-24. Mr. Downing unequivocally testified that "Tolmar did not copy the RLD. Tolmar developed a generic equivalent to the RLD based on guidelines by the FDA." *Id.* at 35:17-20. Mr. Downing further explained that, when Tolmar started developing its generic version of paliperidone palmitate, Tolmar reviewed the product label for Invega Sustenna, patents listed in the FDA Orange Book for Invega Sustenna, and published journal articles. *Id.* at 28:23-24, 29:1-16, 33:4-10. Mr. Downing also explained that Tolmar also conducted their own experimentation. *Id*. As part of that experimentation, Mr. Downing elaborated that Tolmar experimented with methods of manufacturing and measuring various particle sizes. *Id.* at 34:21-24, 35:1-8, 35:22-24, 36:1-13. Through this experimentation, Tolmar established a particle size range for their generic version of paliperidone palmitate which was wider than the particle size range found for Invega Sustenna. Day 1 Tr. 45:23-24, 46:1-20.

    **F.**    **Janssen Failed to Establish Commercial Success as a Result of the Claimed Dosing Regimen**

"Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). Janssen must show that the "driving force" behind Invega Sustenna's sales was a direct result of the unique characteristics of the '906 patent's dosing regimen. *See WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1330–31 (Fed. Cir. 2018) (citing *In re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008)). Janssen has not shown that Invega Sustenna's alleged commercial success is due to the claimed dosing regimen as opposed to other factors.

**1. Invega Sustenna's Sales and Revenues**

Invega Sustenna's performance in the marketplace for long-acting injectables in the United States is largely due to its status as the market leader in second-generation long-acting injectables. Where the patent holder is shown to be the market leader prior to the introduction of the claimed invention, its sales figures cannot be given controlling weight in determining the significance of the evidence of commercial success. *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 316 (Fed. Cir. 1985). Prior to Invega Sustenna's introduction in 2009, the only second-generation long-acting injectable approved for the market was Janssen's Risperdal Consta, which was introduced in 2003. Day 3 Tr. 290:5-8. Thus, Janssen was the market leader in second-generation long-acting injectables for years before the introduction of Invega Sustenna and its sales figures carry little weight.

Ms. Mulhern's testimony on Invega Sustenna's market share and market penetration relative to other long-acting injectables should also be afforded little weight because she did not analyze what additional market share for Invega Sustenna resulted from the use of the patented features. Day 4 Tr. 58:8-17.

### 2.      Janssen's Marketing Messages

Ms. Mulhern's testimony regarding Janssen's marketing messages largely relies on cherry-picking particular statements in Janssen's marketing materials she claims are consistent with the benefits derived from the claimed features. Day 4 Tr. 60:4-13. However, Ms. Mulhern fails to show how the particular messages she chose impact commercial success as opposed to other non-patented factors. *Id.* at 60:4-13.

### 3.      Janssen's Portfolio Drives Invega Sustenna's Alleged Commercial Success

Janssen has an entire portfolio of treatments for schizophrenia. Day 3 Tr. 54:13-20. Janssen's marketing materials make clear that its portfolio of treatments for schizophrenia drive Invega Sustenna's sales. JTX-321 at 9, 40-41.

### 4.      Janssen's Discounting, Sampling and Market Spending Drive Invega Sustenna's Sales

Ms. Mulhern's analysis of discounting, sampling, and market spending is also flawed. Dr. Vander Veen testified that Ms. Mulhern's analysis with respect to discounting is essentially that it did not impact her analysis because everyone discounts, and therefore, it does not impact market share. Day 4 Tr. 69:19-70:5. Her analysis is flawed because the market share will be impacted if parties discount in different ways. *Id.* at 70:5-15.

Likewise, Ms. Mulhern's analysis on sampling is flawed because she did not actually look at the sampling practices for the other long-acting injectable products in her market share comparison. *Id.* at 74:5-23. She simply concludes that sampling does not explain Invega Sustenna's commercial success because all long-acting injectable brands have sampling programs. *Id.*

Lastly, Ms. Mulhern's analysis with respect to marketing spend is based on incomplete data. Day 3 Tr. 313:22-314:3; JTX-012B at 22. Ms. Mulhern's data does not include Invega Sustenna's first two years on the market. *See* JTX-012B at 22.

### 5.    Blocking Patents Discount Any Evidence of Commercial Success

The alleged commercial success of Invega Sustenna is obviated by blocking patents, such as the '556 patent, the '843 patent, and the '544 patent. Where practice of a later invention would infringe an earlier patent, the earlier patent has been called a "blocking patent." *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1337 (Fed. Cir. 2018). "Existence of…a blocking patent may deter non-owners and non-licensees from investing the resources needed to make, develop, and market such a later, 'blocked' invention, because of the risk of infringement liability and associated monetary or injunctive remedies." *Id.* When an owner of a blocking patent also patents the later invention, the "potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent." *Id.* (citing Note, *Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity*, 112 U. PA. L. REV. 1169, 1177 (1964)).

Dr. Vander Veen testified that Ms. Mulhern failed to show Invega Sustenna's commercial success is a result of the '906 patent as opposed to the other patents identified in the Orange Book as related to Invega Sustenna. Day 4 Tr. 51:20-52:8. He relied on Dr. Havel's testimony that these patents cover the use of paliperidone, or paliperidone palmitate, or the use of suspended release formulations and testified that this can impact the commercial success of Invega Sustenna due to a lack of competition rather than the features of the '906 patent. *Id.* at 52:3-8, 101:15-3.

Dr. Havel testified that using or practicing the '906 patent claims falls within claims 1 and 3 of the '556 patent. *Id.* at 11:23-12:10. The '556 patent was issued to Janssen in 1993 and expired

in 2013. *Id.* at 9:19-21, 50:20-21. Dr. Havel also testified that using or practicing the '906 patent

claims falls within claims 1, 2, and 10 of the '843 patent. *Id.* at 15:24-16:18. The '843 patent was

issued in 2000 and expired in May 2017. *Id.* at 12:14-17, 50:22-23. Dr. Havel further testified that

using or practicing the '906 patent claims falls within claims 1 and 7 of the '544 patent. *Id.* at 18:6-

19. The '544 patent did not expire until November 10, 2018. *Id.* at 50:23-24. Until 2018, each of

these patents blocked competitors from marketing an aqueous nanoparticle paliperidone palmitate

formulation and deterred competitors from investing resources to market the claimed dosing

regimen. Any evidence of Invega Sustenna's commercial success should be given little weight.

## V.   CLAIMS 1-21 OF THE '906 PATENT ARE INVALID FOR FAILING TO SATISFY THE ENABLEMENT AND WRITTEN DESCRIPTION REQUIREMENTS

A patent is invalid if it does not satisfy the enablement or written description requirements

set forth in 35 U.S.C. § 112(a) (pre-AIA first paragraph).  Section 112(a) states, in part, "[t]he

specification shall contain a written description of the invention, and of the manner and process of

making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in

the art to which it pertains, or with which it is most nearly connected, to make and use the same."

A patent is invalid for lack of enablement if a POSA would not be able to practice the

claimed invention, including how to use the claimed invention, without undue experimentation.

*Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (citing *In Re Wands*,

858 F.2d at 736-37).

To satisfy the written description requirement, the patent description must clearly show and

allow POSAs to recognize that the inventor or inventors invented what is claimed. *Ariad Pharms.,*

*Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*) (citing *Vas-Cath Inc.*, 935

F.2d at 1562-63).  "[T]he test for sufficiency is whether the disclosure of the application relied

upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id*.

A. **Administering Maintenance Doses, a Month (± 7 Days) After the Second Loading Dose or at Monthly (± 7 days) Intervals Is Not Enabled or Adequately Described by the '906 Patent**

Claims 1-21 of the '906 patent are invalid as not enabled and lacking written description because the specification of the '906 patent does not enable or adequately describe how to administer the full range of doses across the full range of the 17-day dosing window claimed.

The terminology "a month (± 7 days)" and monthly (± 7 days)" was added to the '276 provisional and incorporated into the '906 patent. DTX-362 at 8-9; Day 1 Tr. 85:2-86:17. Claims 1-21 are not original claims to the '906 patent. After receiving a Notice of Allowance, the patentee amended all the independent claims to remove administering the first maintenance dose on the 34th to 38th Day of treatment. Day 1 Tr. 78:5-17; JTX-002 at 1145-1151, 1236-1244. Patentee replaced this four-day dosing window with administering the first maintenance doses "a month (± 7 days) after the second loading dose." Day 1 Tr. 79:15-80:9; JTX-002 at 1236-37. Certain dependent claims were also amended to require administering subsequent maintenance doses "at monthly (± 7 days) intervals" after the first maintenance dose. JTX-002 at 1237-1240. The parties agree that "monthly (± 7 days)" means 21 to 38 days, *i.e.*, a 17-day dosing window. D.I. 132 at ¶ 14 (Pretrial Order).

1. **Administering a First Maintenance Dose of 25-150 mg-eq. Throughout the 17-Day Dosing Window Is Not Enabled and Requires Undue Experimentation**

A patent lacks enablement when, based on evidence regarding each of the *In re Wands* factors, the specification, at the time the application was filed, would not have taught a person skilled in the art how to make and/or use the full scope of the claimed invention without undue experimentation. *In re Wright*, 999 F.2d 1557, 1562 (Fed. Cir. 1993). Moreover, the full scope of

the claimed invention must be enabled. *Promega Corp. v. Life Technologies Corp.*, 773 F.3d 1338, 1347 (Fed. Cir. 2014) (stating that the "scope of the claims" must be "commensurate" with the specification). The rationale for this statutory requirement is straightforward. Enabling the full scope of each claim is "part of the quid pro quo of the patent bargain." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). A patentee who chooses broad claim language must make sure the broad claims are fully enabled. "The scope of the claims must be less than or equal to the scope of the enablement" to "ensure[] that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999). Here, an analysis of the *Wands* factors demonstrates that the '906 patent does not enable the full scope of the 17-day dosing window with undue experimentation. *Wands*, 858 F.2d at 737 (providing the following factors: (1) quantity of experimentation necessary, (2) amount or direction or guidance presented, (3) presence or absence of working examples, (4) nature of the invention, (5) state of the prior art, (6) relative skill of those in the art, (7) predictability or unpredictability in the art, and (8) breadth of the claims).

Turning first to *In re Wands* factors (8), (2), (3), and (4), the breadth of the claims is not described in the '906 patent. Besides the words "monthly (± 7 days)," the '906 patent does not disclose how to select the range of doses for the first maintenance dose that are used to treat a schizophrenia patient within the claimed 17-day dosing window. Day 1 Tr. 201:15-202:17, 344:14-20. The examples disclose maintenance dosing on Days 36 and 64 (28-day intervals), monthly, or every four weeks. JTX-001 at Col. 17:4-10 (Example 2), Cols. 18-19 (Table 4 citing PSY-1001), Cols. 20-21 (Table 5 describing "monthly i.m. injections" and injections on Days 1, 8, 36, and 64), Col. 21:20-30 ("monthly intervals"), Col. 24:7-11 (i.m. injections on Days 8, 36, and 64). None of

the examples in the '906 patent evaluate or report data related to dosing windows in any way. Day 1 Tr. 206:18-207:23.

The '906 patent discloses that the target exposure plasma concentration efficacy range for paliperidone after injection of paliperidone palmitate is 7.5 ng/ml-40 ng/ml. JTX-001 at Col. 21:58-Col. 22:17; Day 1 Tr. 204:12-18. The '906 patent discloses that plasma concentration below 7.5 ng/ml is a cut-off for efficacy, while plasma concentrations above 40 ng/ml resulted in clearly higher risks to develop EPS. JTX-001 at Col. 21:53-67; Day 1 Tr. 204:21-206:13. The goal of the loading dose regimen is to "get patients as quickly as possible above 7.5 ng/ml, certainly after 1 week" to "avoid drop-out due to lack of efficacy at the start of therapy" and to maintain plasma concentrations within the target exposure range over time. JTX-001 at Col. 22:38-43; Day 1 Tr. 206:7-13. The '906 patent discloses the "optimized loading dose regimens" were followed by maintenance dosing "every 4 weeks." JTX-001 at Col. 23:15-25. Based on the 7.5-40 ng/ml target exposure range, the '906 patent discloses three figures showing pharmacokinetic (pK) simulations of three different dosing regimens. JTX-601 at Col. 4:45-60.

Figs. 1-3 show observed and population pK model simulations for plasma paliperidone concentrations. JTX-001 at Col. 31:53-62; Day 1 Tr. 208:2-8. The observed plasma concentrations represent actual patient plasma concentrations; however, the figures do not indicate which plasma concentrations are associated with any particular patient. Day 3 Tr. 220:5-12, 249:18-23, 251:1-20. Figure 2 shows simulated pK concentrations for patients receiving 150 mg-eq. in the deltoid on Day 1 followed by 100 mg-eq. in the deltoid or gluteal on Days, 8, 36, and 64. JTX-001 at Col. 4:51-55; Day 1 Tr. 213:6-214:9. None of the figures disclose data or simulations related to dosing windows. *Id.* at 210:12-19, 213:9-14, 214:10-16.

The '906 patent discloses, and Dr. Coles explained, that the pK simulations found in Figs. 1-3 are generated from a population pK model (pop-pK model). *Id.* at 208:14-210:6. However, the '906 patent only makes passing reference to the pop-pK model and does not disclose the model, itself, or the parameters used in the model. JTX-001 at Col. 22:23-26; Day 1 Tr. 214:24-215:9. And while the '906 patent identifies several factors identified as a result of "extensive population pK analysis" and several simulation scenarios with covariates, none of them relate to dosing windows. JTX-001 at Col. 22:27-23:14; Day 1 Tr. 215:10-217:19.

Turning to *Wands* factors (5) the state of the prior art, (6) the relative skill of those in the art, and (7) the predictability or unpredictability of the art, the state of the prior art did not include dosing window data for paliperidone palmitate maintenance doses or the model used in the simulations found in Figs. 1-3. Dr. Vermeulen testified that the pop-pK model was based on proprietary Janssen plasma concentration that was not available to the public. *Id.* at 186:16-19, 195:20-196:26. As Dr. Coles explained, the prior art did teach how to build a pop-pK model, but without the underlying pK data or model parameters, a POSA would not be able to build the model or run simulations. Day 1 Tr. 89:23-98:14, 218:14-219:4; JTX-163 at 1-3; JTX-638 at 6. And while a POSA does have an advanced degree and several years of experience, Dr. Vermeulen testified that "very few people" in 2007 and 2008 could build pop-pK models, and even today "there are more, of course, than at that time, but still, it's a skill that not many – many people actually master." Day 2 Tr. 197:17-198:16.

Inventions in unpredictable fields, such as in the pharmaceutical and chemical arts, are required to disclose more than a single example to enable the full scope of the claims. *Spectra Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987) (holding that disclosure of a single embodiment would only allow the POSA to practice the full scope of the claimed invention

without undue experimentation when the invention "…pertains to an art where the results are predictable, e.g., mechanical as opposed to chemical arts"). Here, the '906 patent only discloses dosing on Days 1, 8, 36, and 64.

The quantity of experimentation needed to teach a POSA how to maintain or achieve target plasma concentrations of paliperidone with a range of potential doses (25-150 mg-eq.) dosed anywhere within a 17-day window would be significant and undue. As explained in *Cephalon, Inc. v. Watson Pharms., Inc*., 707 F.3d 1330, 1339 (Fed. Cir. 2013), the requirement for more clinical studies constitutes undue experimentation such that the claims are not enabled if an unreasonable amount of time would be required to practice the claimed invention. *Cephalon*, 707 F.3d at 1339 (holding that "experimentation was unreasonable, for example, where it was found that eighteen months to two years' work was required to practice the patented invention") (citing *White Consol. Indus., Inc. v. Vega Servo-Control, Inc.*, 713 F.2d 788, 791 (Fed. Cir. 1983)). Moreover, claims were found invalid for lack of enablement in *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 777 F. Supp. 330, 374 (D. Del. 1991), *aff'd*, 972 F.2d 1354 (Fed. Cir. 1992) because several years of dose studies had to be conducted to determine an effective dose for achieving the benefit of cardioselectivity. *Id.* (holding the claims invalid for lack of enablement because the discovery responsible for the effective dose regiment of atenolol, which took several years of dose studies, represented "the result of substantial experimentation such that the requirement of an adequate disclosure of 35 U.S.C. § 112 has not been satisfied") (internal citations omitted).

Here, designing and conducting a clinical trial to explore the claimed 17-day dosing window would be "extremely difficult." Day 3 Tr. 402:2-8. Dr. Briscoe, one of the alleged inventors of the '906 patent, explained that dosing windows are "not the kind of information you can get from a clinical study because you'd have to collect data on all these different time points

when somebody missed a dose or didn't, came in late, came in early." *Id.* at 402:9-16, 405:6-12. Dr. Briscoe further explained that "you can't get that kind of – in my opinion, get that information from a clinical study." *Id.* at 402:17-20. Dr. Briscoe also confirmed that there are no clinical trials supporting maintenance dosing at 3 weeks or 5 weeks. *Id.* at 407:13-24. As a result, Janssen used pop-pK modeling to explore the 17-day dosing windows. *Id.* at 402:21-22, 399:21-400:19.

The quantity of experimentation needed to practice the full scope of the claims was extensive and, in the case of developing a pop-pK model and running pK simulations, not possible without the underlying data or pop-pK model parameters. Day 1 Tr. 218:14-219:4. Here, Dr. Vermeulen testified that her initial pop-pK model was designed and based on data from 1215 patients with 13,238 plasma concentrations. Day 2 Tr. 181:11-21; JTX-606 at 3. Dr. Samtani confirmed his pop-pK model utilized even more data. Day 2 Tr. 351:13-352:12. None of this data was in the public domain. *Id.* at 186:16-19, 352:13-16.

Dr. Vermeulen testified she "found it really hard actually at that time to build the Pop PK model for this formulation" due to the complex covariate structure. *Id.* at 182:13-183:4. Dr. Samtani testified that he had to rebuild Dr. Vermeulen's model to make it more useful, which took him 5 months working full time. *Id.* at 348:16-350:16. None of the pop-pK model parameters or the underlying clinical data are found in the '906 patent. Day 1 Tr. 218:14-12. Dr. Coles testified that without the underlying data or the pop-pK model parameters, a POSA would not be able to build a model to run simulation scenarios, such as the claimed 17-day dosing windows. *Id.* at 218:14-12. Dr. Samtani, who did have his pop-pK model, ran dosing window simulations based on his model and submitted them to the FDA, but did not include them in the '906 patent. Day 2 Tr. 401:6-402:14. This is not surprising since Dr. Samtani was not originally listed as an inventor

of the '906 patent, was not involved in its preparation, and was only added as an inventor years after it issued. *Id.* at 388:17-389:2, 390:2-7, 396:1-18; Day 3 Tr. 412: 17-413:2.

Without the clinical date, pop-pK model parameters, or Dr. Samtani's dosing windows simulations, all Dr. Coles found in the '906 patent was the discussion of half-life, which is different for lower and higher paliperidone palmitate dosages. JTX-001 at Col. 19:29-35; Day 1 Tr. 218-222. Half-life impacts the amount of drug that accumulates over time in the body and the dosing windows affects drug concentrations. Day 1 Tr. 219-222. Dr. Coles attempted to determine whether a POSA, based on the '906 patent, would be able to select an appropriate dosage. Dr. Coles presented two demonstratives annotating Fig. 2 with two different dosing scenarios that are within the scope of the claims: administering a first maintenance dose at Day 46 of treatment (*i.e.*, 38 days after the day 8 second loading dose) and administering a first maintenance dose at Day 29 (*i.e.*, 21 days after the Day 8 second loading dose). Day 1 Tr. 226:2-17, 228:23-20.



Dr. Coles explained that for the Day 46 first maintenance dose, a POSA would not know what patients were below the therapeutic target exposure or what the appropriate dose to administer a patient would be to maintain a therapeutic target exposure for the next 21-38 day dosing window. Day 1 Tr. 227:18-228:11. Similarly, Dr. Coles explained that for the Day 29 first maintenance dose,

a POSA would not know what patients were near the 40 ng/ml threshold where safety concerns or what dose to give a patient to maintain target plasma concentrations over the next 21-38 days. *Id.* at 229:4-230:5. Accordingly, Dr. Coles concluded the claims of the '906 patent were not enabled because a POSA could not practice or use the claims because of the large 17-day dosing window. *Id.* at 230:6-18.

For his part, Dr. Sinko testified that the '906 patent is like a recipe and a POSA would simply follow the recipe. Day 3 Tr. 213:7-15. Dr. Sinko further explained all a POSA would have to do is give the patient "the same dose that they would normally be given" if they came in a week early or a week late for their monthly injection. *Id.* at 222:11-15. That testimony, in and of itself, proves the point. A POSA would not know what dose to give within the 25-150 mg-eq. range in the first place if a patient came in at week 3 for their first maintenance dose versus week 5 to maintain or achieve target plasma concentrations. Day 1 Tr. 226:2-228:11, 228:23-230:18. Therefore, the '906 patent does not provide enablement for the full scope of the dosing window without undue experimentation.

> **2.    The '906 Patent Fails to Adequately Describe that the Inventors Possessed a Dosing Regimen in which 25-150 mg-eq. Are Administered 21 to 38 Days After the Second Loading Dose**

The written description requirement "plays a vital role in curtailing claims… that have not been invented, and thus cannot be described." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.,* 759 F.3d 1285, 1299 (Fed. Cir. 2014) (citing *Ariad Pharms.,* 598 F.3d at 1352). As such, the "purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Univ. of Rochester v. G.D. Searle & Co.,* 358 F.3d 916, 920 (Fed. Cir. 2004) (internal quotation omitted).

To demonstrate possession, the inventor must provide enough description in the specification to demonstrate that he actually invented what has been claimed – a "mere wish or plan for obtaining the claimed invention" is not enough. *Centocor Ortho*, 636 F.3d at 1348. The written description requirement is particularly important to analyze where claims are added later during prosecution. *FWP IP ApS v. Biogen MA, Inc.*, 749 Fed. Appx. 969, 974 (Fed. Cir. 2018); *see also Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed. Cir. 2009) ("The written description doctrine prohibits new matter from entering into claim amendments."); *In re Wright*, 866 F.2d 422, 424 (Fed. Cir. 1989) ("When the scope of a claim has been changed by amendment in such a way as to justify an assertion that it is directed to a *different invention* than was the original claim, it is proper to inquire whether the newly claimed subject matter was *described* in the patent application when filed as the invention of the applicant. That is the essence of the so-called "description requirement" of § 112, first paragraph.").

As explained above, besides the words "monthly (± 7 days)," there is no disclosure in the '906 patent showing the inventors had possession of a maintenance dosing regimen in which 25-150 mg-eq. paliperidone could be administered within a 17-day monthly dosing window. *Supra*, V.A. The only days the first maintenance dose is administered as disclosed in the '906 patent is day 36, monthly, or every 4 weeks. This is insufficient to show the inventors possessed a 17-day dosing window as the '906 patent does not provide sufficient "blaze marks" to show they possessed the full range of doses and days within the dosing window. *Ferring Pharms.*, 2020 U.S. Dist. LEXIS 1562197 at *153, *159-60; *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149,1164 (Fed. Cir. 2019) (holding the claims of the patent invalid as lacking written description where eighteen disclosed compounds did not provide sufficient blaze marks to direct a POSA to which

compounds encompassed by the claims, other than the eighteen disclosed, would be effective to treat HCV). Accordingly, the '906 patent is also invalid for lack of written description.

### 3.    Administering Subsequent Maintenance Doses Is Not Enabled or Adequately Described

Claims 2, 9, 15 and 16 require subsequent maintenance doses from about 25 mg-eq. to 150 mg-eq. paliperidone administered at monthly (± 7 days) intervals. JTX-001 at Col. 32, 33, 34. Based on the parties' agreed claim construction, this results in maintenance doses administered every 21-38 days after the first maintenance dose—or about every 3 to 5 weeks. In effect, one patient under the shortest possible dosing interval (21 days) would receive four doses of paliperidone palmitate (Day 1, Day 8, Day 29, and Day 50) in almost the same time as another patient would receive three doses under the longest possible dosing interval (38 days) (Day 1, Day 8, Day 46). Day 1 Tr. 222:13-225:22. Moreover, Dr. Samtani testified, and Janssen represented to the FDA, that every 3-week or every 5-week dosing intervals "should not be done. It's a monthly product, so it should not be given once every three week or once every five weeks." Day 2 Tr. 401:18-402:3; JTX-597 at 100. Based on Dr. Samtani's testimony, Janssen's representations to the FDA, and the lack of any disclosure in the '906 patent related to every 3-week or every 5-week dosing, claims 2, 9, 15 and 16 are invalid for lack of enablement because a POSA would not be able to practice the full scope of the claims without undue experimentation and for lack of written description because the inventors did not describe or have possession of subsequent maintenance doses administered in a range include every 3 or every 5 week intervals.

### B.    The '906 Patent Fails to Adequately Describe and Enable Treating a Psychiatric Patient with the Full Scope of Disorders Encompassed by "Psychotic Disorders"

Claims 4, 5, 11-12, and 15-21 are invalid as not enabled or adequately described because the '906 patent does not disclose how to treat the full scope of "psychotic disorders" using the dosing regimens claimed.

### 1. The Examiner And Prosecution History Agree That The Scope of Psychotic Disorders Are Not Enabled or Adequately Described

The '906 patent describes treatment of a psychiatric patient potentially having a laundry list of mental disorders. JTX-001 at Col. 11:45- Col. 14:4. Janssen initially attempted to claim treatment of the entire laundry list of mental disorders. JTX-002 at 54-67 (see original claims 12, 14, 15, 22, 24, 25, 31, 33, and 34). The Examiner issued a restriction requirement for the claims, stating that the claims were directed to "patentably distinct species of disorders" which have "mutually exclusive characteristics". *Id.* at 117-122. In response, Janssen elected the species of schizophrenia and schizoaffective diseases. *Id.* at 124-140. Claims related to treatment of psychosis and other psychotic disorders were withdrawn. The Examiner then rejected the claims under 35 U.S.C. 112 for failing to enable and describe treatment of the laundry list of mental disorders. *Id.* at 168-174. In response, Janssen amended the claims and represented that the "claims have been amended to claim the treatment of psychosis, schizophrenia and closely related disorders (e.g., schizoaffective disease, schizophreniform disorder, etc.)" *Id.* at 293-309.

The Examiner was not persuaded and issued a final rejection maintaining the same 35 U.S.C. section 112 rejections. *Id.* at 312-319. Janssen again amended the claims, requiring independent claims 1 and 16 to administer the dosing regimen to psychiatric patients in need of treatment of schizophrenia, schizoaffective disorder, and schizophreniform, while requiring independent claims 4 and 19 to administer the dosing regimen to psychiatric patients in need of treatment for psychotic disorder. *Id.* at 554-562. In so doing, Janssen reintroduced substance-induced psychotic disorders to the scope of the claims under the umbrella-term psychotic disorder.

The Examiner then allowed the claims, specifically, but did not discuss the written description rejection. *Id.* at 565-574.

### 2. A Person Skilled in the Art Would Not Be Able to Treat the Full Scope of "Psychotic Disorders" Without Undue Experimentation

There is no evidence to suggest that the claimed dosing regimen would be used to treat patients in need of treatment for other psychotic disorders, besides schizophrenia, particularly those with different etiologies. All of the examples listed in the '906 patent are directed toward the treatment of schizophrenia. JTX-001 at col 16:60-65 (Ex. 2). Col 18: 1-3 (Ex. 3), Col. 18- 68 (Table 4), Col.20-21(Table 5), Col. 23:35-Col. 31:50 (Ex. 8). There is no teaching in the '906 patent to enable a POSA to use the claimed dosing regimen on psychiatric patients having such disparate conditions as are disclosed and claimed. *Id.* Identification of specific embodiments included within the scope of the claim that are not enabled is often required by courts. *Amgen Inc. v. Sanofi*, 987 F. 3d 1080, 1086 (Fed. Cir. 2021) (citing *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020)).

The parties agreed that "psychotic disorder" means "a disorder characterized by psychotic symptoms, such as delusions, hallucinations, disorganized speech, or disorganized or catatonic behavior." D.I. 132, Ex. 1, ¶ 14. Consistent with the agreed claim construction DSM-IV states that psychotic disorder is an umbrella term that encompasses a broad range of disorders including, schizophrenia, schizoaffective disorder, schizophreniform, delusional disorder, brief psychotic disorder, shared psychotic disorder, psychotic disorder due to a general medical condition, substance-induced psychotic disorder, and psychotic disorder not otherwise specified. JTX-216 at 10. Dr. Kohler agreed that the agreed claim construction of psychotic disorder includes the psychotic disorders identified in the DSM-IV. Day 3 Tr. 64:9-12, 86:9-17.

The '906 patent is not enabling of treatment of psychiatric patients with delusional disorder, brief psychotic disorder, shared psychotic disorder, psychotic disorder due to a general medical condition, substance-induced psychotic disorder, and psychotic disorder not otherwise specified. These psychotic disorders are specific embodiments included within the scope of the claim that are not enabled. *Amgen*, 987 F. 3d at 1086.

### 3. Treatment of Psychotic Disorders Which Have Different Causes Than Schizophrenia Are Not Enabled

DSM-IV recognizes that there are separate, disparate causes for the various psychotic disorders. JTX-216 at 11. Dr. Kohler agrees. Day 3 Tr. 89:4-7. However, DSM-IV teaches that other psychotic disorders can be caused by substance use, medical conditions, and even the delusions of others. JTX-216 at 11. Dr. Kohler testified that very few patients with psychotic disorders, other than schizophrenia, schizoaffective disorder, and possibly schizophreniform, would be treated with Invega Sustenna. Day 3 Tr. 87:17-24, 88:1. He admitted that patients with psychotic disorders other than schizophrenia, schizoaffective disorder, and possibly schizophreniform are not the primary group of interest for long-acting injectables. *Id.* at 88:3-19.

Substance-induced psychotic disorder is defined as "the psychotic symptoms are judged to be a direct physiological consequence of a drug of abuse, a medication, or toxin exposure." JTX-216 at 11. Substance-induced psychotic disorder is a transient condition, not a lifelong genetic progressive disorder, like schizophrenia. Dr. Dizon explained that a POSA would not treat a patient diagnosed with substance induced psychotic disorder with Invega Sustenna or any other long-acting injectable antipsychotic medication. Day 1 Tr. 406:18-24, 407:1-24, 408:1-24, 409:1-24, 410:1-21. Dr. Kohler agreed with Dr. Dizon that he would not treat a patient with substance-induced psychotic disorder with a long-acting injectable antipsychotic medication without a co-diagnosis of schizophrenia. Day 3 Tr. 86:19-24, 87:1-16, 89:24, 90:1-5, 92:9-17. Dr. Kohler further

agreed that the '906 patent provides no teaching as to how a POSA could treat substance-induced psychotic disorders. *Id.* at 92:19-23; 93:3-7.

Psychotic disorder due to a general medical condition is defined as "the psychotic symptoms are judged to be a direct physiological consequence of a general medical condition." JTX-216 at 11. DSM-IV teaches that "treatment of the underlying medical condition often results in a resolution of the psychotic symptoms" in the patient. JTX-216 at 49. Dr. Dizon explains that a POSA would not treat a patient with a psychotic disorder due to a general medical condition with Invega Sustenna or any other long-acting injectable antipsychotic. Day 1 Tr. 410:22-24.

Shared psychotic disorder is a psychotic disorder "characterized by the presence of a delusion in an individual is influenced by someone else who has a longer-standing delusion with similar content." JTX-216 at 11. Accordingly, the '906 patent does not enable a POSA to use the claimed dosing regimens to treat patients with substance induced psychotic disorders due to general medical conditions or shared psychotic disorders.

### 4. Treatment of Transient Psychotic Disorders With a Long-Acting Injectable Are Not Enabled

Dr. Kohler agrees that a POSA would readily understand that it would only be appropriate to administer these sustained release formulations in the claimed dosing regimens to patients with enduring symptomatic presentations in need of treatment with a once-monthly long-acting injectable medication, such as patients with schizophrenia. Day 3 Tr. 94:24; 95:1-7. However, Dr. Kohler explicitly recognized there are other psychotic disorders that do not last long enough for a diagnosis of schizophrenia, including brief psychotic disorder, substance-induced psychotic disorder, and possibly psychotic disorder not otherwise specified. *Id.* at 95:20-24; 96:1-3. Treatment of these transient psychotic disorders with the claimed dosing regimens is not enabled by the '906 patent.

Brief psychotic disorder is a psychotic disorder "that lasts more than 1 day and remits by 1 month." JTX-216 at 11. As explained by Dr. Dizon, a POSA would understand that psychiatric patients with psychotic disorders should not be treated with a long-acting injectable antipsychotic such as paliperidone palmitate if the condition lasts about a month or less. Day 1 Tr. 455:21-24, 256:1-4. Beyond etiological considerations, the '906 patent does not enable a POSA to use the claimed dosing regimens to treat patients with substance-induced psychotic disorders due to the potential short time periods of intoxication or withdrawal associated with substance use.

Dr. Kohler further agrees that, under the DSM-IV, you need a full six months to diagnose a patient with schizophrenia. *Id.* at 101:3-14. Dr. Kohler does not diagnose a patient with schizophrenia on the first day of treatment with no prior medical history because such a cross-sectional diagnosis may not hold true. *Id.* at 100:22-24; 101:1-2. Dr. Dizon agrees. Day 1 Tr. 398:13-19. Dr. Dizon explains that a POSA has to wait 6 months to see if the patient will get better "before branding them with an illness that they will carry for the rest of their lives." *Id.* at 398:20-24; 399:1-5. Dr. Dizon further explains that a POSA would not treat such a patient, never previously diagnosed with schizophrenia, with a long-acting injectable without a full diagnosis of schizophrenia. *Id.* at 396:18-24, 397:1-4. As Dr. Dizon concludes, "[t]hat would be unethical." *Id.* at 396:24. The '906 patent does not enable a POSA to use the claimed dosing regimens to treat patients with schizophreniform.

A psychotic disorder not otherwise specified would not be treated with Invega Sustenna or any other long-acting injectable antipsychotic medication until the POSA knows what is causing the psychosis. *Id.* at 411:13-24; 412:1. Dr. Kohler agrees that a POSA does not know if a patient has, for example, brief psychotic disorder or schizophrenia from simply meeting with them once – due to the seriousness of such a diagnosis of schizophrenia, it requires longitudinal observation

and treatment. Day 3 Tr. 65:13-17. Accordingly, the '906 patent does not enable a POSA to use the claimed dosing regimen to treat patients with brief psychotic disorder, substance induced psychotic disorder, or psychotic disorder not otherwise specified before a POSA knows what is causing the psychosis. As Dr. Dizon recognizes, the '906 patent does not teach nor disclose how to treat patients with psychotic disorder, using the claimed dosing regimen. Day 1 Tr. 414:10-12. Claims 1-21 are thus invalid for lack of enablement for failure to enable treatment of all the psychotic disorders falling within the scope of claims 4, 5, 11-12, and 15-21.

> **5.    The '906 Patent Failes to Adequately Demonstrate the Inventors Possessed a Dosing Regimen for Treating the Full Scope of Psychotic Disorders Claimed**

Claims 4, 5, 11-12, and 15-21 are invalid for lack of written description for failure to describe treatment of all different "psychotic disorders" other than schizophrenia. The DSM-IV recognizes that there are separate, disparate causes for the various psychotic disorders. JTX-216 at 11. Dr. Kohler agrees that the DSM-IV recognizes that the various psychotic disorders have different etiologies or causes. Day 3 Tr. 89:4-7. As implicitly recognized by the Examiner, possession of the treatment of schizophrenia is not tantamount to possession of treatment all psychotic disorders. *Ferring*, 2020 U.S. Dist. Lexis at * 117; *FWP IP ApS v. Biogen MA., Inc.*, 749 F. App'x 969, 975-976 (Fed. Cir. 2018) (holding the claims invalid for lack of written description where the inventors "had not yet firmly concluded that fumarates at a particular daily dosage were in fact effective for treating the entire list of enumerated conditions, which included MS, particularly in light of the disparate pathophysiologies of the listed diseases"). As Dr. Dizon recognizes, the inventors did not know how to treat all the psychotic disorders falling within the scope of the term. Day 1 Tr. 414:10-12. Claims 1-5, 7-12, and 14-21 are thus invalid for lack of written description for failure to describe treatment of all different psychotic disorders other than schizophrenia.

VI.   **CONCLUSION**

For the foregoing reasons, Tolmar has proven by clear and convincing evidence that claims 1-21 of the '906 patent are invalid as obvious and failing to satisfy the written description and enablement requirement. Accordingly, Tolmar respectfully requests the Court enter judgment invalidating claims 1-21 of the '906 patent.

Respectfully submitted,

Dated:                          By: */s/ Adam W. Poff*_____
                                Adam W. Poff (SBN 3990)
                                Pilar G. Kraman (SBN 5199)
                                **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
                                Rodney Square
                                1000 North King Street
                                Wilmington, Delaware 19801
                                Phone: (302) 571-6600
                                APoff@YCST.com
                                PKraman@YCST.com

                                Kevin P. Shortsle
                                David C. Van Dyke
                                R. Saleha Mohamedulla
                                Daniel A. Balavitch
                                Madison A. Scaggs
                                **HOWARD & HOWARD ATTORNEYS PLLC**
                                200 South Michigan Avenue, Suite 1100
                                Chicago, Illinois 60604
                                (312) 456-3682 | Fax: (312) 939-5617
                                KShortsle@HowardandHoward.com

                                ***Attorneys for Defendant/Counterclaim Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 21, 2023, a copy of the foregoing

document was served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jack B. Blumenfeld
Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT
 &TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

Barbara L. Mullin
Aron Fischer
Andrew D. Cohen
Meghan Larywon
Zhiqiang Liu
J. Jay Cho
Lachlan S. Campbell-Verduyn
Joyce L. Nadipuram
Anna Boltyanskiy
PATTERSON BELKNAP WEBB
 & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
bmullin@pbwt.com
afischer@pbwt.com
acohen@pbwt.com
mlarywon@pbwt.com
zliu@pbwt.com
jcho@pbwt.com
lcampbellverduyn@pbwt.com
jnadipuram@pbwt.com
aboltyanskiy@pbwt.com


YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
pkraman@ycst.com

*Attorneys for Defendant*